United States Bankruptcy Court
Southern District of Texas
FILED

FEB 0 7 2005

Michael N. Milby, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BEN FLOYD, TRUSTEE OF THE ESTATE OF SEVEN SEAS PETROLEUM, INC., | § § § § | Civil Action No. 03-5693 |
| Plaintiff, | § § | |
| v. | § § | |
| ROBERT A. HEFNER, III, ET AL., | § § | |
| Defendants. | § § | |

## TRUSTEE'S SECOND AMENDED ADVERSARY COMPLAINT

Pursuant to FED. R. CIV. P. 15(a), Ben B. Floyd, Chapter 11 Trustee ("Trustee" or "Plaintiff") for Seven Seas Petroleum, Inc. ("Seven Seas," "the Debtor," or "the Company" or "the Corporation"), files this Trustee's Second Amended Adversary Complaint and respectfully states:

### Parties

1. Ben Floyd is the Chapter 11 Trustee for Seven Seas Petroleum, Inc. Seven Seas is a Cayman Islands corporation. Ben Floyd is bringing this claim on behalf of the Debtor's estate and its creditors.

2. Robert Hefner ("Hefner") is a citizen of the State of Oklahoma. The Trustee is suing Hefner in his capacity as a former officer and director of the Debtor.

3. Randolph Devening ("Devening") is a citizen of the State of Oklahoma. The Trustee is suing Devening in his capacity as a former director of the Debtor.

4. Brian Egolf ("Egolf") is a citizen of the State of Oklahoma. The Trustee is suing Egolf in his capacity as a former director of the Debtor.

5.  Gary Fuller ("Fuller") is a citizen of the State of Oklahoma. The Trustee is suing Fuller in his capacity as a former director of the Debtor. The Trustee is also suing Fuller in his capacity as the Debtor's corporate counsel.

6.  Dr. James Schlesinger ("Schlesinger") is a citizen of the State of Virginia. The Trustee is suing Schlesinger in his capacity as a former director of the Debtor.

7.  Larry Ray ("Ray") is a citizen of the State of Oklahoma. The Trustee is suing Larry Ray in his capacity as a former director and officer of the Debtor.

8.  McAfee & Taft, P.C. ("M&T") is a citizen of the state of Oklahoma.

9.  Ramiilaj Limited Partnership ("Ramiilaj") is a citizen of the State of Oklahoma.

10.  Petroleum Properties Management Company ("Petroleum Properties") is a citizen of the State of Oklahoma.

11.  Fuller Family Investments Limited Partnership ("Fuller Family Investments") is a citizen of the State of Oklahoma.

12.  Jerry Warren ("Warren") is a citizen of the State of Oklahoma. The Trustee is suing Warren in his capacity as the Debtor's corporate counsel.

### Jurisdiction and Venue

13.  This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157, 1332, and 1334. This is a non-core proceeding. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) and §1391(b)(2).

### Factual Background

14.  Seven Seas is an oil and gas exploration company with properties in Colombia, South America. Hefner, Devening, Egolf, Fuller, Ray, and Schlesinger (collectively, the "Directors") were all directors of Seven Seas before its bankruptcy filing. Seven Seas' public

filings indicate that each of these defendants had substantial expertise in the oil and gas industry or as officers and directors of public entities. Hefner was the Debtor's CEO, its largest shareholder, and the chairman of the Debtor's board of directors. Through these positions and others, Hefner dominated and controlled the Debtor and the Debtor's board of directors. The Debtor's public filings also indicate that one of its board members (Gary Fuller) has substantial legal expertise in the oil and gas industry as well as in public finance. Fuller is also a senior partner/shareholder of the law firm of M&T. Jerry Warren is a partner/shareholder of M&T. M&T was the Debtor's corporate counsel from 1998 to the Petition date. The firm was intimately familiar with the Debtor's business operations and financial condition. M&T provided the Debtor with both legal and financial advice. Through M&T's relationship with Warren, Fuller, and its representation of the Debtor, M&T had access to highly confidential and sensitive information that was not available to the public and was generally not available to the Debtor's employees and in some instances, its management. Through its control of Fuller and Warren, its relationship with Fuller, past representation of the Debtor, and other means, M&T exerted substantial control over the Debtor and was an insider of the Debtor.

