IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Ben Floyd | } | |
| Chapter 11 Trustee of the Estate of Seven | } | |
| Seas Petroleum Inc., | } | |
| | } | |
| Plaintiff | } | |
| | } | |
| v. | } | CIVIL ACTION NO. H-03-5693 |
| | } | |
| | } | |
| Robert A Hefner, III, *et al.,* | } | |
| | } | |
| Defendant | } | |

**MEMORANDUM AND ORDER**

Before the court are cross motions for summary judgment and numerous evidentiary motions. Ben B. Floyd as the Chapter 11 Trustee for Seven Seas Petroleum, Inc. has moved for summary judgment to render the business judgment rule defense inapplicable to the Defendants' case and to find, conclusively, that Seven Seas was insolvent or in the "zone of insolvency." Doc. 126. The Trustee's motion is DENIED without prejudice as not helpful to resolving any issues facing this court at this time.

The Defendants, Jerry Warren, Gary Fuller, Robert A Hefner III, Dr. James Schlesinger, Randolph Devening, Brian Egolf, Larry Ray, Petroleum Properties Management Company, Fuller Family Investments Limited Partnership, Ramiilaj Limited Partnership, McAfee & Taft PC, have filed an opposing motion for summary judgment on a number of grounds. Doc. 153. The Defendants' motion is GRANTED IN PART with leave to present any argument not addressed by this order because the briefing before the court does not sufficiently clarify the evidentiary record to resolve all possible theories of recovery against the Defendants. Doc. 153.

Because the reasoning in this order affects many aspects of the case and evidentiary motions depend, in part, on the issues extant before the court, all pending evidentiary and procedural motions are DENIED WITHOUT PREJUDICE. Doc. 138, Doc. 142, Doc. 144, Doc. 145, Doc. 146, Doc. 148, Doc. 149, Doc.158, Doc. 159, Doc. 160, Doc. 172, Doc. 238, Doc. 244., and Doc. 251.

## I.   PARTIES AND ALLEGATIONS

Ben B. Floyd is the Chapter 11 Trustee ("Trustee" or "Plaintiff") for Seven Seas Petroleum, Inc. ("Seven Seas" or the "Company"). Seven Seas is a corporation that was incorporated under the law of British Columbia, Canada on February 3, 1995, continued as a corporation incorporated under the law of the Yukon Territory, Canada in August 1996, and finally, in March 2001, "as a Cayman Islands exempted company limited by shares." Doc. 153, Exh. 72 at 2. At all relevant times, it did business from Houston, Texas.

The Trustee sued the former directors of Seven Seas ("the Directors"), several financial entities, and two of the Company's lawyers, Gary Fuller and Jerry Warren, as well as their employer, McAfee & Taft, P.C. (collectively "the Lawyers"). The Trustee alleges three causes of action against the Directors, a single cause of action against the Entities, and five causes of action against the Lawyers. Second Amended Adversarial Complaint, Doc. 52.

The Directors sued by the Trustee include Robert Hefner (Hefner), a director and the CEO of Seven Seas; Larry Ray (Ray), a director and the President of Seven Seas; Brian Egolf (Egolf), a director; Gary Fuller (Fuller), a director, Hefner's personal lawyer, and a partner at McAfee & Taft; and two other directors, James Schlesinger and Randolph Devening.

The first cause of action against the Directors alleges that they breached their duty of care by failing to "properly consider the consequences of the $45 million Secured Facility to the Company or its creditors" and by failing to "consider or undertake alternative transactions …

that would have been available … to the Debtor that would *not* have unduly risked or jeopardized the recovery of the Debtor's existing creditors or the financial viability of the Company itself." Doc. 52 at 10, ¶30 (emphasis in original). The second cause of action against the Directors also alleges beaches of the duty of care, and, more specifically, that between, 1998 and the date of filing the petition, "the Directors undertook several courses of action that were either negligent, grossly negligent, or reckless." Id. at 10, ¶32. The Second Amended Complaint does not identify which courses of action support the Trustee's characterization of the Directors' behavior. The third cause of action alleges that the Directors breached their duty of loyalty when they failed to "properly inform themselves of the consequences of the $45 million Secured Facility and enter[ed] into the Secured Facility when other courses of action [were]… available … [Thus,] the Directors failed to act in the best interest of the Company and its creditors, failed to exercise their power for a proper purpose, placed their own interests ahead of that of the Company and its creditors, and breached their fiduciary duties." Id. at 11, ¶35. From the pleadings, memoranda of law, and record, it appears that the Trustee complains that: (1) the Directors' decision to loan their own money to the Company in a transaction that favored them over another set of creditors violated the Directors' duty of loyalty; (2) the decision to drill a particular well violated the Directors' duty of care; (3) the decision to build a pipeline violated the Directors' duty of care because it served no business purpose and violated the Directors' duty of loyalty because it served no purpose other than to distract the SEC from the Directors' misrepresentations.

The Trustee alleges that the financial entities aided and abetted the first and third causes of action against the Directors. Id. at 11-12, ¶36. Each entity is connected to the Directors to some degree. Ramiiilaj Limited Partnership is a Texas limited partnership directly controlled by Hefner, one of its limited partners. Petroleum Properties Management Co., LLC is an investment

vehicle wholly owned by Egolf Family Limited Partnership, a partnership in which Egolf held a 40% interest. Fuller Family Investments is a Limited Partnership associated with Fuller.

In his first two counts against the Lawyers, the Trustee alleged that the Lawyers conspired with the Directors to breach the duties that the Directors owed to the Company's creditors and aided and abetted those breaches. Id. at 12-13, ¶¶37-40. According to the next two counts, the Lawyers allegedly breached their fiduciary duties to the Company. Id. at 13-15, ¶¶41-44. Finally, the Lawyers allegedly committed malpractice. Id. at 16-17, ¶¶45-47.

## II. BACKGROUND

Hefner, with the assistance of Fuller, assumed control of Seven Seas in May of 1997. Hefner installed Fuller, Egolf, and Ray as directors and exercised a significant amount of control over Seven Seas. In March 1998, the new board issued its first annual report, describing the activities of Seven Seas in 1997. Doc. 153, Exh. 66. In it, Hefner described plans to complete a pipeline by 2000 and the completion of "three additional highly prolific wells" in an oil field in Colombia. Id. at 1.

Seven Seas operated this "Shallow Field" pursuant to contracts with Ecopetrol, the agency of the Colombian government responsible for oil exploration. Doc. 153, Exh. 67 and Exh. 70 at 3. Hefner also projected that, in 1998, Seven Seas would continue to explore the Shallow Field and would commence drilling "a deep exploratory well that will test the multiple additional productive reservoirs below" the Shallow Field. Doc. 153, Exh. 66 at 1.

To fund its operations and exploration, Seven Seas issued $110 million worth of unsecured promissory notes ("Unsecured Notes") to large, sophisticated investors. Offering Memorandum, Doc. 153, Exh. 65. The bonds were issued under the terms of an "Indenture" that expressly allowed Seven Seas to borrow more money in the future and to secure those future loans with the Company's assets. Doc. 153, Exh. 66 at 53-54 and 66A. Seven Seas could, under

certain conditions, borrow additional money from "affiliated parties," such as its own directors. Id., Exh. 66 at 58. Finally, the Indenture absolved the Directors of liability relating to the creation of the Indenture. Id. at 88.[1]

After receiving funding for its operations exploration, Seven Seas encountered delays. According to the 10-K that it filed for 1998, Seven Seas experienced "mechanical difficulties of both drilling and completion operations," longer than anticipated production testing," extensive "negotiations with Ecopetrol," a "need to replace the entire senior management of the Company's Colombian subsidiary" and fire its consultants, and "a decision by the Colombian Supreme Court that ... result[ed] in the promulgation of new environmental laws and standards." Doc. 153, Exh. 67 at 22.

In addition to these delays, the Shallow Field began producing less oil than anticipated in early 1999. Bryan Sanchez, a vice president of investor relations and corporate development, testified that "five or six wells … were amazing producers," but that "three to five wells … were disappointing." Doc. 207, Exh. 23 at 113:18-22. He also testified that, in February 2000, Seven Seas was "unable to proceed" with its plans and that it "couldn't implement [its] plan to affect [its] cash flow" because Ecopetrol placed "restrictions on development wells" and because it did not "decide whether or not to participate in the project," it was "not in the … private company's interests to proceed with development operations prior to that decision." Doc. 207, Exh. 23 at 117:2-118:3. Similarly, Hefner's handwritten notes from January 20, 1999 record that the "Colombian web site states 7 Seas … production tests not going well." Doc. 207, Exh. 60. Thus, the notes continued "just as LAR and I had predicted our commerciality strategy has been

---

1. The Indenture also stated that it would be governed by the laws of New York. Indenture, Doc. 153, Exh. 66 at 88. However, the parties have not argued that the choice of law provision in the Indenture has any effect on the issues before the court.

disastrous to 7 Seas. The [Memorandum of Understanding] … committed us to more expenditures … which could only have downside. … all of the above putting a financial strain on the company at the time we are in survival mode and our upside is our ability to drill the deep." Id.

In its 10-K filed for 1998, Seven Seas described a new strategy or "Pay As You Go Plan" that it "developed… to use existing cash and cash generated from operations to … develop the" Shallow Field. Doc. 153, Exh. 160 at 4. The strategy would "take advantage of the expected low equipment and construction costs associated with a currently depressed oil industry[.]" Id. Seven Seas planned to develop the Shallow Field in increments, using trucks and then a pipeline to transport oil. Id. Eventually, it would develop more and more wells only as existing production facilities provided the money to do so. Id. at 5.

However, the oil reserves in the Shallow Field may not have supported the plan that Seven Seas sought to implement. On April 15, 1998, an employee of Seven Seas, Helen Panero, met with officials of Ectopetrol. The officials expressed concerns about the plans of Seven Seas and its optimistic beliefs about the amount of oil in the Shallow Field.  They also suggested that approval for any of Seven Seas' plans could take several years. Doc. 207, Exh. 84 at 1-2.

Rather than pursue the Pay As You Go Plan, the Directors adopted a resolution to pursue an incredibly risky project called "the Deep Well" and to build a pipeline in September, 1999. Doc. 153, Exh. 2 at 2, ¶7. In making this change, the board adopted "Alternative 4" of the seven alternative strategic plans that Hefner had suggested during a board meeting on September 17, 1999. Id.  A motion was "[m]ade and seconded that the Company pursue [a scenario] presented by Mr. Hefner which [was] a combination of completing the [Memorandum of Understanding] obligation, along with downsizing and a refocus of efforts and resources towards exploration." Doc. 207, Exh. 6, at 4,¶8. The minutes reflected Hefner's belief that the "record should note that

it was the board's unanimous decision to change the company strategy to exploration from production and that financing efforts should begin to implement this strategy." Id.

After Seven Seas changed its strategy, the SEC questioned the amount of oil that Seven Seas believed it could bring to market. Doc. 207, Exh. 30. The SEC's letter dated February 7, 2000 asked Seven Seas to explain its estimated profits and why it had not completed a pipeline. Id. at 12-14. In particular, the SEC expressed concern that, in early 1998, Seven Seas had disclosed a plan to build a pipeline quickly, but, by the end of 1998, planned to build that pipeline no sooner than 2005. Id. at 13, ¶89. According to the SEC, the pipeline appeared critical to the ability of Seven Seas to transport a sufficient amount of oil to justify statements about its oil reserves that Seven Seas made in its SEC filings. Id.