15.     Seven Seas was incorporated in February 1995 and at one time or another owned (or had the rights to explore and develop) properties in several countries around the world. At some point in time, however, the Company apparently decided to focus its operations on developing its Colombian properties. The Company's Colombian properties are known as the Guaduas Fields (the "Fields"). Before selling certain portions of the Fields in Bankruptcy Court, the Debtor had a 57.7% working interest in the Fields and its subsidiary, GHK Colombia, was the operator in charge of their exploration and development.

16. After losing several million dollars trying to develop the Fields before 1998, the Company concentrated its efforts on increasing its drilling in the proven areas of the Fields and building a pipeline to more efficiently deliver extracted oil. From the summer of 1998 to the spring of 2000, however, the Company continued to lose money and it became evident to the Directors and certain other insiders of the Company that Seven Seas would have to file bankruptcy by mid to late 2001 unless it obtained additional financing. Indeed, as early as August of 2000, the Company was aware that it would not be able to make its November 15, 2001 bond payment or meet certain of its other obligations.

17. The Company's insolvency, or questionable solvency, did not begin in August of 2000, however. The Company had nearly $100 million dollars in operating losses from 1998 through 1999 and the Company's 10-K for the year ending 1999 states that the Company has "substantial indebtedness and does not have enough revenue to pay its debts." Further, the Debtor's bonds were trading at a substantial discount to face value well before August of 2000. Despite the Debtor's perilous financial position, M&T, Warren, and Fuller did not advise the Debtor to file bankruptcy or to retain restructuring/bankruptcy counsel to investigate its bankruptcy options.

18. In light of the Company's precarious financial condition, the Directors began searching for additional financing to fund the Company's operations. Although certain parties in interest discouraged the Directors from entering into a secured financing facility, and other sources of financing had been (and were) available to the Debtor, the Directors began negotiating a $45 million secured facility (the "Facility" or the "Secured Facility") with Chesapeake Energy Corporation ("Chesapeake"). Under the terms of the Secured Facility, Chesapeake and a group of the Company's insiders would each loan the Debtor $22.5 million on a secured basis. The

Facility would be secured by substantially all of the assets of the Debtor. The group of insiders was headed by Hefner, the Company's CEO, and other members of the board of directors. Of the Debtor's seven board members, four board members stood to personally gain from the transaction and were interested parties.

19. As part of their rights under the Secured Facility, Chesapeake and the insiders would receive several thousand detachable warrants that, if exercised, would allow them to purchase up to 40% of the Company's common shares. (A letter to M&T more fully describing the Facility is attached as Exhibit "A".) The detachable warrants were considered crucial to the Secured Facility because they allowed Chesapeake and the insiders to increase their ownership interest in the Debtor if the Company's Escuela 2 well was successfully drilled. The Escuela 2 well was intended to exploit the deep reserves of the Fields and the Company believed it could be one of the most significant oil discoveries in the Western Hemisphere. Under the terms of the Facility, the Debtor was required to use funds from the Facility to drill the Escuela 2 well. From the Directors' perspective, the Secured Facility was a no-lose investment. If the Escuela 2 well was successfully drilled, the Directors could exercise their stock warrants and cash-in on the Company's soaring stock price. In the event that the Escuela 2 was not successful and the Company had to file bankruptcy, their investment would be protected by their secured position in the Debtor. From the perspective of the Company's unsecured creditors, however, the $45 million Secured Facility could not have been more risky. Not only did the Secured Facility prime their existing debt, but in order for the unsecured creditors to be repaid, the Company's Escuela 2 well had to be a success. In short, if the Escuela 2 was not a success, the Company's unsecured creditors would receive nothing (or next to nothing) in bankruptcy, which is exactly what happened.