After the SEC began asking questions, Egolf urged Hefner to explore for more oil. In a memorandum dated February 13, 2000, Egolf criticized the Company's management for lacking direction. Doc. 207, Exh. 31. He believed that Seven Seas should pursue "the company's greatest potential asset[,] the deep" well. Id. at 1. According to Egolf, no other course of action held any prospect of success because as he saw it, Seven Seas had "12 months before it's over." Id. at 2. Selling the Company was not feasible and "[t]he only resolution to the company's problem is to FIND MORE OIL!!" Id. Even schedules for "cost reduction account for 10% of our overhead" was "too little, too late," like "the Captain and crew of the Titanic sitting around discussing how to design a better navigation system after they've already hit the iceberg!" Id. According to Egolf, building a pipeline to transport oil would be futile because Seven Seas was not producing enough oil. Id. In fact, Egolf believed that the Directors were less likely to be sued if they spent the Company's remaining money on drilling a well than if they spent "the last $20 million on pipeline and product facilities when [they knew] the deal [was] uneconomic to Seven Seas[.]" Id. at 3. Because Egolf believed Seven Seas "had better get that deep test drilled ASAP or we're

history," he believed that Seven Seas should "do the right thing for once and drill the prospect." Id. After all, he concluded "that's the business we're in – exploration!" Id.

On May 17, 2001, the Directors approved the Secured Facility. Doc. 153, Exh. 5. On July 23, 2001, Chesapeake Energy Corporation loaned $22.5 million to Seven Seas. Doc. 153, Exh. 72 at 38. Hefner and a group of "qualified investors." loaned Seven Seas most of the remaining $22.5 million by purchasing Secured Notes. The qualified investors included three other Directors, Egolf, Fuller, and Schlesinger, although some them purchased secured notes through the investment entities named in this suit. Id. Existing shareholders also "purchased approximately $2 million of the [Secured] Notes[.]" Doc. 153, Exh. 50 at 12.

For a time, the Company's operations proceeded without incident. Doc. 153, Exh. 72 at 19-20; and Doc. 153, Exh. 74. However, the oil reserves were not sufficient to meet the Company's needs and the Deep Well failed. Thus, creditors holding some of the Unsecured Notes filed an involuntary bankruptcy petition under Chapter 7 against Seven Seas on December 20, 2002. On January 13, 2003, Seven Seas converted the bankruptcy petition into a reorganization under Chapter 11 of the Bankruptcy Code.

On March 31, 2003, the Trustee filed an Adversary Complaint against (1) Chesapeake, in its individual capacity and "as collateral agent for all" holders of the Secured Notes, (2) U.S. Trust Company of Texas, N.A. as "the Indenture Trustee" for the holders of the Secured Notes, and (3) all holders of the Secured Notes. Doc. 153, Exh. 47 at 1-2, ¶¶2-4. However, the Trustee served only Chesapeake. Doc. 153, Exh. 50 at 18, § III.H.9. Although he did not name the Directors in their capacities as directors as defendants, the Trustee did cite the Directors' role in the Secured Facility as part of the basis for challenging it. Doc. 153, Exh. 47 at 5-6, ¶¶11-14. The Trustee sought to recover damages, Id. at 8, ¶¶17-18 and 9-10, ¶¶23-24, recharacterize the debt as equity, Id. at 8-9, ¶¶19-20, to equitably subordinate the debt to allow other creditors to

recover for their claims before the lenders, Id. at 9, ¶¶21-22, and to recover funds fraudulently transferred, Id. at 10-11, ¶¶25-30.

Eventually, the Trustee decided to settle his claims against the lenders. Doc. 153, Exh. 50 at 5.  He explained both the settlement and how he proposed to reorganize Seven Seas in a Second Amended Disclosure Statement (Trustee's Disclosure Statement).  Id. The Trustee's Disclosure Statement was issued pursuant to 11 U.S.C. §1125 and approved by the Bankruptcy Court on June 26, 2003. Id.  It also contained a copy of the proposed Second Amended Plan of Reorganization (Reorganization Plan), attached as Exhibit A and adopted on August 4, 2003. Doc. 153, Exh. 51 and Exh. 52.

The Trustee's Disclosure Statement described the terms of the settlement with Chesapeake and the holders of the Secured Notes. Doc. 153, Exh. 50 at 23, § IV.B.1. Chesapeake and the holders of the Secured Note would be permitted to collect "allowed secured claims in an aggregate amount of $45.0 million in principal plus accrued and accruing interest, fees and expenses including fees and expenses of counsel." Id., § IV.B.2.b. The settlement also contained a "mutual release" that dismissed all claims against Chesapeake and the holders of the Secured Notes.  Id. at 26, § IV.B.2.l. Although the wording of the release was broad, it cautioned that "[n]othing contained herein in the Plan shall be deemed to release the Debtor's current and former officers and directors for pre-petition acts or omissions." Id. at 27, § IV.B.2.l.(C). The Trustee agreed to this settlement because "[t]he law remains unsettled as to many of these theories of recovery." Id. at 27, § IV.B.2.m. Pursuing litigation risked destroying any possibility of recovery for any creditors but Chesapeake and the holders of the Secured Notes whereas the settlement "realize[d] approximately sixty-five percent (65%) of the value attributable to the strongest claims asserted against ... the Secured Lenders." Id. at 27-28, § IV.B.2.m.

Near its conclusion, the Trustee's Disclosure Statement also described causes of action that Seven Seas possessed. Id. at 39-41, § VII.D. Specifically, it stated that the Reorganized Debtor would possess "all other claims belonging to the Estate, including but not limited to claims for breach of fiduciary duty, alter ego, single business enterprise, self-dealing, usurpation of corporate opportunity, denuding, and similar claims under *In re: S.I. Acquisition,* 817 F.2d 1142 (5th Cir. 1987) and related authorities[.]" Id, § VII.D.1. After describing the potential for bringing suits related to preferences or fraudulent transfers, in a section titled "*S.I. Acquisition* Claims and Other Potential Claims," the Trustee stated that "[u]nder the Bankruptcy Code and various state laws, the Debtor may recover based on claims for breach of fiduciary duty, alter ego, single business enterprise, self-dealing, usurpation of corporate opportunity, denuding, and similar claims under *In re: S.I. Acquisition,* 817 F.2d 1142 (5th Cir. 1987) and related authorities. Possible *S.I. Acquisition* type claims and other claims are described below." The next paragraph stated that "[t]he Trustee is currently investigating and may bring certain causes of action against the Debtor's current and former officers and directors for pre-petition acts and/or omissions." Id.

Like the Trustee's Disclosure Statement, Article 8 the Reorganization Plan described the "proposed compromise and settlement" of the Trustee's claims against Chesapeake and the other "Secured Lenders." Doc. 153, Exh. 51 at 16, § 8.1.[2] Under the "terms of the compromise and settlement," the "Secured Lenders" were granted "Allowed Secured Claims in the aggregate amount of $45.0 million" that would "not be subject to objection, subordination, recharacterization, setoff, recoupment, avoidance, or reduction." Id. § 8.2.b. In this paragraph

---

2. The Reorganization Plan defines "Secured Lenders" as "(a) Chesapeake, as the holder of the Chesapeake Note, and (b) the holders of the Senior Notes." The Reorganization Plan did not define "Secured Lenders" to include any of the Defendants unless they held the Senior Notes at the time the bankruptcy court confirmed the Reorganization Plan.

allowing the Secured Facility as a secured claim, the Reorganization Plan did not mention the Directors. In addition to granting Chesapeake an allowed secure claim, the Reorganization Plan dismissed, with prejudice, the Trustee's action against the "Collateral Agent, the Secured Indenture Trustee, and the Secured Lenders[.]" Id. at 20, § 8.2.k. The dismissal of these parties was subject to the specific provision that "Robert Hefner, Larry R. Ray, Ronald Lefaive, Randolph Devening, Brian E. Egolf, Robert Panero, Gary Fuller, James R. Schlesinger, Brian Sanchez, Ramiiilaj, A Limited Partnership, Petroleum Properties Management Company LLC, Fuller Family Investments, A Limited Partnership … shall not be dismissed from the Chesapeake Adversary and the rights of the Trustee, the Debtor, and the Reorganized Debtor to bring claims against these individuals and entities who are not being dismissed shall be preserved." Id. The Reorganization Plan continued to explain that "[n]othing contained in this Mutual Release shall be deemed to release Robert Hefner, Larry R. Ray, Ronald Lefaive, Randolph Devening, Brian E. Egolf, Robert Panero, Gary Fuller, James R. Schlesinger, Brian Sanchez, Ramiiilaj, A Limited Partnership, Petroleum Properties Management Company LLC, Fuller Family Investments, A Limited Partnership … for any pre-petition acts or omissions." Id. at 21, § 8.2.l.C.

At the hearing to confirm the Reorganization Plan, the Trustee testified that the Reorganization Plan had been amended "to address the manner in which the parties to the compromise described in Article 8 of the Plan are to be dismissed from the litigation." Doc. 236, Exh. 48 at 13:20-13:22. The Trustee admitted that he had "contemplated dismissing the entire adversary proceeding" but instead decided to dismiss only "certain of the targets" because "[w]e always reserved and did not dismiss or release in that compromise the former officers and directors and certain entities owned by them and certain other defendants named in the complaint." Id. at 13:22-14:3. The Trustee emphasized, "[w]e never were going to release them

[and] always reserved our claims against them." Id. at 14:4-14:6. He explained that "[t]he lawsuit remains on file" and did not "impact the economic transaction that any of the parties voting on the plan or had notice of the plan contemplated or exepct[ed]." Id. at 14:5-14:7. Later, the Trustee explained that the "contingent assets are litigation claims" and "the company [had] 20 million dollars in directors and officers insurance" because the Trustee had "looked at the directors and officers claims, and that's part of the reason we make the revision to the dismissal and release provisions just to sort of make sure we don't' lose any of those." Id. at 21:9-21-15. Both the Secured Lenders and the unsecured creditors, including the bondholders, voted to approve the Reorganization Plan. Id. at 31:16-32:3.

On August 13, 2003, the Trustee filed the First Amended Complaint and on February 7, 2005 the Trustee filed the Second Amended Complaint, the complaint that governs this case currently. Doc. 52.

### III. LEGAL ANALYSIS

#### A. SUMMARY JUDGMENT MAY BE GRANTED ONLY WHEN NO QUESTIONS OF MATERIAL FACT EXIST.

A party moving for summary judgment must inform the court of the basis of the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding any of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the moving party fails to meet

its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment because the substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986). The moving party need not negate the opposing party's claims nor produce evidence showing the absence of a genuine issue of fact, but may rely on the absence of evidence to support essential elements of the opposing party's claims. *Celotex*, 477 U.S. at 323-25. However, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). A party seeking summary judgment may rely upon the complete absence of proof of an essential element if (1) the party seeking summary judgment has no access to evidence of disproof, (2) ample time has been allowed for discovery, and (3) the party opposing the motion for summary judgment bears the proof burden. *Fontenot,* 780 F.2d at 1195.

If the moving party establishes the absence of any dispute of material fact, then the burden shifts to the opposing party to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R. Civ. P. 56(c). The party opposing a motion for summary judgment may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 256-157. The non-moving party may identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.

1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form.