20. In February of 2001, the Company announced that it had reached a tentative agreement with Chesapeake requiring Chesapeake and certain of the Company's insiders to fund the Secured Facility. Despite the disapproval of some of the Company's stockholders, the Company's board of directors considered a resolution that would authorize the Company to enter into the Secured Facility at the Directors' May 17, 2001 board meeting. Although the Company's Articles of Association strictly prohibited directors interested in a particular transaction from voting on its approval, *all* four directors who were interested in the Secured Facility voted in favor of approving the transaction. Of the Company's seven directors, only two directors that were not interested in the Secured Facility voted in favor of the transaction. Despite these obvious and glaring conflicts, M&T, Fuller, and Warren never advised the Debtor to create a special committee to consider the Secured Facility.

21. Before voting on the transaction, the Directors also considered the professional advice of two entities that were not disinterested. M&T (including Fuller and Warren) provided legal advice related to the Directors and the Secured Facility and stood to generate substantial legal fees if the Secured Facility was consummated. Also, as a condition to consummating the Secured Facility, M&T was required to render a legal opinion that approval of the Facility would not violate any laws, the Debtor's major contracts, or its internal corporate documents. CIBC was likewise retained to give a fairness opinion concerning the transaction and would receive a "success fee" or bonus if the transaction was approved by the Debtor's board of directors. At no time before, during, or after the May 17, 2001 board meeting, did M&T, Warren, or Fuller, inform the Directors and the Debtor of numerous conflicts of interest that affected their legal representation of the Debtor and its board members related to the Secured Facility. Nor did M&T, Fuller, or Warren obtain a waiver from all the interested parties. The conflicts implicated

by the legal advice of M&T, Warren, and Fuller, included, but were not limited to, conflicts arising among the Debtor and its board members.

22.     The Secured Facility was consummated in July 2001.[1]  At the time it was finalized, the Company was insolvent from a liquidity perspective.  In fact, in May 2001, the Company applied for (and obtained) an exemption from the American Stock Exchange ("AMEX") relieving it of its obligations to seek shareholder approval of the $45 million Secured Facility because the Company's cash position was so strained.  M&T, Warren, and Fuller represented the Company before the AMEX.  In its correspondence with the AMEX, the Company not only indicated that it could not pay its debts as they came due, but claimed it would have a cash "deficiency" as early as July 2001.  Arthur Andersen, which previously served as the Company's auditors, also refused to give the Debtor a going concern opinion unless it obtained additional financing.

23.     The Company was also insolvent from a balance sheet perspective.  In May 2001, the Company's bonds were trading at 37% of face value.  The minutes from the March 17, 2001 board meeting also indicate that CIBC informed the Debtor's board that the Company had no equity value and was insolvent. Accordingly, M&T, Fuller, Warren, and the Directors knew or should have known the Debtor was insolvent. Despite the Company's perilous financial condition, the Directors did *not* consider the consequences of the $45 million Secured Facility to the Company's unsecured creditors.  Nor did they consider alternative transactions or other courses of action that would have been available (or were available) to the Debtor that would *not* have unduly risked or jeopardized the recovery of those creditors.  Indeed, unlike resolutions approved immediately preceding the Debtor's bankruptcy, the board of directors' resolution

---

[1]     Certain Directors participated in the transaction through their ownership interest in Ramiilaj, Fuller Family Investments, and Petroleum Properties Management.

approving the $45 million Secured Facility makes no mention of the Company's creditors or how the Facility would affect their interests. Further, despite the fact that M&T, Warren, and Fuller knew that consummation of the Secured Facility would result in a violation of the Directors' duties to the Company, its creditors, and/or its shareholders, they did not attempt to inform the Corporation of these facts. Instead, they took steps to facilitate the Directors' breach and the approval of the Facility. In particular, M&T rendered a legal opinion that the Secured Facility would not violate any laws, the Debtor's major contracts, and the Debtor's internal corporate governance documents when M&T, Warren, and Fuller knew or should have know that approval of the Facility most certainly would result in a violation of the Directors' fiduciary duties, other laws, and the Debtor's Articles of Association.

24. With the Secured Facility in place and its pipeline completed, the Company focused its efforts on developing the proven reserves in the shallow portion of the Fields and drilling its Escuela 2 well to exploit the deep portion of the Fields. Things did not go as planned, however. Under the terms of the Secured Facility, the Company budgeted $15 million of the $45 million secured funding to drill the Escuela 2 well. The Company, however, actually spent over $25 million drilling the Escuela 2 well to a depth of almost 20,000 feet and never hit oil.