> That the defendants' response does not affirmatively state in the document itself that the [witnesses] are competent to testify as to the facts to which they swore does not necessarily doom their testimony. Affidavits are to be considered in conjunction with other types of evidence before the court. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2738 at 467 (1983). Furthermore, the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party. Id. at 484. In previous cases we have accepted evidence from the party opposing summary judgment despite its failure to meet the technical requirements of rule 56(e). See, e.g., *Jackson v. State of Mississippi,* 644 F.2d 1142, 1144 (5th Cir.1981) (even though opposing party's affidavit did not conform to rule 56(e), the court did not reject his claim that there were issues of fact to be decided); *Whitaker v. Coleman,* 115 F.2d 305, 307 (5th Cir.1940) (non-moving party's proffered transcript from earlier trial sufficient to show outstanding issues of fact despite "defects in its certification and presentation"); see also *Albert Dickinson Co. v. Mellos Peanut Co.,* 179 F.2d 265 (7th Cir.1950) (plaintiff's verified petition sufficient to oppose summary judgment). Thus, so long as the record, taken as a whole, demonstrates that the [witnesses'] testimony meets the requirements of rule 56, it is properly before the court and should be considered on a summary judgment motion.

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

Finally, even if a party demonstrates an entitlement to summary judgment, occasionally and rarely, "the sound exercise of judicial discretion dictates that the motion should be denied to give the parties an opportunity to fully develop the case. This is particularly true in light of the posture of the entire litigation. A district judge can perform this 'negative discretionary function' and deny a Rule 56 motion that may be justifiable under the rule, if policy considerations

counsel caution." *Marcus v. St. Paul Fire and Marine Ins. Co.,* 651 F.2d 379, 382 (5th Cir. 1981); *see also Veillon v. Exploration Services, Inc.,* 876 F.2d 1197, 1200 (5th Cir. 1989); 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2728 (3d ed. 1998).

## B. STATE LAW APPLIES TO CLAIMS AGAINST THIRD PARTIES IN BANKRUPTCY PROCEEDINGS.

The Trustee alleged that the Directors violated fiduciary duties. The Fifth Circuit recognizes that "the fiduciary duties of corporate officers and directors ... are creatures of state common law[.]" *Gearhart Industries, Inc. v. Smith Intern., Inc.,* 741 F.2d 707, 719 (5th Cir. 1984) (citing *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 549 (1949)); *see also Burks v. Lasker,* 441 U.S. 471, 477 (1979). The parties have proceeded as if the common law of Texas governs the Trustee's claims apparently because the corporate offices of Seven Seas were in Texas.

Because other parties could have asserted each of the Trustee's claims in the absence of a bankruptcy proceeding, this court will apply Texas law to the Trustee's claims. This determination follows a more general rule that:

> Unless some federal interest requires a different result, there is no reason why [property] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Butner v. U.S.,* 440 U.S. 48, 55 (1979) (quoting *Lewis v. Manufacturers National Bank,* 364 U.S. 603 (1961)). *See also Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20 (2000).

Although *Butner* governed how federal courts should analyze property interests, this court has found no authority suggesting that a federal court should employ a different

methodology for analyzing common law torts. Thus, *Butner* dictates, by analogy, that a federal court hearing common law claims brought by a bankruptcy trustee against a third party should apply state law to the dispute.

The method of applying state law to an adversarial proceeding within a bankruptcy case should incorporate the case law developed in diversity cases to avoid creating a rhetorically distinct, yet substantially identical, line of authority. In a diversity case, state law includes not only statutes passed by the state's legislature, but also the law as explained by the state's highest court. *See Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938). Thus, a federal court must follow the decisions of the relevant state's highest court. *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 236 (1940). "When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir. 1992). To determine what the highest court of the state would decide, a federal court should analyze:

> (1) decisions of the [Texas] Supreme Court in analogous cases, (2) the rationales and analyses underlying [Texas] Supreme Court decisions on related issues, (3) dicta by the [Texas] Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which [Texas] courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries.

*Centennial Ins. Co. v. Ryder Truck Rental, Inc.,* 149 F.3d 378, 382 (5th Cir. 1998) (citations omitted).

No matter how a federal court analyzes these seven factors, it still may not "adopt innovative theories of" state law, but must "apply that law as it currently exists." *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1217 (5th Cir. 1985). If a state's law is to be changed, "[i]t is up to the Supreme Court of [that state] and not [a federal] court to change … substantive

law," even though a party "cites … many scholarly criticisms of the rule" at issue. *Cargill, Inc.*
*v. Offshore Logistics, Inc.,* 615 F.2d 212, 215 (5th Cir. 1980). Although adapted to diversity
cases, these rules apply to bankruptcy cases because no party should obtain "a windfall merely
by reason of the happenstance of bankruptcy."

### C. DIRECTORS OF A CORPORATION OWE NO FIDUCIARY DUTIES TO THE CREDITORS OF A STILL-OPERATING CORPORATION.

The case law forbidding federal courts from adopting innovative approaches to state law
is particularly important to this case. Many of the Trustee's arguments appear to rest on the
theory that the directors of an insolvent, or nearly insolvent, corporation owe broad fiduciary
duties to that corporation's creditors. However, Texas state courts have not endorsed the
Trustee's position and a Fifth Circuit decision expressly rejected a virtually identical argument.

The Trustee alleges that the Directors were "bound to act in the best interest of th[e]
creditors" because Seven Seas was insolvent. Doc. 52 at 9, ¶29 and 11, ¶34. According to the
Trustee, the Directors failed to act in the best interests of the creditors because they mortgaged
the assets of Seven Seas to borrow $45 million and because they spent that money to explore the
Deep Well. The Trustee suggests that the Directors should have restructured Seven Seas and
followed a conservative business plan or liquidated the Company's assets slowly to maximize
their value. The Trustee does not allege that the directors tried to "loot" the Company or
misappropriate its assets in the complaint, although the Trustee does attempt to recover for
"[d]amages related to corporate monies that were improperly used to reimburse personal
expenditures by or on behalf of Defendants." Doc. 259 at 68 (citing Plaintiff's Eighth
Supplemental Rule 26(a)(1) Disclosures, Doc. 207, Exh. 2). Likewise, the Trustee does not
allege that the Directors repaid the loans they made to Seven Seas before repaying other

similarly situated creditors. In fact, the Trustee, not the Directors, acquiesced[3] to paying the Secured Facility. Instead, the Trustee alleges that the Directors violated their duties to the creditors of Seven Seas: (1) by making business decisions that he believes were foolish and (2) by exploiting a company in a desperate financial position.

### 1.  THE FIFTH CIRCUIT REFUSED TO IMPOSE FIDUCIARY DUTIES ON DIRECTORS OF A CORPORATION IN FAVOR OF ITS CREDITORS.

Although the Trustee alleged that the Directors owed the creditors of Seven Seas a fiduciary duty once Seven Seas entered the zone of insolvency, "officers and directors of a corporation owe to it duties of care and loyalty. They stand in a fiduciary relationship to the corporation. Such duties, however, are owed to the corporation and not to creditors of the corporation." *Fagan v. La Gloria Oil & Gas Co.,* 494 S.W.2d 624, 628 (Tex.Civ.App.–Houston [14th Dist.] 1973, no writ). A corporation's directors owe shareholders, not creditors, those duties "so long as [the corporation] continues to be a going concern, conducting its business in the ordinary way, without some positive act of insolvency, such as the filing of a bill to administer its assets, or the making of a general assignment." *Conway v. Bonner,* 100 F.2d 786, 787 (5th Cir. 1939) (citations omitted).

*Conway* addresses the Trustee's legal arguments more directly than any other case cited to this court. In *Conway,* a director of a bankrupt corporation obtained some of the bankrupt corporation's assets. The bankruptcy trustee sought to recover those assets by "alleging that the bankrupt was insolvent at the time of the transaction, and, for that reason, [the] director, was

---

3. The record before the court does not support the conclusion that the Trustee "blessed" the Secured Facility, only that the Trustee pursued a course of action he believed to be lesser of two evils.

trustee of the assets of the corporation for the benefit of its creditors." *Id.*[4] In fact, "[m]uch testimony was introduced to prove insolvency at the time of the transfer, on the theory that the corporation was insolvent if its total assets were less than its debts," but insolvency in fact did not require the directors to act as fiduciaries for the corporation's creditors. *Id.*

### 2. *CONWAY* REMAINS BINDING PRECEDENT.

A more recent opinion issued by the Fifth Circuit arguably contradicted *Conway* when it stated: "[o]fficers and directors that are aware that the corporation is insolvent, or within the 'zone of insolvency' … have expanded fiduciary duties to include the creditors of the corporation." *Carrieri v. Jobs.com,* 393 F.3d 508, 534, n. 24 (5th Cir. 2004). To the extent that *Carrieri* contradicts *Conway, Carrieri* has no precedential value because "where two previous holdings or lines of precedent conflict, the earlier opinion controls and is the binding precedent in the circuit." *Society of Separationists, Inc. v. Herman,* 939 F.2d 1207, 1211 (5th Cir. 1991) (citations omitted). Thus, *Carrieri* cannot be, as the Trustee asserts, "binding precedent in the Fifth Circuit." Doc. 240 at 34.

Nevertheless, *Carrieri* deserves serious consideration as the product of a very persistent strain of analysis that continues to appear in published opinions. To give those opinions the consideration they deserve, this opinion traces the lines of authority on which they rely to their possible sources and examines the facts behind and language of the major cases in some detail. This research indicates that even without the *Conway* opinion, the cases cited by the Trustee provide almost no support for the proposition that Texas law grants creditors the right to sue

---

4. Although *Conway* described directors as becoming "trustees" acting on behalf creditors rather than owing "fiduciary" duties to them, this court has found no reason to believe that the use of different terms is anything but an accident of no legal significance.

directors personally for breaching fiduciary duties or that a corporation can sue its directors for breaching fiduciary duties to the corporation's creditors.

Despite a clear statement that an insolvent corporation's directors owe fiduciary duties to that corporation's creditors, the *Carrieri* court was not actually required to address issues resembling the questions raised by this case. Instead, it decided: (1) whether compulsory stock repurchase agreements were equity securities or claims under the bankruptcy code, (2) whether Texas law or the Bankruptcy Code supplied the applicable definition of "insolvency," and (3) whether a bankrupt corporation possessed "legally available funds" with which it could repurchase stock without becoming insolvent. *Carrieri,* 393 F.3d 508. After ruling on each of these issues completely, the Fifth Circuit stated that the directors of the corporation owed its creditors fiduciary duties. The Fifth Circuit's discussion is quoted at length to reveal how the argument developed and how the set of concerns that the *Carrieri* opinion addressed differ from the allegations raised by the Trustee:

> Finally, although neither party addressed this argument, even if the Debtor was not actually insolvent at the time of the Carrieri Group's demands, the bankruptcy court's determination that the Debtor would have been rendered insolvent after the demands can alternatively be supported by a "zone of insolvency" analysis. Gudmundsson testified that members of the board of directors believed that Jobs.com was in the zone of insolvency under Texas law based on the advice of counsel at the time of their 14 March 2001 meeting. The Debtor's board believed then that its fiduciary duty had expanded from just the equity holders to all the stakeholders, including all creditors. Once the Debtor's board of directors became aware that Jobs.com was within the zone of insolvency, they held special knowledge that was unknown to their creditors and equity holders, ... had the board chosen to redeem the C-1 Stock, to the detriment of creditors, at a time when they knew they were in the zone of insolvency, the board may have opened itself up to breaches of fiduciary duty claims by other creditors. *See Weaver v. Kellogg,* 216 B.R. 563, 583-84 (S.D. Tex. 1997). Although the bankruptcy court did not discuss "zone of insolvency" as a reason for its decision, it did expressly point out Gudmundsson's testimony that the board of directors believed the Debtor was within the "zone of insolvency" when they made their decision to deny the [request to repurchase stock] and that the board knew it needed "to file bankruptcy to try and salvage some value for both creditors and shareholders." The bankruptcy court's decision, therefore, to use [Texas law] to determine that

-20-

the Debtor would have been rendered insolvent by the redemptions can also be affirmed under "zone of insolvency" analysis.