25. The shallow portion of the Fields did not fare much better than the Escuela 2. Although the wells did produce oil, the oil contained a high percentage of gas for which there was no market in Colombia. As a result, the Company's marketable production declined and its operations continued to lose money. Finally, because of the high content of gas contained in the Company's oil production and a series of failed development wells in the shallow Fields, Ryder Scott, the Company's reserve engineers, reduced its previous reserve estimates by 66%. As a result, the Company's bonds plummeted even further below face value and by November 2002,

the Company announced it would likely cease operations in late 2002 or early 2003. The Company also implemented a wind-down strategy at the request of Chesapeake which included a plan to sell the Company's rights to the shallow portion of the Fields to Sociedad International Petrolera S.A. ("Sipetrol").

26. Faced with the prospect of recovering nothing for their claims, a group of Senior Noteholders (the "Petitioning Creditors") filed an involuntary Chapter 7 petition against Seven Seas on December 20, 2002. After initially resisting the involuntary petition, the Company filed its own petition under Chapter 11 of the Bankruptcy Code and moved the Court to appoint Ben Floyd as Chapter 11 Trustee (the "Trustee").

27. On August 4, 2003, the Debtor confirmed its Amended Plan of Reorganization. Under the Plan, the non-contingent recovery of the Company's unsecured creditors was less than one cent on the dollar.

## Claims Against The Directors

### *Breach of Duty of Care*
**(Count I)**

28. The Trustee re-alleges the allegations in paragraphs 1 through 27 as if set forth in full.

29. As directors of Seven Seas, the Directors owed the Company a duty to exercise reasonable care, skill, and diligence in fulfilling their responsibilities which required them to exercise the care and skill reasonably expected from persons having their knowledge, expertise, and experience in the oil and gas exploration industry. Because the Company was either insolvent or of doubtful solvency for the periods described above, the interests of the Company coincided with the interest of its creditors and Directors were therefore bound to act in the best interest of those creditors.

30. Despite the Company's perilous financial condition, lack of solvency or doubtful solvency, the Directors did *not* properly consider the consequences of the $45 million Secured Facility to the Company or its creditors, did not properly inform themselves of all relevant information concerning the $45 million Secured Facility, and did not properly follow the Company's own internal procedures for authorizing such a transaction. Nor did they consider or undertake alternative transactions or other courses of action that would have been available (or were available) to the Debtor that would *not* have unduly risked or jeopardized the recovery of the Debtor's existing creditors or the financial viability of the Company itself. The Directors also failed to properly inform themselves or properly consider the Debtor's financial condition in the months before the $45 million Secured Facility was consummated or when alternative transactions or courses of action presented themselves to the Debtor. The Directors' negligence caused the Company and its creditors to suffer loss and damages of more than $100 million.

### *Breach of Duty of Care*
### (Count II)

31. The Trustee re-alleges the allegations in paragraphs 1 through 30 as if set forth in full.

32. From 1998 until the Petition Date, the Directors of Seven Seas owed the Company a duty to exercise reasonable care, skill, and diligence in fulfilling their responsibilities which required them to exercise the care and skill reasonably expected from persons having their knowledge, expertise, and experience in the oil and gas exploration industry. In undertaking their duties and implementing their business plan, the Directors undertook several courses of action that were either negligent, grossly negligent, or reckless. The Directors' negligence, gross negligence, or recklessness caused the Company loss and damages of over $100 million.

*Breach of Fiduciary Duty*
**(Count III)**

33. The Trustee re-alleges the allegations in paragraphs 1 through 32 as if set forth in full.

34. The Directors owed the Company a fiduciary duty. The Directors had a duty to act honestly and in the best interest of the Company; to avoid conflicts between the Company's interest and their personal interest; to exercise their power for a proper purpose; and not to fetter their discretion. Because the Company was either insolvent or of doubtful solvency at all relevant times described above, the interest of the Company coincided with the interest of the creditors and the Directors were therefore bound to act in the best interest of the creditors.