*Id.*

Thus, the posture of *Carrieri* differs significantly from this case. In *Carrieri,* the Fifth Circuit granted absolution to the estate of a bankrupt company against the claims of former shareholders. In the instant case, the Trustee seeks to hold the Directors liable for damaging creditors.

Despite the significant differences between *Carrieri* and this case, footnote 24 contains a very broad theoretical endorsement of the rule that the Trustee proposes:

> Officers and directors that are aware that the corporation is insolvent, or within the "zone of insolvency" as in this case, have expanded fiduciary duties to include the creditors of the corporation. *See Weaver v. Kellogg,* 216 B.R. 563, 583-84 (S.D. Tex. 1997) (holding that, under both Delaware and Texas law, corporate insiders may have a fiduciary duty to the corporation's creditors even when the corporation was not insolvent and, thus, a plaintiff may prevail on a breach of corporate duty claim if he shows, for each wrongful transaction, that the corporation was in "the vicinity of insolvency."); *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348, 355 (N.D. Tex. 1996) (noting that Delaware may have expanded the fiduciary duty of directors beyond a corporation's insolvency, as distinguished from the directors' fiduciary duty to the corporation, to include the period when the corporation operates within a zone of insolvency). Accordingly, when a corporation reaches the "zone of insolvency", as with actual insolvency, the officers and directors have an expanded fiduciary duty to all creditors of the corporation, not just the equity holders.

*Id.,* n. 24.

The Trustee characterizes these statements as the "holding" of *Carrieri*. Doc. 126 at 16, ¶33. Such a characterization could be accurate because "all alternative rationales for a given result have precedential value.'" *McLellan v. Mississippi Power & Light Co.*. 545 F.2d 919, 925 (5th Cir. 1977).

On the other hand, a statement that "could have been deleted without seriously impairing the analytical foundations of the holding and, being peripheral, may not have received the full and careful consideration of the court that uttered it," is dicta. *Gochicoa v. Johnson,* 238 F.3d 278, 286, n. 11 (5th Cir. 2000). The statement that "the officers and directors have an expanded fiduciary duty to all creditors of the corporation, not just the equity holders" "when a corporation reaches the 'zone of insolvency'" meets both criteria. The Fifth Circuit could have affirmed the lower court entirely without discussing the zone of insolvency and, because neither party tested arguments concerning the zone of insolvency through the adversarial process, the statement "may not have received the full and careful consideration of the court that uttered it." Thus, the Fifth Circuit's discussion of the duties directors of an insolvent corporation may owe to the corporation's creditors is probably dicta and could be disregarded even if *Conway* was not already the more authoritative precedent.

In addition to *Carrieri,* several other cases have been cited for their persuasive value. In the most cited such opinion, directors of a corporation sought to dismiss allegations that they had breached their fiduciary duties to a corporation's creditors. *Weaver v. Kellogg,* 216 B.R. 563 (S.D. Tex. 1997). The two defendants were a corporation's only shareholders and its only directors. They formed the corporation in Texas in 1985, transferred its state of incorporation to Delaware in 1991, and then caused its insolvency by structuring a number of transactions to its detriment (and to their personal benefit).

To defeat the trustee's claims, the defendants argued that Delaware law "require[d] a strict showing by Plaintiff of [the corporation's] insolvency at the time of each of the disputed transactions." *Weaver,* 216 B.R. at 583 (citing *Geyer v. Ingersoll Publications Company,* 621 A.2d 784 (Del.Ch. 1992)) The court disagreed because "the *Geyer* decision makes clear and the Court is persuaded that insolvency is only *one example* of a circumstance in which directors owe

fiduciary duties to creditors." *Id.* (emphasis in original). Instead, the court concluded: "*it appears* that under both Delaware law and Texas law, corporate insiders … *may* have a fiduciary duty to the corporation's creditors even when the corporation was not insolvent." *Weaver,* 216 B.R. at 583-84 (emphasis added).

However, the Trustee cites *Weaver* as a more authoritative statement of Texas law than the decision itself purported to be. The *Weaver* opinion merely denied a motion for summary judgment and used tentative language to do so. Moreover, the District Court focused most of its attention on extremely conventional legal theories under which the defendants could be liable and discussed the fiduciary duties that a corporation's directors may owe its creditors almost as a last resort. In fact, the jury ultimately found that the two defendants had committed fraudulent transfers and "usurped a corporate opportunity and engaged in self-dealing" and that the corporation had been insolvent or in the vicinity of insolvency. *Weaver v. Kellog,* No. 4:94-cv-3703, Post-Verdict Memorandum and Order, Doc. 146 (S.D. Tex. May 20, 1997). Consequently, the case never truly forced the court to adopt, conclusively, the proposition for which it has been cited.

Because the *Weaver* opinion focused its attention on Delaware law, it did not cite opinions issued by Texas state courts, but cited a string of cases that the Trustee presented: *Credit Lyonnais Bank Nederland v. Pathe Communications Corp.,* 1991 WL 277613, at 34 (Del.Ch. 1991) (unpublished), cited in *Geyer,* 621 A.2d at 789; and *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348 (N.D. Tex. 1996). The *Weaver* decision also quoted a full paragraph from the decision of another bankruptcy court: *Jackson v. Jackson (In re Jackson),* 141 B.R. 909 (Bankr. N.D. Tex. 1992). However, these cases do not support the Trustee's conclusion in this case. *Jewel Recovery* interpreted Delaware law and the facts of *In re Jackson* do not resemble the facts of this case.

*In re Jackson* was a derivative suit brought on behalf of a corporation's shareholders. It analyzed how those governing a corporation relate to the corporation's shareholders, not to the corporation's creditors. Ultimately, *In re Jackson* provides no insight into the issues facing this court because its holdings include only mundane propositions of law such as: directors cannot use corporate funds to pay their personal bills. *In re Jackson,* 141 B.R. at 918.

Even though *In re Jackson* itself provides little guidance to this court, the paragraph of *In re Jackson* quoted in *Weaver* cites a pair of cases: *Pepper v. Litton,* 308 U.S. 295 (1939) and *Martin v. Kagan (In re Tufts Electronics, Inc.),* 746 F.2d 915 (1st Cir. 1984). Like *In re Jackson,* neither *Pepper* nor *Martin* supports the Trustee's theory of liability. *Pepper* merely allowed a bankruptcy trustee to deny the salary claims of a bankrupt corporation's director who "was enabled by astute legal manoeuvering to acquire most of the assets of the bankrupt not for cash or other consideration of value to creditors but for bookkeeping entries representing at best merely [the director's] appraisal of the worth of [his own] services over the years." *Pepper,* 308 U.S. at 312. That is, the director looted the corporation for his personal benefit.  Therefore, *Pepper* is not analogous to this case. *Martin* provides even less guidance because it interpreted Massachusetts or New Hampshire law. Thus, the authorities on which *Weaver* based its conclusion provide this court with no basis for concluding that Texas law requires directors of an insolvent corporation to act as fiduciaries for the creditors of that corporation.

In addition to arguing that the directors of insolvent corporations owe the creditors of those corporations fiduciary duties, the Trustee advanced a related argument: the business judgment rule does not protect the directors of insolvent corporations. *See, e.g., In re Performance Nutrition, Inc.,* 239 B.R. 93 (Bankr. N.D. Tex., 1999); *In re General Homes Corp.,* 199 B.R. 148, 151 (S.D. Tex., 1996); and *Askanase v. Fatjo,* No. H-91-3140, 1993 WL 208440

(S.D. Tex., April 22, 1993).[5] However, none of these cases actually holds that directors of an insolvent corporation owe that corporation's creditors any fiduciary duties. In fact, *Askanase* explains why, under Texas law, the Directors owed the creditors of Seven Seas no fiduciary duties and both *In re Performance Nutrition* and *In re General Homes* rely on the analysis in *Askanase*.

In re Performance Nutrition states only "[f]urthermore, the business judgment rule *may* be wholly inapplicable in a case where the corporation is insolvent." *Performance Nutrition,* 239 B.R. at 111 (emphasis added). To support this dicta, the court cited *General Homes*. But, the court actually held only "[b]ecause Roth acted with self-interest, he may not enjoy the protection of the business judgment rule." *Id.* Thus, the case appears to stand for the unremarkable proposition that a self-interested director cannot orchestrate the sale of a corporation's assets for his benefit below the price that diligent marketing efforts could have obtained.

The *General Homes* opinion provides no further assistance because the challenged transactions occurred after creditors had filed an involuntary bankruptcy petition against a corporation. Before the bankruptcy court ruled on the creditors' petition, the directors of the debtor substantially increased salary and severance benefits for the three principal officers, two of whom were directors. The only arguably relevant portion of the opinion states "while the business judgment rule may apply to the decisions of solvent corporations, it has no consequence in the context of a conservatorship." *General Homes,* 199 B.R. at 151-52 (citing *Askanase,* 1993

---

5. Another case cited by the Trustee concluded, "[w]hen a corporation enters a zone of insolvency, the fiduciary duty shifts from the shareholders to the creditors of the corporation." *Sherman v. FSC Realty LLC, et al., (In re Brentwood Lexford Partners, LLC),* 292 B.R. 255, 272 (Bkrtcy. N.D. Tex., 2003) (citing *In re Hechinger Inv. Co. of Delaware,* 280 B.R. 90, 92 (D.Del. 2002). Although *In re Brentwood Lexford Partners* purported to interpret Texas law, it cited only *In re Hechinger Inv. Co.,* a decision interpreting Delaware law for its conclusion.

WL 208440, at *5. That is, the *General Homes* opinion does not apply to corporations that are insolvent *in fact,* or within the zone of insolvency. It applies only to corporations that are already the subject of a bankruptcy proceeding even though a court may not have entered a formal finding of insolvency.

Only the *Askanase* decision actually analyzed claims resembling the Trustee's theories of recovery. It rejected them as unsupported by Texas law. In *Askanase,* a Chapter 7 trustee sought to recover damages from the bankrupt corporation's directors. The trustee argued "directors of an insolvent corporation are considered to be trustees of the corporation's remaining assets for the benefit of all the creditors." *Askanase,* 1993 WL 208440, at *1. The court classified the trustee's argument as arising under "Delaware common law's 'trust fund doctrine[.]'" *Id.* It concluded: "[i]n Delaware, unlike in Texas, the corporation at issue need not have ceased to do business for the trust fund to arise[.]" *Id,* at *5 (citing *Geyer,* 621 A.2d 784 and *Credit Lyonnais,* 1991 WL 277613. To reach this conclusion, the court compared Delaware's formulation of the trust fund doctrine, including *Geyer* and *Credit Lyonnais,* to the way in which Texas courts formulate the trust fund doctrine. It ruled that, under Texas law, directors of a corporation owe the corporation's creditors fiduciary duties only after it is both insolvent and has ceased doing business. *Hixson v. Pride of Texas Distrib. Co.,* 683 S.W.2d 173, 176 (Tex.App.–Fort Worth 1985, no writ); *State v. Nevitt,* 595 S.W.2d 140, 143 (Tex.App.–Dallas 1980, writ ref'd n.r.e.); and *Fagan v. La Gloria Oil & Gas Co.,* 494 S.W.2d 624, 628 (Tex.App.–Houston [14th Dist.] 1973, no writ).