35. By undertaking the actions described above, not properly informing themselves of the consequences of the $45 million Secured Facility and entering into the Secured Facility when other courses of action or transactions had been (or were) available to the Debtor, the Directors failed to act in the best interest of the Company and its creditors, failed to exercise their power for a proper purpose, placed their own interests ahead of that of the Company and its creditors, and breached their fiduciary duties. The Directors' conduct caused the Company and its creditors loss and damages of more than $100 million. The Directors' conduct was also intentional, willful, and malicious thereby warranting an award of exemplary damages.

**Claims Against Ramiilaj, Fuller Family Investments, and Petroleum Properties Management**

*Conspiracy, Tortious Interference and/or Aiding and Abetting Breach of Fiduciary Duty*
**(Count I)**

36. The Trustee re-alleges the allegations in paragraphs 1 through 35 as if set forth in full. At all relevant times, Ramiilaj, Fuller Family Investments, and Petroleum Properties Management were aware of the Directors' duty of care and fiduciary duties. By providing the

Directors with funds to consummate the Secured Facility and other actions, these entities participated in, interfered with, or aided and abetted the Directors in their breach of duty of care and in their breach of fiduciary duties owed to the Debtor. These entities knowingly and dishonestly assisted the Directors' breach of fiduciary duty by providing them with the funds to consummate the Secured Facility. The conduct of these entities caused the Debtor loss and damages in excess of $75 thousand.

### Claims Against M&T, Warren, and Fuller in His Capacity as a Lawyer

*Conspiracy to Breach The Directors' Duties*
**(Count I)**

37. The Trustee re-alleges the allegations in paragraphs 1 through 36 as if set forth in full.

38. As reflected above, M&T, Fuller, Warren, and the Directors were aware the Directors owed fiduciary duties to the Debtor including, but not limited to, the duties of care and loyalty. M&T, Fuller, Warren, and the Directors also knew that the Directors' actions described above constituted a breach of the Directors' fiduciary duties to the Debtor. Before the Directors undertook such wrongful acts, the Directors made an agreement to conspire with M&T, Fuller, and Warren to take actions that the Directors and M&T, Fuller, and Warren knew would result in the Directors' breach of the Directors' fiduciary duties to the Company. By committing the acts described above, M&T, Fuller, and Warren took actions in furtherance of their conspiracy and/or agreement with the Directors and conspired with the Directors to breach the Directors' fiduciary duties to the Debtor. As a direct and proximate result of the conduct of M&T, Fuller, and Warren, the Debtor, its creditors, and/or its shareholders suffered loss and damages of more than $100 million. The conduct of M&T, Warren, and Fuller was also intentional, willful, and malicious thereby warranting an award of exemplary damages.

### *Aiding and Abetting The Directors' Breach of Duties*
### (Count II)

39. The Trustee re-alleges the allegations in paragraphs 1 through 38 as if set forth in full.

40. As reflected above, M&T, Fuller, and Warren were aware the Directors owed fiduciary duties to the Debtor including, but not limited to, the duties of care and loyalty. They also knew the Directors' conduct described above constituted a breach of those duties. By assisting the Directors in obtaining an exemption from their requirement to seek shareholder approval for the Secured Facility, providing an opinion letter that M&T, Fuller, and Warren knew contained incorrect statements and false representations, and failing to inform the Debtor that the Directors' actions were a breach of the Directors' fiduciary duties, and participating in the other actions described above, M&T, Warren, and Fuller, aided and abetted, encouraged, and assisted the Directors in the Directors' breach of fiduciary duties owed to the Debtor. As a direct and proximate result of the conduct of M&T, Fuller, and Warren, the Debtor, its creditors, and/or its shareholders suffered loss and damages of more than $100 million. The conduct of M&T, Warren, and Fuller was also intentional, willful, and malicious thereby warranting an award of exemplary damages.