However, *Askanase's* reliance on the trust fund doctrine has been criticized by a bankruptcy court in California. *See Decker v. Mitchell (In re JTS Corp),* 305 B.R. 529 (Bankr. N.D. Cal. 2003). In *Decker,* a bankruptcy trustee alleged: "directors and other controlling persons removed millions of dollars from the corporation that otherwise belonged to the

bankruptcy estate." *Id.* at 534. The parties did not contest *whether* the directors of the corporation owed the corporation's creditors some duty. Instead, they quarreled over which standard the court should use to evaluate the directors' behavior. The trustee urged the court to adopt a strict formulation of the trust fund doctrine under which the directors would be liable for any self-dealing, even if the self-dealing was fair. However, the court's analysis of Delaware cases lead it to conclude that Delaware had adopted a rule that it described as the "insolvency exception," not the trust fund doctrine. *Id.* at 539.[6] Under the insolvency exception, directors could escape liability by proving that self-interested transactions were fair:

> The rationale for [the insolvency exception] acknowledges that creditors need protection even if an insolvent corporation is not liquidating, because the fact of insolvency shifts the risk of loss from the stockholders to the creditors. While stockholders no longer risk further loss, creditors become at risk when decisions of the directors affect the corporation's ability to repay debt. This new fiduciary relationship is certainly one of loyalty, trust and confidence, but it does not involve holding the insolvent corporation's assets in trust for distribution to creditors or holding directors strictly liable for actions that deplete corporate assets.

*Id.*

*Decker* reviewed several decades of Delaware cases to conclude "that Delaware has never relied on the trust fund doctrine in the strict sense" and that "present day reality simply does not lend itself to strict application of the trust fund doctrine. ... Thus, there is a need to consider the fiduciary duties of directors beyond the narrow confines of the trust fund doctrine, which Delaware has accomplished through adoption of the insolvency exception." *Decker,* 305 B.R. at 540. *Decker,* like *Carrieri* and other cases cited by the Trustee, is a decision that actually minimized the exposure that directors of a corporation faced. Thus, it does not stand for the

---

6. Although the term "insolvency exception" appears only rarely in the case law and literature, this opinion will use the term "insolvency exception" to distinguish the Trustee's argument from the trust fund doctrine.

proposition that directors may face more liability under Delaware's insolvency exception than they do under the trust fund doctrine as recognized in Texas.

### 3.  DELAWARE CASES DO NOT CREATE A CAUSE OF ACTION.

Even *Credit Lyonnais* and *Geyer,* the Delaware cases cited in *Weaver, Askanase* and *Decker,* do not support the Trustee's legal arguments for two reasons. First, neither case established that Delaware law permits creditors to sue a corporation's directors for breaching fiduciary duties. Second, even if *Credit Lyonnais* and *Geyer* create a cause of action, then that cause of action is either (1) a continuation of Delaware's "trust fund doctrine" that does not alter the trust fund doctrine in Texas or (2) an "insolvency exception," a theory of recovery unrecognized by any Texas court and likely to remain unrecognized by the Supreme Court of Texas.

*Credit Lyonnais* did not create a cause of action. It, like *Decker* and *Carrieri,* shielded directors from liability. A creditor, Credit Lyonnais, held a contractual right to elect board members until the corporation repaid its debt. The corporation's major shareholder alleged that directors chosen by Credit Lyonnais had breached their duty to the shareholders by refusing to sell assets that would have repaid the corporation's debt and returned control of the corporation to the shareholders.

Chancellor William Allen dismissed the shareholder's claim because, "[a]t least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise." *Credit Lyonnais,* 1991 WL 277613 at 34. Thus, even though the majority shareholder "needed to liquidate assets to raise capital," the directors did not need to "accept fire-sale prices" given their "obligation to the

community of interest that sustained the corporation." *Id.* Instead, the court expected the directors "to maximize the corporation's long-term wealth creating capacity." *Id.*

In a footnote, Chancellor Allen illustrated his point by constructing a hypothetical scenario in which an insolvent corporation could choose to pursue one of two courses of action. The first course of action had a higher expected value than the second. However, only the second option held any prospect of returning money to the corporation's shareholders. Thus, Chancellor Allen hypothesized that the option with the lower expected value would be pursued "by a director who thinks he owes duties directly to shareholders only." *Id.* at 34, n.55. In contrast, the option with the higher expected value, with no chance of benefitting the shareholders, would be pursued "by directors who are capable of conceiving of the corporation as a legal and economic entity" because "[s]uch directors will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders ... would make if given the opportunity to act." *Id.* The opinion cited neither empirical evidence nor legal precedent for the conclusion that such a course of action was either efficient or fair.

Moreover, Chancellor Allen's opinion did not even purport to create a cause of action that would allow creditors to sue the directors of a corporation. It merely exonerated directors who chose to maintain a corporation's long-term viability. His position does not differ from statutes enacted by 28 states that permit directors to consider the interests of constituencies other than shareholders. Ramesh K.S. Rao, et al., *Fiduciary Duty a la Lyonnais: An Economic Perspective on Corporate Governance in a Financially-Distressed Firm,* 22 J. Corp. L. 53, 54, n. 3 (1996). In fact, Chancellor Allen explained his own decision six years later in just those terms: "where foreseeable financial effects of a board decision may importantly fall upon creditors as

well as holders of common stock, as where corporation is in the vicinity of insolvency, an independent board may consider impacts upon all corporate constituencies in exercising its good faith business judgment for benefit of the 'corporation.'" *Equity-Linked Investors, L.P. v. Adams,* 705 A.2d 1040, 1042 n.2 (Del. Ch. 1997). Thus, this court interprets *Credit Lyonnais* as providing only a shield against shareholder suits. It does not provide the basis for a new cause of action, much less any reason to believe that Texas would adopt an "insolvency exception."

Although *Credit Lyonnais* did not create a cause of action, *Geyer* may have done so when it declined to dismiss a creditor's claims against a corporation's director. In *Geyer,* the plaintiff, one of two shareholders of the corporation, alleged that the defendant, a director and the only other shareholder, had transferred the corporation's assets for his personal benefit. The transactions rendered the corporation insolvent and, therefore, prevented it from repaying a promissory note that the plaintiff held. Thus, the decision may stand for only the simple proposition that directors can be held liable for the consequences of a fraudulent conveyance.

In fact, a recent Delaware case affirmed that *Credit Lyonnais* did not create a cause of action. *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772 (Del. Ch. 2004). In *Production Resources Group*, a creditor alleged that the directors of an insolvent Delaware corporation had breached their fiduciary duties to the corporation's creditors. The chancellor acknowledged that "[c]reative language in a famous footnote in *Credit Lyonnais* was read more expansively by some, not to create a shield for directors from stockholder claims, but to expose directors to a new set of fiduciary duty claims, this time by creditors." *Id* at 789. Instead "[t]he *Credit Lyonnais* decision's holding and spirit clearly emphasized that directors would be protected by the business judgment rule if they, in good faith, pursued a less risky business strategy precisely because they feared that a more risky strategy might render the firm unable to meet its legal obligations to creditors and other constituencies." *Id.* at 788. The chancellor found

that interpreting *Credit Lyonnais* to create a cause of action "involves using the law of fiduciary duty to fill gaps that do not exist." *Id.* at 790. In the chancellor's opinion, creditors seeking protection from reckless corporate directors should contract for "strong covenants, liens on assets, and other negotiated contractual protections" or rely on common law and statutory protections such as "[t]he implied covenant of good faith and fair dealing" or "the law of fraudulent conveyance." *Id.* Given the existing and established doctrines protecting creditors, the chancellor concluded: "when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, if extant." *Id.*

Instead of behaving as fiduciaries on behalf of creditors, the chancellor believed that a corporation's board should "be free to take economic risk for the benefit of the firm's equity owners[.]" *Id.* In fact "[b]ecause creditors have no interest beyond the debts owed to them, they have no incentive (and much to risk) by encouraging business strategies that would risk the payment of the bulk of their claims but provide some hope that the firm's value will increase to the level at which there could be a return for the equity." *Id.* at 790, n. 57. Thus, acting as fiduciaries for creditors may cause directors to adopt excessively conservative strategies, a problem that this court has no reason to believe is any less dangerous to shareholders than excessively risky strategies are to debt holders.

Although the *Production Resources Group* opinion rejected *Credit Lyonnais* as creating a new cause of action, it acknowledged that "[t]he elimination of the stockholders' interest in the firm" would increase the "risk to creditors." *Id.* at 791. It even conceded that such risks might justify "imposing fiduciary obligations towards the company's creditors on the directors." *Id.* However, the chancellor found the proper basis for holding directors liable to a corporation's

creditors to be a doctrine which "has been termed the 'trust fund doctrine'" provided the proper basis for holding directors liable to creditors. *Id.* at 791. Thus, in the absence of an authoritative and comprehensive discussion of the issues, the best developed and most analogous case law suggests that Delaware's courts evaluate claims by creditors against directors under the trust fund doctrine and classify the insolvency exception as a defense to suits against directors.

### 4.   ONLY THE TRUST FUND DOCTRINE ENABLES CREDITORS TO SUE A CORPORATION'S DIRECTORS.

Even though the authorities presented to and discussed by this court have classified *Credit Lyonnais* and *Geyer* in three distinct ways, none of those interpretations of Delaware cases persuade this court that Texas law imposes any general fiduciary duty on the directors of a corporation in favor of that corporation's creditors outside the narrow boundaries of the trust fund doctrine. First, *Askanase* classified *Credit Lyonnais* and *Geyer* as creating a cause of action under the trust fund doctrine. Second, *Production Resources Group* classifies *Credit Lyonnais* as nothing more than a shield that directors may use to defend themselves against shareholder lawsuits and concludes that only the trust fund doctrine provides any basis for holding directors liable to creditors. Third, *Decker* classifies *Credit Lyonnais* and *Geyer* as creating a viable cause of action under the "insolvency exception," a theory distinct from the trust fund.

If either *Askanase* or *Production Resources Group* properly interpreted *Credit Lyonnais,* then the Trustee must establish the elements of the trust fund doctrine as Texas courts have formulated that doctrine. On the other hand, if the *Decker* opinion correctly analyzed *Credit Lyonnais* and *Geyer,* then this court must determine whether the Texas Supreme Court has adopted an "insolvency exception," and, if it has not, predict whether it would. This court concludes that it has not adopted and would not adopt the insolvency exception as described in the *Decker* opinion.

The *Production Resources Group* opinion is the most persuasive interpretation of the insolvency exception not only because it is the opinion of a Delaware court interpreting a previous Delaware decision, but also because neither *Credit Lyonnais* nor *Geyer* expressly created a new cause of action. Thus, this court holds that, only the trust fund doctrine, as explained by Texas state courts, rather than some other "insolvency exception," provides a basis for creditors of a corporation to sue the directors of that corporation. The authorities with which this court is familiar support such a holding even if *Conway* is not binding precedent and even if Texas has adopted Delaware's case law.