### *Intentional Breach of Fiduciary Duty*
### (Count III)

41. The Trustee re-alleges the allegations in paragraphs 1 through 40 as if set forth in full.

42. As the Debtor's corporate counsel, M&T, Fuller, and Warren had fiduciary duties to the Debtor. Those duties included, but were not limited to, the duties of care and loyalty, the duty to act in good faith, perfect candor, openness and honesty, the duty to act without

concealment and deception, and the duty to act in the best interests of the Debtor and not their own. M&T, Fuller, and Warren were also required to subordinate their interests to those of the Debtor and refrain from making misrepresentations to the Debtor, from self-dealing, and from engaging in conflicts of interest when giving legal advice to the Debtor or when representing the Debtor. Because the Company was either insolvent or of doubtful solvency for the periods described above, the interests of the Company coincided with the interest of its creditors and M&T, Fuller, and Warren were therefore bound to act in the best interest of those creditors. In the event that the Debtor was not insolvent or of doubtful solvency, the interests of the Company coincided with the interests of its shareholders and M&T, Fuller, and Warren were therefore bound to act in the best interests of those shareholders. By failing to fully inform the Debtor of numerous conflicts of interests, providing legal representation and advice to the Debtor while such conflicts existed, failing to withdraw from representing the Debtor and the Directors when certain conflicts of interest likely would have or did impair their judgment, and by putting the interests of M&T and Fuller ahead of those of the Debtor as well committing other acts, M&T, Fuller, and Warren intentionally breached their duty of loyalty to the Debtor as well as the other fiduciary duties described above. As a direct and proximate result of this conduct, the Debtor, its creditors, and/or its shareholders suffered loss and damages of more than $100 million. The conduct of M&T, Warren, and Fuller was also intentional, willful, and malicious thereby warranting an award of exemplary damages.

### *Negligent Breach of Fiduciary Duty* (Count IV)

43. The Trustee re-alleges the allegations in paragraphs 1 through 42 as if set forth in full.

44. In the alternative, M&T, Fuller and Warren, negligently breached their fiduciary to the Debtor. As the Debtor's corporate counsel, M&T, Fuller, and Warren had fiduciary duties to the Debtor. Those duties included, but were not limited to, the duties of care and loyalty, the duty to act in good faith, perfect candor, openness and honesty, the duty to act without concealment and deception, and the duty to act in the best interests of the Debtor and not their own. M&T, Fuller, and Warren were also required to subordinate their interests to those of the Debtor and refrain from making misrepresentations to the Debtor, from self-dealing, and from engaging in conflicts of interest when giving legal advice to the Debtor or when representing the Debtor. Because the Company was either insolvent or of doubtful solvency for the periods described above, the interests of the Company coincided with the interest of its creditors and M&T, Fuller, and Warren were therefore bound to act in the best interest of those creditors. In the event that the Debtor was not insolvent or of doubtful solvency, the interests of the Company coincided with the interests of its shareholders and M&T, Fuller, and Warren were therefore bound to act in the best interests of those shareholders. By failing to fully inform the Debtor of numerous conflicts of interests, providing legal representation and advice to the Debtor while such conflicts existed, failing to withdraw from representing the Debtor and the Directors when certain conflicts of interest likely would have or did impair their judgment, and by putting the interests of M&T and Fuller ahead of those of the Debtor as well committing other acts, M&T, Fuller, and Warren negligently breached their duty care to the Debtor as well as the other fiduciary duties described above. As a direct and proximate result of this conduct, the Debtor, its creditors, and/or its shareholders suffered loss and damages of more than $100 million. The conduct of M&T, Fuller, and Warren was carried out with such indifference, recklessness, and conscious disregard for the rights of the Debtor that it warrants an award of exemplary damages.