Even if *Decker* analyzed Delaware law correctly and the "insolvency exception" is a viable cause of action, Texas has not adopted it and the seven factors identified in *Centennial Ins. Co.* suggest that the Supreme Court of Texas would not do so. First, no "decisions of the [Texas] Supreme Court in analogous cases" exist other than those decisions limiting the application of the trust fund doctrine to insolvent corporations that are no longer operating. *See Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 550 (Tex. 1981). The trust fund doctrine served as a way to prevent shareholders, before statutes governed the winding up and dissolution of corporations, from leaving a corporation's creditors with nothing but the corporation's empty shell by dissolving the corporation and keeping its assets. *Id.* It did not create a method by which creditors could challenge the decisions of a corporation's creditors.

Second, like the analogous cases, "the rationales and analyses underlying [Texas] Supreme Court decisions on related issues," are no more helpful than the analogous decisions themselves. Third, helpful "dicta by the [Texas] Supreme Court" has not been cited to or discovered by this court beyond the analogous decisions under the trust fund doctrine. Thus, no analogous decisions, underlying reasons, or statements made in dicta suggest that the Supreme

Court of Texas believes that creditors of an active corporation require the protection of an "insolvency exception."

Fourth, "lower state court decisions" have held that a corporation's directors are agents of the shareholders and do not owe the corporation's creditors any duty whatsoever because creditors deal with the corporation, not the individual directors. *Conrick v. Houston Civic Opera Ass'n,* 99 S.W.2d 382, 384 (Tex.Civ.App.–Amarillo 1936, no writ). *Conrick* implies, but does not state explicitly, that directors cannot serve both as agents of the shareholders and as fiduciaries of the corporation's creditors because the roles are contradictory.

Fifth, no "general rule on the question" exists because only Delaware appears to have discussed any sort of "insolvency exception." Instead, the clarity with which Texas courts have established the trust fund doctrine obviates the need to examine any general rules. Sixth, "the rulings of courts of other states to which [Texas] courts look when formulating substantive law" provide no assistance of the same reason.

On the other hand, if any relevant general rule exists and to the extent that other states have decided similar issues, then the actual rule applied is not as broad as suggested by the language of the decisions applying it. That is, the cases stating that directors of a corporation may owe fiduciary duties to that corporation's creditors did so only under extremely limited circumstances and imposed only limited duties on those directors. According to a broad survey of decisions, "[a]ll of the decisions in which the courts have found breaches of fiduciary responsibility to creditors either involve closely held corporations in which directors are also shareholders or corporations that are under common ownership and control." Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors,* 46 Vand. L. Rev. 1485, 1518 (1993). These decisions also "involved directors of an insolvent

corporation diverting corporate assets for the benefit of insiders or preferred creditors" and resembled "fraudulent conveyances or voidable preferences under bankruptcy law." Id. at 1513-14. Even within this limited set of cases, directors were not held liable for "obligations to creditors beyond what the contract already provided." Id. at 1513. Thus, the general rule implies that courts do little more than "protect creditors' contractual rights to priority of repayment." Id. 1521.

Seventh, "other available sources, such as treatises and legal commentaries" provide many reasons to believe that the Supreme Court of Texas would probably not adopt an insolvency exception. The commentaries suggest that the insolvency exception is probably an awkward adaptation of the trust fund doctrine and may be an unnecessary, unworkable, and harmful rule.

Like the courts, academic writers have struggled to categorize the legal theories that support holding directors of a corporation personally liable to that corporation's creditors. At least one author agreed with the *Decker* court*,* concluding that Delaware law does not so much rely on the "trust fund doctrine," as much as "common honesty." Stephen R. McDonnell, *Geyer v. Ingersoll Publications Co.: Insolvency Shifts Directors' Burden from Shareholders to Creditors,* 19 Del. J. Corp. L. 177, 194-95 (1994). However, more articles classified *Credit Lyonnais* and *Geyer* as awkward extensions of the trust fund doctrine. See Robert B. Millner, *What Does It Mean for Directors of Financially Troubled Corporations to Have Fiduciary Duties to Creditors?,* 9 J. Bankr. L. & Prac. 201, 203-204 (2000) (*Credit Lyonnais* was a "sea change in the articulation of the rationale for the fiduciary duty to creditors."); Royce de R. Barondes, *Fiduciary Duties of Officers and Directors of Distressed Corporations,* 7 Geo. Mason L. Rev. 45, 64 (1998) ("There is some controversy concerning whether the existence of such a duty owed directly to creditors has a strong basis in traditional jurisprudence. [But, the] 'trust

fund doctrine' is the seminal theory."); Bruce A. Markell, *The Folly of Representing Insolvent Corporations: Examining Lawyer Liability and Ethical Issues Involved in Extending Fiduciary Duties to Creditors,* 6 J. Bankr. L. & Prac. 403, 405-07 (1997); Norwood P. Beveridge, Jr., *Does a Corporation's Board of Directors Owe a Fiduciary Duty to Its Creditors?,* 25 St. Mary's L.J. 589, 592-93 (1994) ("The only doctrinal basis which has been cited in the cases is the 'trust fund doctrine.' A review of all reported trust fund cases to date demonstrates that … this doctrine … was never intended to establish direct duties to creditors on the part of directors of a solvent or an insolvent corporation. … [A]part from the 'trust fund doctrine,' … directors of a corporation owe a duty of care in management only to the corporation itself and not directly to its creditors."); and Mike Roberts, *The Conundrum of Directors' Duties in Nearly Insolvent Corporations,* 23 Mem. St. U. L. Rev. 273, 284 (1993) ("Traditionally, this pre-filing fiduciary duty, which is often disruptive, if not contradictory, to the directives of state corporate law, evolved from traditional trust fund jurisprudence."). Thus, academic authors acknowledge that *Credit Lyonnais* and *Geyer* are not traditional trust fund cases, but these same authors did not discover any other basis for concluding that directors of an insolvent, or nearly insolvent, corporation owe fiduciary duties to the corporation's creditors.

Despite the rather thin legal support for the Trustee's position, it may appear to be a just rule nonetheless because it prevents directors from gambling with "other people's money." Doc. 207 at 1. In more academic terms, gambling with other people's money is known as the "'overinvestment' theory of finance." Royce de R. Barondes, *Fiduciary Duties of Officers and Directors of Distressed Corporations,* 7 Geo. Mason L. Rev. 45, 47 (1998). This theory, like the Trustee, postulates that increased corporate debt "generates incentives for the corporation's directors, who are assumed to act to maximize shareholder returns, to undertake excessively risky transactions. The increased preference for risk arises because the debtholders incur a

disproportionate share of the downside risk, relative to the gains they receive if the transactions are successful." Id.

However, the overinvestment theory may not describe how corporations actually behave and the Trustee's proposed rule may damage corporations. Although scholarly discussions of public policy do not form the basis for this court's decision, they demonstrate that governing how insolvent corporations behave is a problem that is too complex to reduce to appealing rhetoric that is unsupported by empirical research or solid precedent for four reasons.

First, personal liability may be unnecessary to prevent directors from taking excessive risks. Distressed firms did not pursue excessively risky strategies frequently according to the existing research surveyed by Royce de R. Barondes, an assistant professor of finance at Louisiana State University. Barondes at 60-63. Professor Barondes reasoned that CEO's of distressed corporations may refuse to take excessive risk to preserve their jobs, even though shareholders may prefer riskier strategies. Id. at 59. Thus, the behavior of Seven Seas during a time of financial distress may be the exception to the rule and, consequently, this court sees no reason to adopt a generally applicable rule to prevent such behavior or to believe that the Supreme Court of Texas would do so.

Second, applying the definition of insolvency is much easier in theory than in practice. Id. at 71. For example, a corporation may not create records showing its insolvency because "[a] financially-distressed, but not-yet-bankrupt, firm will often carry a historical balance sheet that reflects solvency. However, once a firm seeks the protection of bankruptcy, its balance sheet may be retroactively restated through write-offs and write-downs of assets to show that it was insolvent at some point before the filing." Ramesh K.S. Rao et al., *Fiduciary Duty a la Lyonnais: An Economic Perspective on Corporate Governance in a Financially-Distressed Firm,* 22 J.

Corp. L. 53, 63-64 (1996); see also Barondes at 71-72. Thus, directors may find themselves accused of having violated duties that they had no reason to believe existed after auditors adjust balance sheets for the purpose of facilitating a bankruptcy proceeding.

Third, the insolvency exception would be an extremely difficult rule to follow because any:

> pre-filing [for bankruptcy] fiduciary duty, … is often disruptive, if not contradictory, to the directives of state corporate law … The mandate of fiduciary duty, though clear and simple, nonetheless opens the debate regarding who or what should be the beneficiary of the fiduciary responsibility. While it is simple to define fiduciary duties between a trustee and a beneficiary, it is quite another task to moderate the competing constituencies in the corporate law context even before the enterprise makes the transition to insolvency.

Roberts at 284.

In fact, Professor Barondes elaborated on this criticism by explaining how the insolvency exception actually contradicts the usual reason for imposing fiduciary duties:

> the law frequently creates vague standards … to deter undesirable conduct. However, inherent in such a rationale is that there is no cause of action where one is, in fact, deterred. If *Credit Lyonnais* creates an affirmatively enforceable duty, directors who attempt to follow its dictates when deciding among alternative strategies, but fail to predict accurately when a court will determine that a corporation is "operating in the vicinity of insolvency," will necessarily be subject to liability. If the directors incorrectly believe the corporation is not "in the vicinity of insolvency," the directors will promote the shareholders' interest and be subject to liability in an action brought by creditors. If they instead gravitate to promoting the interests of creditors and the corporation is not "in the vicinity of insolvency," directors will be subject to liability to the shareholders. If *Credit Lyonnais* creates an affirmatively enforceable standard, directors have to be precisely correct in determining whether the standard is met.

Barondes at 75-76.

Fourth, adopting a rule as impractical as the insolvency exception "imposes extraordinarily powerful economic incentives that can be expected to affect significantly the actions of managers of nearly insolvent firms, and perhaps precipitate managerial defections, to

the detriment of distressed firms." Id. at 76. Not only would the firm's own managers possibly

defect, third parties might not assist nearly insolvent corporations:

> The burden on firms operating in the vicinity of insolvency in that context would be increased by the possibility that outside professionals, such as investment banks, that facilitate consummation of transactions approved by boards of directors also may be subject to liability. An investment bank that provides substantial assistance in the consummation of a transaction that the investment bank knows or should know to be in violation of a board's fiduciary duty aids or abets the board's primary violation and thus will be liable to the beneficiary of the duty. The cost of that risk ultimately will be reflected in fees paid to such professionals by firms operating in the vicinity of insolvency.

Id. at 76.

Because "other available sources, such as treatises and legal commentaries" describe the

insolvency exception as an unnecessary, impractical, harmful, and poorly-supported extension of

the trust fund doctrine, this court does not believe that the Trustee's claims would prevail if

presented to the Supreme Court of Texas.