*Negligence/Malpractice*
**(Count V)**

45. The Trustee re-alleges the allegations in paragraphs 1 through 44 as if set forth in full.

46. In the alternative, M&T, Fuller, and Warren committed negligence. M&T, Fuller and Warren had a duty to provide advice to (and represent the Debtor) with the ordinary skill, care, and diligence commonly possessed by a prudent and skilled attorney. Because the Company was either insolvent or of doubtful solvency for the periods described above, the interests of the Company coincided with the interests of its creditors and M&T, Fuller, and Warren were therefore bound to act in the best interest of those creditors. In the event that the Debtor was not insolvent or of doubtful solvency, the interests of the Company coincided with the interests of its shareholders and M&T, Fuller, and Warren were therefore bound to act in the best interests of those shareholders. By failing to fully inform the Debtor that it should create an independent committee to consider the $45 million Secured Facility, failing to inform the Debtor of numerous conflicts of interests that arose from their legal representation of the Debtor, providing legal representation and advice to the Debtor while such conflicts existed, failing to withdraw from representing the Debtor and the Directors when certain conflicts of interest likely would have or did impair their judgment, failing to advise the Debtor that consummating the $45 million Secured Facility would violate the Directors' fiduciary duties, failing to advise the Debtor to retain bankruptcy/restructuring counsel well before the Secured Facility was consummated and committing as well as other acts, M&T, Fuller, and Warren committed negligence/malpractice. As a direct and proximate result of this conduct, the Debtor, its creditors, and/or its shareholders suffered loss and damages of more than $100 million. The conduct of M&T, Fuller, and Warren was carried out with such indifference, recklessness, and

conscious disregard for the rights of the Debtor that it amounted to gross negligence and warrants an award of exemplary damages.

### *Vicarious Liability*

47. The actions of Warren and Fuller were undertaken during the scope of their employment and partnership with M&T. M&T was aware of, consented to, and authorized their conduct. Accordingly, M&T is vicariously liable for their conduct and damages caused by them.

### **Jury Demand**

The Trustee requests that his claims be tried before a jury.

### **Prayer for Relief**

Based on the foregoing, the Trustee requests that the Court enter an order awarding the Trustee (i) actual, consequential and exemplary damages against the Defendants, and (ii) all such other relief that the Trustee is entitled to under law and equity.

Dated: February 7, 2004.

Respectfully submitted,

By: *James Donnell with permission Jon W. Daly*
James Donnell
Southern District I.D. No. 7792
Texas State Bar No. 05981300
600 Travis Street, Suite 4200
Houston, Texas 77002-3090
(713) 220-4251 (Telephone)
(713) 238-4285 (Facsimile)

**Attorney-in-Charge of the Trustee's Claims against Robert Hefner, Randolph Devening, Brian Eglof, Gary Fuller (as a Director), James Schlesinger and Larry Ray**

OF COUNSEL:

ANDREWS KURTH LLP
Kent W. Robinson, State Bar No. 17098600
Gary C. Miller, State Bar No. 14071900
Paul D. Moak, State Bar No. 00794316
Omar S. Saleh, State Bar No. 00797786
600 Travis Street, Suite 4200
Houston, Texas 77002-3090
(713) 220-4200 (Telephone)
(713) 220-4285 (Facsimile)

SPECIAL COUNSEL TO THE TRUSTEE

-AND-

Respectfully submitted,

By: *Kenneth J. Wall with permission Jon W. Daly*
Kenneth S. Wall, State Bar. No. 20756790
LAW OFFICES OF J. ROBERT DAVIS, LLP
440 Louisiana, Suite 1930
Houston, Texas 77002
(713) 425-5255 (Telephone)
(713) 425-5355 (Facsimile)

**Attorney In Charge Of The Trustee's Claims Against McAfee & Taft, Jerry Warren and Gary Fuller (as an Attorney)**

- 18 -

## CERTIFICATE OF SERVICE

I herby certify that, pursuant to the agreement between the counsel for Seven Seas and counsel for the Defendants, a true and correct copy of the foregoing *Trustee's Second Amended Adversary Complaint*, along with a corresponding Summons, was served on the parties listed below as indicated below on this the 7th day of February, 2005.

**Via U.S. Mail:**
J. Clifford Gunter, III
Ileana M. Blanco
Bracewell & Patterson, L.L.P.
South Tower Pennzoil Place
711 Louisiana Street, Suite 2900
Houston, Texas 77002-2781
*Counsel for Existing Defendants and Larry Ray*

**Via FedEx Overnight and Email:**
George W. Dahnke
Abowitz, Timberlake & Dahnke, P.C.
The Hightower Building, Tenth Floor
105 North Hudson
Oklahoma City, Oklahoma 73102
*Counsel for Gary Fuller, McAfee & Taft, P.C. and Jerry Warren*

_____
Jon W. Daly