Ultimately, this court holds that the Directors of Seven Seas did not owe the creditors of

Seven Seas any broad fiduciary duties under the common law of Texas because: (1) *Conway*

held that they did not; (2) the decisions arguably contradicting *Conway* are not supported by

opinions issued by Texas courts, but cite only Delaware cases; (3) the Delaware cases on which

the Trustee relies did not actually create a cause of action distinct from the trust fund doctrine;

and (4) nothing suggests that the Supreme Court of Texas would adopt the reasoning of those

Delaware cases, even if they did create a cause of action distinct from the trust fund doctrine.

Because the Directors of Seven Seas owed the creditors of Seven Seas no fiduciary

duties, the decision to mortgage the assets of Seven Seas is actionable only if the Trustee

establishes both that the decision damaged Seven Seas and that a defendant's violation of legal

obligation caused the damage.

### D. A CORPORATION'S DIRECTORS OWE DUTIES OF CARE AND LOYALTY TO IT.

Although Texas law does not impose fiduciary duties in favor of creditors on the directors of an insolvent, but still operating, corporation, it does require those directors to act as fiduciaries of the corporation itself.  As mentioned above, "[t]hree broad duties stem from the fiduciary status of corporate directors; namely, the duties of obedience, loyalty, and due care." *Gearhart Industries, Inc. v. Smith Intern., Inc.,* 741 F.2d at 719 (citing Ubelaker, Director Liability Under the Business Judgment Rule, 35 Sw.L.J. 775, 781-82 (1981)). Of these three duties, the Trustee alleges that the directors violated their duties of care and loyalty, but not their duty of obedience.

In *Gearhart Industries,* the Fifth Circuit emphasized that opinions from the state courts of Texas provide the proper authority to which federal courts should defer when deciding lawsuits against the directors of corporations incorporated in Texas and was "both surprised and inconvenienced" when the parties "despite their multitudinous and voluminous briefs and exhibits … argue[d] back and forth over the applicability of the plethora of out-of-state cases they cite[d]." *Id.* at 719, n. 4. Because the parties in *Gearhart Industries* cited inapplicable cases, the Fifth Circuit relied on Professor Ubelaker's "thorough treatment of the duties of corporate fiduciaries and the business judgment rule" and "the depth of her research into Texas law on these topics." *Id.* at 719, n. 5. Like the Fifth Circuit, this court will rely on opinions issued by the state courts of Texas to analyze the Trustee's claims against the Directors for their alleged breaches of the duties of care and loyalty.

### 1. A CORPORATION MAY REMEDY A BREACH OF THE DUTY OF LOYALTY EITHER BY SUING FOR DAMAGES OR VOIDING THE TRANSACTION.

The remedies available to a corporation whose directors have breached the duty of loyalty that they owe to that corporation are more relevant to this case than the scope of the duty itself because the parties have argued past each other. The Defendants invoked authorities and raised arguments that affect whether the Secured Facility was a valid and enforceable debt. The Trustee implicitly concedes that it was, but seeks monetary damages from the Directors for creating that valid and enforceable debt.

The confusion appears to arise because, in most circumstances, corporations find voiding a debt is more efficient than suing for damages.  Thus, traditionally, "[i]t [was] a wholesome and thoroughly settled rule that" when "a director of a private corporation … deal[t] in his own behalf in respect of the corporate property … and his vote as a member of the board [was] necessary to the passage of the resolution authorizing it, [then] this action … [was] … voidable[.]" *Texas Auto Co. v. Arbetter,* 1 S.W.2d 334, 337 (Tex.App.–San Antonio 1927, writ dism'd).[7] For example, a corporation could challenge the enforceability of a promissory note created by a director who had breached his duty of loyalty. *Landon v. S & H Marketing Group, Inc.,* 82 S.W.3d 666 (Tex.App.–Eastland, 2002).

In this case, the Trustee no longer seeks to void the Secured Facility, a course of action that would require this court to resolve when a corporation's transaction with an interested director is voidable. Instead, the Trustee seeks monetary damages from the Directors for creating the Secured Facility. He bases his claim for monetary damages on the allegation that the Directors' interest in the Secured Facility constitutes a breach of their duty of loyalty to Seven Seas because, for example, a higher interest rate on the Secured Notes enriched the Directors at

---

7.  Current statutes have limited a corporation's ability to void transactions with interested directors. Bus. Corp. Act, Art. 2.35-1.  However, the statute does not address a corporation's ability to sue for monetary damages and has no bearing on this case.

the expense of Seven Seas. If the Directors had provided all of the funds for the Secured Facility and had continued to hold the Secured Notes, then such a transaction might be voidable.

However, the Secured Facility affected other parties. Chesapeake held a 50% interest in the Secured Facility, shareholders of Seven Seas purchased $2 million in Secured Notes, and the qualified investors had sold some, or even many, of the Secured Notes to innocent purchasers by the time Seven Seas filed for bankruptcy. The involvement of these other parties created the possibility that voiding the Secured Facility, rather than pursuing claims against the Directors, may have been incredibly unjust. Voiding the Secured Facility would have left innocent purchasers of Secured Notes without any recovery and the arguably culpable Directors with the proceeds from the sales of their Secured Notes. By pursuing the legal theories that he believed to be most advantageous and by electing one remedy over another, the Trustee did not "reverse course" or "bless the Secured Facility" and the Defendants have not cited any authority that extinguishes the corporation's right to recover monetary damages from those directors who violated their duty of loyalty simply because the corporation refuses to void or cannot void the harmful transaction.

Because the parties devoted so much of their attention to issues that are relevant only to the question of whether the Trustee could void the Secured Facility, this court cannot efficiently or accurately resolve what authorities and evidence truly determine whether the Trustee may recover damages from the Directors for their role in the Secured Facility or any other breaches of their duty of loyalty. Similarly overlapping arguments prevent this court from properly determining whether any alleged breaches of the Directors' duty of loyalty to Seven Seas actually damaged the Company, rather than its creditors, in a legally compensable manner. That is, the parties have not established, although they have addressed, the standard for evaluating

how and whether an already-insolvent corporation can be damaged by further debt or how a bankruptcy trustee may pursue those claims.

Accordingly, this court declines to address whether the parties were interested or not interested as a matter of law, whether the Secured Facility was fair as a matter of law, whether any of the Trustee's legal theories against the Entity Defendants are valid as a matter of law, and whether the Trustee has presented evidence of damages or whether the Defendants' have demonstrated an entitlement to judgment as a matter of law on the issue of damages.

### 2.   THE DIRECTORS DID NOT VIOLATE THE DUTY OF CARE THAT THEY OWED TO SEVEN SEAS.

Arguably drilling the Deep Well and building the pipeline were such reckless or useless endeavors that the Directors' decisions to pursue each strategy violated the duty of care that the Directors owed to Seven Seas. However, these decision appear to fall beyond the court's scrutiny, even though they might have been ill-advised.

Applying a legal standard to the Directors' decisions that would support a finding of liability is virtually impossible because although "Texas courts hold directors liable for negligent mismanagement of their corporations," those "decisions do not specifically refer to such acts as violations of the duty of care, preferring to speak in general terms of directors as fiduciaries." *Gearhart Industries,* 741 F.2d at 720 (citations omitted). In fact, the opinions defining the duty of care that directors owe a corporation do not appear to create a well-defined rule. Thus, "[t]he modern view definitely stresses the duty of loyalty and avoids specific discussion of the parameters of due care." *Gearhart Industries,* 741 F.2d at 720-21 (quoting Ubelaker at 789).

According to the Fifth Circuit, "[t]he leading case in Texas defining a director's standard of care" was decided in 1919. *Id.* (citing *McCollum v. Dollar,* 213 S.W. 259 (Tex.Com.App.

1919, holding approved)).[8]   To meet the standard of care, the *McCollum* opinion required a director to demonstrate the same care as "an ordinarily prudent man would use under similar circumstances." *McCollum v. Dollar,* 213 S.W. at 261. To define "similar circumstances," the *McCollum* court, quoted from a treatise on corporations:

> What may be regarded as negligence in one instance, or under certain circumstances, would not be regarded as negligence under other circumstances; the proper performance of their duties is a question of fact and must be determined in each case in view of all the circumstances. In considering such circumstances, regard may be had to the character of the corporation, the condition of its business, the usual method in which such corporations are managed, and any and all other relevant facts that tend to throw light upon the question of the proper discharge of the duty as a director.

*McCollum v. Dollar,* 213 S.W. at 261 (quoting Thompson on Corp. (2d Ed.) § 1275).

The *Gearhart Industries* court could not find any other cases that defined the standard of care, except to conclude that "[u]nquestionably, under Texas law, a director as a fiduciary must exercise his unbiased or honest business judgment in pursuit of corporate interests." *Gearhart Industries,* 741 F.2d at 720 (citations omitted). But, "despite the ordinary care standard announced in *McCollum v. Dollar,* … Texas courts to this day will not impose liability upon a noninterested corporate director unless the challenged action is ultra vires or is tainted by fraud." *Id.* at 721. Instead, "the standard for judicial intervention in cases involving" "a director's standard of care, negligent mismanagement, and business judgment" is high. *Id.* (*citing Cates v. Sparkman,* 11 S.W. 846 (1889)). Under *Cates:*

---

8. The *McCollum* decision actually interpreted the duty that a director owes to a corporation only indirectly. It actually applied the trust fund doctrine to an insolvent corporation that had ceased to operate. The plaintiffs complained that the directors of a cotton company had misappropriated the proceeds of a cotton sale. The corporation was insolvent, the creditors had met, and a trustee had been appointed to manage its affairs. Thus, the trust fund doctrine imposed fiduciary duties on the corporation's directors in favor of the corporation's creditors, including a duty of care equivalent to the duty of care that directors of a corporation that continues to operate, whether solvent or insolvent, owe to that corporation.

> [I]f the acts or things are or may be that which the majority of the company have a right to do, or if they have been done irregularly, negligently, or imprudently, or are within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved, these would not constitute such a breach of duty, however unwise or inexpedient such acts might be, as would authorize interference by the courts at the suit of a shareholder.

*Cates,* 11 S.W. at 849.

The *Gearhart Industries* court found no basis for holding directors liable unless the director was interested or had committed an action that was ultra vires or tainted by fraud and did not mention the term "gross negligence." Nevertheless, in the early 1990s, Federal District Courts in Texas began to interpret Texas law as holding directors of a corporation liable for grossly negligent acts. *See F.D.I.C. v. Schreiner,* 892 F.Supp. 869 (W.D. Tex. 1995) (citing *FDIC v. Daniel,* 158 F.R.D. 101 (E.D. Tex. 1994); *RTC v. Acton,* 844 F.Supp. 307 (N.D. Tex.1994); *FDIC v. Harrington,* 844 F.Supp. 300 (N.D. Tex. 1994); *FDIC v. Benson,* 867 F.Supp. 512 (S.D.Tex. 1994); *RTC v. Norris,* 830 F.Supp. 351 (S.D. Tex. 1993); and *FDIC v. Brown,* 812 F.Supp. 722 (S.D. Tex. 1992)). Eventually, other opinions issued by District Courts in Texas reached the same conclusions by citing this string of cases. *See, e.g., Weaver,* 216 B.R. at 584 (citing *Schreiner,* 892 F.Supp. 869).

When not citing each other, these cases often cited *Gearhart Industries* as well as an earlier opinion issued by an intermediate appellate court in Texas which explained, "the rule is that, in the absence of usurpation, fraud, or gross negligence on the part of the directors, a court of equity will not interfere at the suit of a minority of stockholders, merely to overrule and control the discretion of the directors on questions of corporate management, policy, or business." *Jewell v. Sal-O-Dent Laboratories*, 69 S.W.2d 544, 546 (Tex.Civ.App.-Eastland 1934, writ refused). These District Courts implicitly followed the instructions of the *McCollum* opinion because they accounted for the nature of the business in which the defendants were

engaged. Specifically, an early decision from the Supreme Court of Texas held the directors of banks to a higher standard of care than the directors of other corporations, requiring them to be more diligent. *Seale v. Baker,* 7 S.W. 742, 747 (Tex. 1888).  In contrast, no authority suggests that Texas courts scrutinize the decisions of oil exploration companies as closely. Thus, the District Court opinions that held directors liable for gross negligence appear to be the product of the special treatment that banks may receive under Texas law. Because this case challenges the actions taken by directors engaged in a far more speculative business, this court will follow the *Gearhart Industries* opinion and reject the proposition that directors can be held liable for gross negligence under Texas law as it exists now.

Seven Seas was a corporation devoted to exploring possible deposits of oil. As early as 1998, it announced that its purpose to explore the Deep Well.  That it attempted to adopt a more conservative strategy for a short time did not change its character as a corporation taking high risks in the pursuit of oil reserves. Similarly, the condition of Seven Seas' business was, according to the Trustee, untenable because it would have been unable to pay its debts in the relatively short term.  Facing the prospect of failure in its chosen business, the Directors' decision to gamble the Company's last resources on a Deep Well that could have enriched everyone holding shares of the Company is not a breach of any duty identified by the *Gearhart Industries* opinion.

The Directors decision to build the pipeline presents a different problem. Although the decision to use a pipeline, rather than trucks, to transport oil is not subject to scrutiny by this court, if the Directors decided to build an otherwise useless pipeline to avoid an SEC investigation or to facilitate the breach of some other duty, then they might have violated the duty of loyalty that they owed to the Company.

**E.     THE TRUSTEE MAY PURSUE THIS LAWSUIT.**

### 1.  THE DOCTRINE OF JUDICIAL ESTOPPEL DOES NOT BAR THE TRUSTEE'S SUIT.

The Defendants argue that the doctrine of judicial estoppel bars the Trustee's complaint. Doc. 153 at 31. To invoke the theory of judicial estoppel, a party's statements must be "clearly inconsistent." *In re Coastal Plains, Inc.,* 179 F3d 197, 206 (5th Cir. 1999). The Trustees' positions are not "clearly inconsistent" because innocent parties may have purchased the Secured Notes whereas those Directors who created the Secured Facility allegedly were not innocent parties. The Reorganization Plan exempts the Directors from any benefits of the mutual release. Doc. 153, Exh. 50, at 27, § IV.B.2.l.(C). Not only does this court's independent review of the file demonstrate that the positions taken by the Trustee are consistent, the Trustee's testimony at the confirmation hearing on August 4, 2003 clearly reveals that he did not "bless" the creation of the Secured Facility except to acknowledge the incredible difficulties faced by anyone seeking to challenge its validity. Doc. 236, Exh. 48 at 13:18-14:19 and 21:8-21:15. The Trustee simply chose to pursue arguably more culpable defendants under different legal theories and the Bankruptcy Court's orders endorsed the Trustee's choice by permitting the mutual release to include the qualification that it did not release any claims against the Defendants.

### 2.  THE DOCTRINE OF RES JUDICATA DOES NOT BAR THE TRUSTEE'S SUIT.

The Defendants argue that the Bankruptcy Court's decision to classify the Secured Facility as an allowed secured claim constitutes a final judgment that the Trustee cannot overturn. Doc. 153 at 33-34. However, the terms of the Reorganization Plan expressly preserved all claims against the Directors and Entity Defendants. The Reorganization Plan merely permitted the Secured Facility to be treated as a valid debt. It did not absolve anyone of liability

for creating it. Therefore, the orders issued by the Bankruptcy Court cannot constitute a final judgment exculpating the Defendants.

### 3.  THE TRUSTEE ADEQUATELY DISCLOSURE THE CLAIMS AGAINST THE DEFENDANTS.

The Defendants argue that the Trustee, either in the Trustee's Disclosure Statement or the Reorganization Plan, did not adequately disclose the claims against them. Specifically, they argue that "[t]he Trustee's general mention of the possibility that he 'is currently investigating and may bring certain causes of action against the Debtor's current and former officers and directors' does not disclose the nature or type of action, the value of the action, or against whom such action might be brought.'" Doc. 153 at 37. The Defendants describe the Trustee's Disclosure Statement as "mak[ing] passing mention of potential causes of action" and conclude that "[s]uch selective disclosure is insufficient under precedent set by the Fifth Circuit and this Court." Id. at 38.

To support the argument that the Trustee's disclosure was inadequate, the Defendants do not cite any authority that establishes the standard for determining how specific or explicit a debtor's disclosure must be. Instead, they cite opinions in which courts recited the general importance of disclosing claims and prohibited debtors from pursuing lawsuits because the debtor failed to disclose the potential lawsuits as assets sufficiently. *See e.g., In re Coastal Plains, Inc.,* 179 F.3d 197 (5th Cir. 1999); and *Westland Oil Development Corp. v. MCorp Management Solutions, Inc.,* 157 B.R. 100, 103 (S.D. Tex. 1993). However, reported bankruptcy cases present an almost innumerable set of permutations because bankruptcy courts possess a great deal of discretion to fashion orders that meet the needs of individual debtors and their creditors. Thus, the proper analysis of the Trustee's disclosures begins with the text of the Bankruptcy Code, not with isolated citations to opinions whose factual patterns and procedural

postures may or may not be analogous for reasons not readily apparent from isolated sentences drawn from them.

Before a debtor may solicit the acceptance or rejection of a reorganization plan, the debtor must transmit "the plan or a summary of the plan, and a written disclosure statement approved ... by the court as containing adequate information." 11 U.S.C. § 1125(b). The same section of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, … that would enable … an informed judgment about the plan [and] … the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

11 U.S.C. § 1125(a)(1).

The flexible standard contained in the Bankruptcy Code compels this court to determine whether the disclosure contains "information of a kind, and in sufficient detail [to] enable … a hypothetical investor of the relevant class to make an informed judgment about the plan ... [and] consider... the benefit of additional information to creditors and other parties in interest," instead of resting its decision on technical omissions from the Trustee's Disclosure Statement.

Neither party has adequately compared the Reorganization Plan and or Trustee's Disclosure Statement to the statutory requirements that define an adequate Reorganization Plan and Trustee's Disclosure Statement. The opinion on which the Defendants rely, *Westland Oil*, is not sufficiently factually similar to dictate the same result. In *Westland Oil,* the debtor disclosed no specific defendants or even possible causes of action. *Westland Oil,* 157 B.R. at 103. In this case, the Trustee identified a set of defendants and a set of possible causes of action. The Trustee's Disclosure Statement did not describe the possible causes of action in the same paragraph that identified the Defendants. However, it did so in the paragraph immediately

preceding its identification of the possible defendants. Furthermore, Section 4, in which the Trustee identified the Defendants and the possible causes of action, distinguishes itself from other possible causes of action.

Finally, for three reasons the existence of an adversarial proceeding constitutes part of the circumstances that permit a relatively vague disclosure statement to constitute "adequate information." First, the complaint already described the Directors' suspect behavior.   The Trustee's Statement, the Reorganization Plan, and the Trustee's testimony at the confirmation hearing indicated that only the defendants in the suit would change.   The goal, and therefore the possible value, of the suit would remain the same.   Thus, the precise value of the claim or the specific additional legal theories that could justify relief would not have provided much information that the creditors did not already possess.

Second, the cost of obtaining additional information may have been excessive. Formulating the proper legal theories under which to proceed required a great deal of legal research.   Calculating the value of the claim appears to have required the retention of experts and even the discovery process.   The Trustee could not perform the factual or legal research presented to this court without the approval of the Reorganization Plan.

In fact, the Bankruptcy Code allows a court to "approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets." 11 U.S.C. § 1125(b).  In this case, the Bankruptcy Court endorsed the Trustee's Disclosure Statement as adequate. Thus, the Trustee's failure to state specific values for the claims against the Defendants does not strip him of his ability to pursue his claim.

Third, the creditors do not appear to have required much more information than they had already obtained through the adversarial proceeding to make an informed choice.  Because the

litigation claims constituted much of the estate's value, the creditors faced a choice between two possible paths: try for some recovery or accept no recovery.  The information that is adequate to enable an informed choice between something and nothing is substantially less than the information that is adequate to enable an informed choice between various permutations of something.

### IV.    CONCLUSION

This order holds that:

(1) the Directors' decision to loan their own money to the Company might have violated their duty of loyalty;

(2) the Directors' decision to prefer one set of creditors, themselves, to another set of creditors is actionable only if it somehow damaged the Company;

(3) the Directors' decision to drill the Deep Well did not violate their duty of care to the Company;

(4) the Directors' decision to build the pipeline did not violate their duty of care to the Company;

(5) the Directors' decision to build the pipeline might have violated their duty of loyalty to the Company;

(6) the effect that other portions of this order have on the issues before this court means that this court now lacks sufficiently focused arguments from the parties make accurate decisions regarding the remaining issues before it and must deny summary judgment without prejudice on the following issues:

(a)     whether the Directors might have violated their duty of loyalty in some manner not identified in paragraphs 1 through 5 of this order;

(b)     whether any of the Directors' actions that allegedly breach their duties to the Company injured it in a legally compensable manner;

(c)     whether any of the Directors were or were not interested in any transaction as a matter of law;

(d)     whether the Secured Facility was fair as a matter of law;

(e)     whether any of the Trustee's legal theories against the Entity Defendants are valid as a matter of law; and

(f)     whether the Trustee has presented evidence of damages or whether the Defendants' have demonstrated an entitlement to judgment as a matter of law on the issue of damages.

(g)     whether any evidence or testimony should be excluded as inadmissible.

Accordingly, it is hereby **ORDERED**:

(1) The Defendants' motion for summary judgment is **GRANTED IN PART**. Doc. 153.

(2)  The Trustee's motion is **DENIED**. Doc. 126.

(3)   All pending evidentiary and procedural motions are **DENIED WITHOUT PREJUDICE** and leave granted to reargue any motion if necessary. Doc. 138, Doc. 142, Doc. 144, Doc. 145, Doc. 146, Doc. 148, Doc. 149, Doc.158, Doc. 159, Doc. 160, Doc. 172, Doc. 244., and Doc. 251.

(4)  The motion to strike evidence in support of the Plaintiff's response to the motion for summary judgment is **DENIED**.  Doc. 238.

(4)  The Trustee's motion to expedite is **DENIED** as **MOOT**. Doc. 261.

(5)  Any matter not decided by this order may be raised again in a manner consistent with this order and without the need to re-file copies of already-filed exhibits so long as any exhibits are identified by their precise location in the court's electronic file, i.e., with a reference to the

docket entry containing the exhibit, the part of that docket entry, and the page of that part of the docket entry (Doc. XXX-YY, at ZZ).

(6)  The parties are referred to Magistrate Judge Stacy for a Scheduling Conference to set a trial date, as well as deadlines to file further dispositive motions and to set the terms on which the parties may correct any deficiencies in expert reports or evidence identified by the motions already filed.

**SIGNED** at Houston, Texas, this 29th day of September, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE