UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BEN FLOYD, TRUSTEE OF THE ESTATE OF SEVEN SEAS PETROLEUM, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT A. HEFNER, III, ET AL., <br><br> Defendants, <br> _____ <br><br> SEVEN SEAS PETROLEUM, INC. <br><br> Plaintiff, <br><br> v. <br><br> MCAFEE & TAFT, P.C. JERRY WARREN and GARY FULLER, IN HIS CAPACITY AS A LAWYER, <br><br> Defendants. | Civil Action No. 03-5693 |

## OPINION & ORDER

This highly contentious case involves the bankruptcy and ultimate demise of Seven

Seas Petroleum, Inc. ("Seven Seas" or the "Company"), an oil and gas company.  The relevant

parties include: Plaintiffs Seven Seas and its Chapter 11 Trustee, Ben Floyd ("Trustee"); Defendants

Robert A. Hefner, III ("Hefner"), Randolph Devening ("Devening"), Brian Egolf ("Egolf"), Dr.

James Schlesinger ("Schlesinger"), Larry Ray ("Ray"), and Gary Fuller ("Fuller"), several former

directors of Seven Seas (collectively "the Directors"); Defendants McAfee & Taft, P.C. ("M&T"),

Fuller, in his capacity as a lawyer, and Jerry Warren ("Warren"), former outside counsel of Seven

-1-

Seas (collectively "the Lawyers"); and Defendants Ramiiilaj Limited Partnership ("Ramiiilaj"), Fuller Family Investments Limited Partnership ("Fuller Family Investments"), and Petroleum Properties Management Company ("Petroleum Properties"), the entity defendants who helped finance the venture (hereafter collectively "Entity Defendants").

Pending before the court are a myriad of summary judgment motions including: (1) Seven Seas' motion for partial summary judgment against the Lawyers (Doc. 295); (2) the Lawyers' renewed summary judgment against Seven Seas (Doc. 297); (3) the Directors' motion for summary judgment on all remaining claims (Doc. 299); (4) Ramiiilaj's motion for summary judgment against the Trustee (Doc. 300); (5) Fuller Family Investments' motion for summary judgment against the Trustee (Doc. 301); and (6) Petroleum Properties' motion for summary judgment against the Trustee (Doc. 302). Also under consideration is the Trustee's motion for reconsideration of certain holdings in the court's September 29, 2006, Order (Doc. 267) ("Sept. 29 Order"), which granted in part Defendants' first round of summary judgment motions.

Additionally, there are numerous evidentiary matters before the court. First, the Director Defendants have objected to certain portions of the Trustee's proffered summary judgment evidence (Doc. 251). Second, the parties have moved to exclude or limit the expert testimony of numerous individuals, including (1) Dean Graves ("Graves"), Dean Swick ("Swick"), and Pete Huddleston ("Huddleston") (Doc. 333); (2) Cary Ferchill  ("Ferchill") (Doc. 324); (3) Thomas Watkins ("Watkins") (Doc. 325); (4) Walter Bratic ("Bratic") (Doc. 328); (5) Don Ray George ("George") (Doc. 329); (6) Ronald Vollmar ("Vollmar") (Doc. 330); (7) Walter Steel ("Steel") (Doc. 331); and (8) Jonathan Macey ("Macey") (Doc. 332).[1]  Finally, Plaintiffs have filed a first amended

---

[1]      Defendants' expert witnesses include Bratic, George, Vollmar, Steele, and Macey.  Plaintiffs' expert witnesses are Graves, Swick, Huddleston, Ferchill, and Watkins.

motion to equalize peremptory challenges (Doc. 326) and a motion in limine (Doc. 327), and Defendants have filed a joint motion in limine (Doc. 334).

Having considered these motions, the innumerable responses and replies thereto, the complete record before the court, and all applicable legal standards, and for the reasons articulated below, the court (1) DENIES WITHOUT PREJUDICE Seven Seas' motion for summary judgment; (2) GRANTS-IN-PART and DENIES-IN-PART the Lawyers' motion for summary judgment; (3) DENIES the Directors' motion for summary judgment; (4) GRANTS-IN-PART and DENIES-IN-PART the Entity Defendants' motions for summary judgment; (5) DENIES the motion to strike summary judgment evidence; (6) DENIES the motions to exclude or limit the testimony of Graves, Swick, Huddleston, George, Vollmar, and Steele; (7) GRANTS-IN-PART and DENIES-IN-PART the motions to exclude or limit the testimony of Ferchill and Watkins; (8) GRANTS the motions to exclude or limit the testimony of Bratic and Macey; and (9) DENIES WITHOUT PREJUDICE the parties' motions in limine and Plaintiffs' motion to equalize the peremptory challenges.

I.      Background & Relevant Facts

        1.      The Risky Venture

        Seven Seas was a Houston-based oil and gas company engaged in the exploration and development of oil and gas properties located in Colombia, South America.  Initially incorporated in Canada, Seven Seas migrated its place of incorporation to the Cayman Islands.  The Company's primary assets were two contracts issued by Ecopetrol, Colombia's state oil company, to explore and develop wells in the Guaduas Field, which produced oil from relatively shallow depths (the "Shallow Field").

The prior board of directors of Seven Seas initially oversaw the Colombian exploration until Hefner, aided by Fuller, deposed the former board in1997.  Thereafter, Hefner installed Fuller and others as directors and assumed significant control over Seven Seas.

To pursue its business plan in the Shallow Field, Seven Seas raised $110 million by issuing unsecured promissory notes (the "Unsecured Notes") to large, sophisticated investors (the "Bondholders") in May 1998.  (*See* Offering Memorandum, Doc. 153 Ex. 65).[2]  The Unsecured Notes earned 12 ½ percent in interest per year and, under the terms of an "Indenture," permitted Seven Seas to borrow money in the future, even on a secured basis.  (Indenture at 53-54, Doc. 153 Ex. 66).  The Indenture also allowed Seven Seas, if certain conditions were met, to borrow additional money from "affiliated parties," including its directors.  (*Id.* at 58).  Finally, the Indenture released the Directors from any liability arising from the issuance of the Unsecured Notes.  (*Id.* at 88).

Despite initial optimism regarding the venture, the Shallow Field was beset by delays and lackluster production.  The Directors strategy during this period was to focus on production and to obtain a "commerciality" decision from Ecopetrol, which had the option of declaring the properties "commercial" so as to give Ecopetrol a 50% working interest in the Shallow Field.  Ecopetrol, however, expressed concerns about the Company's plans and its optimistic beliefs about the amount of oil in the Shallow Field.  (Panero Letter, dated April 20, 1998, at 2-3, Doc. 207 Ex.

---

[2]        In its Sept. 29 Order, the court permitted the parties to reference already-filed exhibits in all future briefing. Unless otherwise noted, citations to evidence in the record are made to the docket entry numbers of the motions or responses to which the exhibits were originally attached rather than the docket entry numbers of the exhibits themselves. For ease of reference, the majority of the exhibits cited were attached to the following: The Director and Entity Defendants' Motion for Summary Judgment (Doc. 153); Plaintiff's Response to Director and Entity Defendants' Motion for Summary Judgment (Doc. 207); and Motion For Summary Judgment of Defendants McAfee & Taft A Professional Corporation, Gary Fuller and Jerry Warren and Brief in Support (Doc. 130).

84).  Ecopetrol subsequently declined to participate.  (Seven Seas 2000 10-K at 3, Doc. 153 Ex. 70)

(informing the public that on May 23, 2000, Ecopetrol decided not to participate in the development

of the Shallow Field).

While still courting Ecopetrol, the Directors announced a new strategy to

conservatively develop the Shallow Field using existing cash and cash generated from operations

to develop the Field in increments  (Seven Seas 1998 10-K at 4-5, Doc. 153 Ex. 67).  The plan also

included the use of trucks and the eventual building of a pipeline to transport the oil to market.  (*Id.*).

In September 1999, the strategy changed from production to exploration.  (September

17, 1999, Board Meeting Minutes at 2, Doc. 153 Ex. 1).  In particular, the Directors chose to pursue

an incredibly risky project to drill a deep exploratory test well, the "Deep Well."  The exact success

rate for the Deep Well is disputed, but all agree that the odds for hitting oil were extremely low.[3]

In its 1999 10-K report, Seven Seas informed the public that it had spent the majority

of the year negotiating with Ecopetrol about commerciality.  The Company then outlined different

scenarios depending on the outcome of Ecopetrol's decision.  Notably absent from the 1999 10-K

report was the critical change in strategy that the Directors had decided to implement at the

September board meeting; however, the report reminded the public that the Bond Indenture allowed

the Company to obtain additional secured financing.

During the first half of 2000, the Directors fielded several inquiries from the

Securities and Exchange Commission ("SEC") regarding their "proved reserves" and the delay in

---

[3]      Some estimated a 1% chance of success.  (George Dep. at 93-94, 133-34, Doc. 207 Ex. 4).  DeGolyer &
MacNaughton ("D&M"), the outside consultant firm hired by the Company, estimated an 11% chance of success, which,
when adjusted to include mechanical risk, dropped to 5%.  (D&M Report at 7, Doc. 207 Ex. 54) (stating that the
probability of geologic success for the Deep Well was 11%); (Huddleston Dep. at 246, Carreras Decl. Ex. P, Doc. 314)
(opining that the mechanical risk would have lowered the probability of geologic success to 5%).

the pipeline construction.  (Feb. 2000 Inquiry, Doc. 207 Ex. 30; May 2000 Inquiry, Doc. 207 Ex.

109).  The SEC questioned whether the proved reserves of the Shallow Field should be downgraded

to "unproved" given the amount of oil and the absence of a pipeline, or other facility, to bring the

oil to market.  The write-down of its reserves may have seriously impacted Seven Seas' ability to

obtain the financing for the Deep Well and may have even exposed the Directors to liability for

making material misrepresentations.  After the SEC began asking questions, Egolf urged Hefner to

explore for more oil.  In a memorandum dated February 13, 2000, Egolf criticized the Company's

management for lacking direction.  (Doc. 207 Ex. 31).  Egolf believed that Seven Seas should pursue

"the company's greatest potential asset[,] the deep" well.  (*Id.* at 1).  According to Egolf, no other

course of action held any prospect of success because as he saw it, Seven Seas had "12 months

before it's over."  (*Id.* at 2).  Selling the Company was not feasible, and "[t]he only resolution to the

company's problem is to FIND MORE OIL!!"  (*Id.*).  Even schedules for "cost reduction account

for 10% of our overhead" were "too little, too late," like "the Captain and crew of the Titanic sitting

around discussing how to design a better navigation system after they've already hit the iceberg!"

(*Id.*).  According to Egolf, building a pipeline to transport oil would be futile because Seven Seas

was not producing enough oil.  (*Id.*).  In fact, Egolf believed that the Directors were less likely to be

sued if they spent the Company's remaining money on drilling a well than if they spent "the last $20

million on pipeline and product facilities when [they knew] the deal [was] uneconomic to Seven

Seas[.]"  (*Id.* at 3).  Because Egolf believed Seven Seas "had better get that deep test drilled ASAP

or we're history," he believed that Seven Seas should "do the right thing for once and drill the

prospect."  (*Id.*).  After all, he concluded "that's the business we're in – exploration!"  (*Id.*).

Faced with the SEC issues, as well as the Company's bleak outlook, the Directors vigorously pursued the Deep Well venture.  At a July 27, 2000, board meeting, Hefner disclosed a plan to raise the necessary funds to drill the Deep Well.  (July 27, 2000, Board Meeting Minutes at 2-3, Doc. 153 Ex. 2).  The goal was to obtain $45 million in financing (the "Secured Facility"), and Seven Seas began negotiating with Chesapeake Energy Corporation ("Chesapeake"), a publicly traded oil and gas company, to help fund the Secured Facility.

Chesapeake ultimately agreed to loan half of the Secured Facility, or $22.5 million of the $45 million needed, on the conditions that the loan was secured by Seven Seas' assets, that Hefner personally lend $15 million of the remaining $22.5 million, and that $15 million of the overall $45 million be escrowed to drill the Deep Well.  (Jan. 26, 2001 Letter from Aubrey McClendon ("McClendon") to Hefner and Ray and Feb. 8, 2001 Letter from Ray to McClendon, Doc. 153 Exs. 13 &14, respectively).  The structure of the Secured Facility was as follows: Chesapeake would purchase $22.5 million in secured promissory notes (the "Senior Secured Notes") with face values of $100.  A "detachable warrant," entitling the holder to buy a certain number of shares of Seven Seas common stock at a discount price, would be attached to each Senior Secured Note.  These Senior Secured Notes with the detachable warrants were the "Series A Notes."  Hefner and the other "qualified investors" would initially purchase $22.5 million in Senior Secured Notes without detachable warrants, the "Series B Notes."  The plan was to offer the Seven Seas' shareholders the opportunity to buy Series A Notes or to pass on the opportunity.  Only after the shareholder offering could the Series B Noteholders exchange their notes for Series A Notes.[4]  Both

---

[4]       This approach provided the participants with "a very, very limited downside, while at the same time offering a very large upside."  (Sept. 27, 2000 Hefner Letter at 2, Doc. 207 Ex. 46).  If the well failed, the secured lenders could recover on their loans, funded by the sale of the mortgaged assets.  If the well struck, the participants could cash in their warrants as the stock price of Seven Seas soared.

Series of Notes carried a 12 ½ percent interest rate.  The qualified investors included three other Directors, Egolf, Fuller, and Schlesinger, although some of them purchased secured notes through the investment entities named in this suit.

In January 2001, the Directors renegotiated the Company's Joint Operating Agreement ("JOA") with its working interest partners in the Shallow Field.  Under the amended JOA, the operatorship would automatically transfer to Sipetrol, one of the other working interest owners, if, *inter alia*, the Company either entered bankruptcy or committed an event of default under one of its loan agreements that remained uncured for thirty days.  (Amendment to JOA, dated January 25, 2001, at 3-5, Doc. 207 Ex. 120).

The Directors held a board meeting on May 17, 2001, to decide whether to pursue the Secured Facility.  At this board meeting, CIBC World Market Corp. ("CIBC") discussed the Secured Facility, as well as other means of financing, and gave the preliminary opinion that the Secured Facility "was fair from a financial point of view to the Company."  (May 17, 2001, Board Meeting Minutes at 2, Doc. 153 Ex. 5).[5]  Also at the meeting, attorney Warren from McAfee & Taft advised the Board that, in some jurisdictions, a director's fiduciary duty could expand to the Company's creditors if the Company came "within the vicinity of insolvency."  (*Id.*).  The meeting concluded with a unanimous vote by the Board to approve the Secured Facility.[6]

The Board did not seek shareholder approval for the Secured Facility.  Hefner informed the shareholders that, although normally a financing of this nature would require

---

[5]    The Bond Indenture specifically required a financial fairness opinion for a loan in which interested parties participated.  (Indenture at 77, Doc. 153 Ex. 66).

[6]    Director Devening was not present at the May 17 meeting, but later joined the other Directors in signing a formal Consent of Board of Directors approving the transaction.  (*See* Doc. 153 Ex. 7).

shareholder approval, the Company had sought and obtained an exemption from the American Stock Exchange ("AMEX") because the delay would have "seriously jeopardize[d] the financial viability of the Company." (July 9, 2001, Letter to Shareholders at 2, Doc. 207 Ex. 45).  The Secured Facility closed shortly thereafter on July 24, 2001.   As a final step, the offering to the shareholders was made on November 9, 2001.  The shareholders bought approximately $2 million of the $22.5 million in Senior Secured Notes.  Hefner and the other qualified investors then exchanged their warrentless notes for $20.5 million in notes with warrants.

With the money to proceed, drilling of the Deep Well commenced.  Unfortunately, and not completely unsurprisingly, the Deep Well was dry and the venture failed.

2.     The Bankruptcy of Seven Seas

On December 20, 2002, after the Deep Well's failure, some of the unsecured Bondholders filed an involuntary bankruptcy petition under Chapter 7 against Seven Seas.  On January 14, 2003, Seven Seas converted the bankruptcy petition into a reorganization under Chapter 11 of the Bankruptcy Code.  Floyd was then appointed Trustee for the debtor, Seven Seas.

On March 31, 2003, the Trustee filed an Adversary Complaint against Chesapeake and the other lenders of the Secured Facility, but only served Chesapeake.  (*See* Second Am. Disclosure Stmt. at 18, § III(H)(9), Doc. 153 Ex. 50).  The Trustee sought, *inter alia*, equitable subordination of the $45 Million and damages for Chesapeake's breach of fiduciary duties and its interference with the fiduciary duties of the Company's management. (Trustee's Orig. Adv. Compl., Doc. 153 Ex. 47).  Although the Trustee eventually settled his claims against the lenders, he expressly excluded claims against the Company's current or former officers and directors for pre-petition acts or omissions.  Shortly after the Reorganization Plan was approved, the Trustee filed his

-9-

First Amended Adversary Complaint adding all of the Directors, except Larry Ray, and the Entity Defendants.  Ray was subsequently added in a Second Amended Adversary Complaint.

        3.      Plaintiffs' Claims

        A.      Claims Against the Directors

As of the most recent complaint,[7] the Trustee brings three claims against the Director Defendants: (1) a claim for breach of the duty of care by not properly considering the consequences of the $45 million Secured Facility to the Company or its creditors, by not properly informing themselves of all relevant information concerning the $45 million Secured Facility, and by not properly following the Company's own internal procedures for authorizing the transaction (Pls.' Third Am. Compl. ¶¶ 29-30, Doc. 269); (2) a claim for breach of the duty of care by undertaking actions that were either negligent, grossly negligent, or reckless (*id.* ¶ 32); and (3) a claim for breach of fiduciary duty by not properly informing themselves of the consequences of the $45 million Secured Facility and entering into the Secured Facility when other courses of action or transactions had been (or were) available to the Company (*id.* ¶ 35).  These claims are made on behalf of the Company and the Company's creditors, whose interests allegedly coincided with those of the Company because of Seven Seas' insolvency, or near insolvency.

        B.      Claims Against the Entity Defendants

The Trustee brings one count against the Entity Defendants for conspiracy, tortious interference, and/or aiding and abetting breach of the Directors' fiduciary duty by "providing the Directors with funds to consummate the Secured Facility and other actions[.]"  (*Id.* ¶ 36).

---

[7]      After the court ruled on the first round of summary judgment motions in its Sept. 29 Order, the Trustee filed his Third Amended Adversary Complaint.  The Third Amended Adversary Complaint did not, however, make any substantive changes to the claims of the Second.  The Third Amended Adversary Complaint merely substitutes Seven Seas for Floyd as the party to the claims against the Lawyers.

C.      Claims Against the Lawyers

Seven Seas brings five claims against the lawyers: conspiracy to breach the Directors'
duties; aiding and abetting the Directors' breach of duties; intentional breach of fiduciary duty,
negligent breach of fiduciary duty; and a claim for negligence/malpractice.

In its first count, Seven Seas claims that the Lawyers and the Directors of Seven Seas
made "an agreement to conspire … to take actions that the Directors [and the Lawyers] knew would
result in the Directors' breach of the Directors' fiduciary duties" to Seven Seas.  (*Id.* ¶ 38).

Seven Seas alleges that the Lawyers also aided and abetted the Directors' breach of
fiduciary duties "[b]y assisting the Directors in obtaining an exemption from their requirement to
seek shareholder approval for the Secured Facility, providing an opinion letter that [the Lawyers]
knew contained incorrect statements and false representations, and failing to inform [Seven Seas]
that the Directors' actions were a breach of the Directors' fiduciary duties . . ." (*Id*. ¶ 40).

In its third and fourth count, Seven Seas claims that the Lawyers either intentionally
or negligently breached their fiduciary duties "[b]y failing to fully inform [the Company] of
numerous conflicts of interest, providing legal representation and advice to [the Company] while
such conflicts existed, failing to withdraw from representing [the Company] . . . when certain
conflicts of interest likely would have or did impair their judgment, and by putting the interests of
M&T and Fuller ahead of those of [the Company] as well [as] committing other acts."  (*Id.* ¶¶ 42,
44).

In its fifth claim, Seven Seas asserts that the Lawyers committed negligence and/or
malpractice by failing to inform Seven Seas that it should create an independent committee to
consider the Secured Facility; failing to inform Seven Seas of numerous conflicts of interests;

-11-

providing legal representation and advice while such conflicts existed; failing to withdraw from representation when certain conflicts likely would or did impair their judgment; failing to advise the Company that consummating the Secured Facility would violate the Directors' fiduciary duties, failing to advise Seven Seas to retain bankruptcy/restructuring counsel before the Secured Facility was consummated; and by "other acts." (*Id.* ¶ 46).

Finally, Seven Seas alleges that M&T is vicariously liable for the actions of Fuller and Warren because their actions were undertaken during the scope of their employment and McAfee & Taft authorized their conduct. (*Id.* ¶ 47).

4.     The Initial Motions for Summary Judgment & the Sept 29 Order

Asserting a myriad of arguments, the Director and Entity Defendants moved for summary judgment on all claims.[8]  On September 29, 2006, the court granted their motion in part. Specifically, the court rejected Trustee's claims that the directors of an insolvent or nearly insolvent corporation owe expanded fiduciary duties to the creditors of the corporation under the common law of Texas. (*See* Sept. 29 Order at 17, 39, Doc. 267).  The court then examined the fiduciary duty causes of action, in particular, the duties of care and loyalty.

The court concluded that the Directors did not violate their duty of care because the business judgment rule applied, and gross negligence was not an appropriate standard for evaluating their decision. (*See id.* at 43-46).  The court found, however, that the Company could recover monetary damages for the alleged breach of the duty of loyalty, but that the briefing and record were

---

[8]     The Lawyers had also moved for summary judgment on the basis that the Trustee was not the actual party in interest when he amended the complaint to add the Lawyers.  (*See* Lawyers' Mot. Summ. J. Based on Failure to Prosecute in the Name of the Real Party in Interest, Doc. 121).  The court granted this motion in part and allowed the Trustee to amend the complaint to add Seven Seas as a party in those claims made against the Lawyers.  (*See* Memorandum and Order, dated Sept. 26, 2006, Doc. 266).  The Third Amended Adversary Complaint reflects this substitution.  *See* note 7, *supra*.

not sufficiently clear to determine whether the parties were interested or not as a matter of law, whether the Secured Facility was fair as a matter of law, whether the claims against the Entity Defendants are valid, and whether the Company suffered legally compensable damages as a result of the alleged breach. (*Id.* at 42-43).

In conclusion, the court held as follows:

(1) the Directors' decision to loan their own money to the Company might have violated their duty of loyalty;

(2) the Directors' decision to prefer one set of creditors, themselves, to another set of creditors is actionable only if it somehow damaged the Company;

(3) the Directors' decision to drill the Deep Well did not violate their duty of care to the Company;

(4) the Directors' decision to build the pipeline did not violate their duty of care to the Company;

(5) the Directors' decision to build the pipeline might have violated their duty of loyalty to the Company;

(6) the effect that other portions of this order have on the issues before this court means that this court now lacks sufficiently focused arguments from the parties [to] make accurate decisions regarding the remaining issues before it and must deny summary judgment without prejudice on the following issues:

(a) whether the Directors might have violated their duty of loyalty in some manner not identified in paragraphs 1 through 5 of this order;

(b) whether any of the Directors' actions that allegedly breach their duties to the Company injured it in a legally compensable manner;

(c) whether any of the Directors were or were not interested in any transaction as a matter of law;

-13-

(d)    whether the Secured Facility was fair as a matter of law;

(e)    whether any of the Trustee's legal theories against the Entity Defendants are valid as a matter of law; and

(f)    whether the Trustee has presented evidence of damages or whether the Defendants' have demonstrated an entitlement to judgment as a matter of law on the issue of damages[; and]

(g)    whether any evidence or testimony should be excluded as inadmissible.

(*Id.* at 51-52).

The Trustee moved for reconsideration of certain holdings in the Sept. 29 Order. In his motion, the Trustee asks this court to reconsider three elements of its Order: (1) the holding that the Directors and the Entity Defendants were immune from liability for negligently breaching their duty of due care; (2) the holding that, under Texas law, directors cannot be liable to their corporation even for gross negligence; and (3) the holding, or potential holding, that the directors of an already or nearly insolvent company owe no duty to the company itself to consider the best interests of creditors. The court has granted the Trustee's motion to the extent that the court shall consider the merits herein.

    5.    The Current Round of Summary Judgment Motions

        A.    The Directors' Summary Judgment Motion

The Directors have moved for summary judgment on "all claims remaining after the Court's September 29, 2006 Order." (Doc. 299). Assuming that the Sept. 29 Order granted summary judgment for the Directors on the Trustee's claim that the Directors breached their

fiduciary duty of loyalty by drilling the Deep Well,[9] the Directors argue that summary judgment is appropriate because there is no evidence of a breach of a fiduciary duty of loyalty and because the Trustee fails to prove that the Company incurred legally compensable damages.

        B.      The Entity Defendants' Summary Judgment Motions

Each Entity Defendant has independently moved for summary judgment.  (Docs. 300, 301, and 302).  All contend that the Trustee has failed to produce evidence to support any of his claims.  Moreover, they assert that the doctrine of *in pari delicto* bars the Trustee's claims.

        C.      The Lawyers' Summary Judgment Motion Against Seven Seas

In their renewed motion for summary judgment (Doc. 297), the Lawyers reinforce the Directors' contention that the breach of the duty of loyalty claim fails as a matter of law, arguing that the shareholder offering and the allegedly fair terms of the Secured Facility negate any interest of the Directors in the Deep Well transaction.  Thus, the Lawyers claim, because the Directors are entitled to summary judgement, the Lawyers are as well.

The Lawyers also address the individual claims against them.  These claims can be divided into two categories: (1) claims relating to their assistance to the Directors, i.e., conspiracy and aiding and abetting, and (2) claims relating solely to their own actions, i.e., breach of fiduciary duty and negligence/malpractice.  The first set of claims are well understood in conjunction to the facts described above.  The second set requires a bit more factual detail regarding the Lawyers legal relationship with Seven Seas and the Directors.

M&T, an Oklahoma-based law firm, has represented Hefner, as well as his father and grandfather, in a variety of matters for decades.  (*See* Fuller Dep. at 33, Doc. 130 Ex. 4).  Fuller,

---

[9]      The Directors bifurcate the decision to drill the Deep Well and the financing of the Deep Well, which was accomplished by the Secured Facility.

facing claims as both a director and a lawyer, has been a practicing attorney for forty-six years, forty

of which with M&T.  (*Id.* at 13, 18).  Warren has been with M&T since he began practicing law in

1968.  (Warren Dep. at 10, Doc. 130 Ex. 5).

In early 1998, Larry Ray, President of Seven Seas, approached Fuller about

expanding the role of M&T's representation of Seven Seas.  M&T's  policy prohibiting firm

members from serving on the board of firm clients had recently changed following an American Bar

Association ("ABA") ethics opinion permitting such representation.  (Fuller Dep. at 38-40, Doc. 130

Ex. 4).  Thus, M&T agreed to represent Seven Seas as its general counsel, subject to Fuller's

disclosure to Seven Seas' board of the potential conflicts.  (*Id.* at 39).  Fuller distributed the ABA

ethics opinion to the board and received its verbal approval to go forward.  (*Id.* at 40-41).

By 1999, M&T had settled comfortably in its role as general counsel for Seven Seas.

The firm assisted Seven Seas with public filings and represented the Company in moving the

Company's place of incorporation from Canada to the Cayman Islands.  (*See id.* at 90-91).  Over the

next several years, Seven Seas became one of M&T's largest revenue-generating clients.  (*See* Fuller

Dep. at 47-48, Doc. 207 Ex. 9).

As Seven Seas' general counsel, the Lawyers played a substantial role in the Secured

Facility.  M&T provided legal advice to insure that the Secured Facility complied with the

conditions of the Bond Indenture.  (*See* Fuller Dep. at 312-14, Doc. 130 Ex. 4).  It negotiated the

legal form and structure of the Secured Facility documentation with Chesapeake.  (*See id.* at 99-

100).  M&T, through Warren, secured the AMEX exemption for shareholder approval.[10]  Warren

---

[10]     M&T initially argued to AMEX that the Company was entitled to a public offering exemption, but AMEX
rejected this position.  (*See* Letter to AMEX, dated April 25, 2001, Doc. 130 Ex. 18).  M&T subsequently applied for,
and AMEX granted, a "distressed company exemption."  (*See* Letter from AMEX, dated May 15, 2001, Doc. 130 Ex.
19).

also provided legal advice to the board at the May 17, 2001, board meeting regarding the potential for expanded fiduciary duties to the creditors of a company that is insolvent or in the "zone of insolvency." (May 17, 2001, Board Minutes at 2, Doc. 130 Ex. 14).  Additionally, M&T facilitated the Secured Facility by issuing its related written legal closing opinion regarding the deal.  (*See* M&T Opinion Letter, dated July 23, 2001, Doc. 207 Ex. 116).  Finally, M&T represented Seven Seas in conjunction with preparing and filing the registration statement for the rights offering to the shareholders.  (*See* Seven Seas Registration Stmt., filed August 17, 2001, Doc. 130 Ex. 9).

The Lawyers' role regarding the other participants in the Secured Facility is less clear because M&T had legal relationships, either current or former, with several key players in the transaction: M&T had represented Hefner and his family for decades and, during the pendency of the  Secured Facility transaction, performed legal work for Hefner personally on unrelated matters (*see* Fuller Dep. at 118-19, Doc. 130 Ex. 4);  M&T had represented Director Brian Egolf's father and Egolf personally for years on unrelated matters and prepared an assignment of Petroleum Properties' note purchase agreement to the Egolf Family Limited Partnership ("EFLP") after it discovered that the note had been executed in the name of the wrong Egolf Entity (*see id.* at 133-42); M&T had also represented Director Devening from time to time on unrelated matters, but it is unclear whether that representation was concurrent with the representation of Seven Seas (*see id.* at 132-33); and M&T had represented Chesapeake in the past on matters unrelated to Seven Seas. Finally Fuller, in addition to acting as director and corporate counsel, participated directly in the Secured Facility as a personal lender, albeit to a much smaller degree.   These convoluted connections form the backbone of Seven Seas' conflict of interest allegations.

The Lawyers claim that there were no conflicts and, alternatively, that Seven Seas knowingly waived such conflicts. The Lawyers have, therefore, moved for summary judgment on all claims asserted against them.

> D.   Seven Seas' Summary Judgement Motion Against the Lawyers

In its motion, Seven Seas seeks a summary judgment ruling that the Lawyers breached their fiduciary duties by (1) engaging in impermissible conflicts of interest while engaged to represent the Company in matters related to the Deep Well Transaction, and (2) simultaneously representing the Company and advising the Directors individually in connection with the Company's claims against the Directors. Ultimately, Seven Seas requests that the Lawyers be required to forfeit their legal fees as a consequence of these conflicts.

II.   <u>Legal Standard on Summary Judgment</u>

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).

Once the movant meets its burden, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment

evidence.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at1075).  The non-movant cannot discharge his burden by offering vague allegations and legal conclusions.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party.  *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

III.      <u>Analysis</u>

The court begins with the issue of the reconsideration of the Sept. 29 Order.  Next, the court addresses the myriad of pending evidentiary issues.  Finally, the court assesses each of the substantive summary judgment motions in turn.

1.      Reconsideration of Certain Holdings in the Sept. 29 Order

In Texas,[11] corporate officers and directors owe a strict fiduciary obligation to their corporation.  *See Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576-77 (Tex. 1963); *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 18-19 (Tex. App.–San Antonio, 2006).  While not uniformly defined by the case law, those fiduciary duties include not usurping corporate opportunities for personal gain, satisfying "the extreme measure of candor, unselfishness, and good faith," and dedication of his uncorrupted business judgment for the sole benefit of the corporation.  *Holloway*, 368 S.W.2d at 577.  More generally, the fiduciary status of corporate officers and directors give rise to three broad duties: the duty of due care, loyalty, and obedience.  *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719

In its prior opinion on this case, the court relied primarily on *Gearhart* for its duty of care and business judgment rule analysis.  (*See* Sept. 29 Order 43-46, Doc. 267).  In particular, the court cited *Gearhart* for its holding that "Texas courts to this day will not impose liability upon a noninterested corporate director unless the challenged action is ultra vires or is tainted by fraud." *Gearhart*, 741 F.2d at 721.  Finding no evidence of either ultra vires or fraudulent acts, the court held that the Directors did not breach their duty of care to Seven Seas in connection with the decision to drill the Deep Well.

The court's prior Order, however, implicitly assumed that the Directors were "noninterested."  In other words, the Directors' decision to drill the Deep Well may still be

---

[11]      Although Texas choice of law principles counsel for the application of the law of the Cayman Islands (the place of Seven Seas' incorporation), the court assumes that Texas law applies because no party has asserted that any law other than that of Texas should govern the corporate governance claims, nor has any proof of foreign law been submitted.

-21-

scrutinized without the benefit of the business judgment rule if there is a fact question regarding whether the Directors were interested in the Deep Well Transaction. Thus, the court shall reconsider its holding in the Sept. 29 Order to the extent that the Trustee may pursue a duty of care claim if he presents a fact question as to his duty of loyalty claim relating to the Deep Well Transaction.[12]

The court also pauses to address a fundamental misconception in the Defendants' interpretation of the Sept. 29 Order. In a constant refrain, all Defendants contend that the Order ruled as a matter of law that the decision to drill the Deep Well did not violate any fiduciary duty owed by the Directors and is not subject to attack in this action. The Sept. 29 Order did not, however, specifically address whether the Directors' actions regarding the Deep Well violated their duty of loyalty. Moreover, the court is unpersuaded that any meaningful distinction exists between the decision to drill the Deep Well and approving the financing to do so. Both are integral to the Trustee's claims that the Directors breached their fiduciary duties by placing their financial interests above the Company's. Thus, the court shall consider both decisions in deciding whether there is a fact question regarding breach of the Directors' fiduciary duties.

Finally, while the issue of whether Seven Seas was insolvent at the time when the Secured Facility was approved and the Deep Well drilled is no longer relevant to the duties owed by the Directors to the creditors of Seven Seas, the solvency issue remains relevant to what, if any, damages the Company may have suffered as result of the Directors' decisions. It is also relevant to whether the Directors acted in good faith in approving the Deep Well Transaction.

2.     Evidentiary Matters

---

[12]     The court declines to revisit any other ruling of the Sept. 29 Order.

In its Sept. 29 Order, the court denied without prejudice the pending evidentiary motions, which included the Director and Entity Defendants' objections to the Trustee's proffered summary judgment evidence and the cross motions to exclude the expert testimony of numerous individuals. Thereafter, the court granted the parties' agreed motion to reinstate the objections to the summary judgment evidence (*see* Doc. 349), and the parties have reurged their respective motions to exclude expert testimony. The court will address the summary judgment objections and the motions to exclude testimony in turn.

### A.    Summary Judgment Objections

The Director and Entity Defendants have objected to the following evidence: (1) Floyd's declaration that the sale of the Company was "distressed" when he approved it during the bankruptcy proceedings, arguing that the declaration is inconsistent and conclusory, (2) the expert testimony of Huddleston, Swick, Graves, and Ferchill because the testimony is irrelevant and/or unreliable, (3) the expert reports of these individuals because the reports are unsworn, and (4) miscellaneous individual documents because they constitute impermissible hearsay. Since the objections to the expert testimony overlap with the motions to exclude that testimony, the court shall address those objections simultaneously with the motions to exclude the expert testimony. Therefore, the court only addresses the remaining objections and finds that all of the Director and Entity Defendants' objections should be overruled.

The Director and Entity Defendants' contention that Floyd's declaration is inconsistent and conclusory is incorrect. Floyd's declaration, in which he states that the Company was not a willing seller but "compelled by the circumstances" to consummate the sale of the Shallow Field assets, is not inconsistent with Floyd's position in bankruptcy. (*See* Floyd Decl. at ¶¶ 6, 8,

Doc. 211).  In the bankruptcy proceeding, Floyd maintained that the sales price was fair "under the circumstances then existing in Columbia" and that delaying the sale would only result in further decline.  (Trustee's Emergency Motion for Authority to Consent to, and to Take All Appropriate Actions to Effectuate the Sale of the Subsidiaries' Assets ¶ 13, Doc. 251 Ex. 1).  The statements are not in conflict, and the Director and Entity Defendants' objection on this ground is meritless. The Director and Entity Defendants also object to Floyd's claim that the Shallow Field assets could have been sold for more than $20 million in May 2001; however, one of Defendants' own experts has asserted that, during the same time frame, the assets could have been sold for approximately $175 million.  (*See* George Dep. at 163, Doc. 207 Ex. 4).  Thus, Director and Entity Defendants' objections to Floyd's declaration are **overruled**.

The Director and Entity Defendants' objections to the admissibility of the expert reports are also without merit.  The Director and Entity Defendants challenge the submission of these reports as evidence on the basis that the reports are unsworn and thus not competent summary judgment evidence.  *See Provident Life and Ac. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) ("'Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment.") (quoting11 James Wm. Moore et al., Moore's Federal Practice § 56.14[2] [c] (3d ed. 1997)).  The general rule regarding the inadmissibility of unsworn expert reports has no bearing in this case because the Trustee's expert reports are attached to each expert's respective declaration, in which the reports are both authenticated and incorporated by reference.  Moreover, the evidence provided by the experts in support of the Trustee's responses to the Director and Entity Defendants'

summary judgment motions is contained within the respective declarations.  As such, the Director and Entity Defendants' objections to the Trustee's expert reports are **overruled**.

With respect to the documentary evidence, only some of the objections are relevant given the current posture of the case.[13]  The relevant objections include the Director and Entity Defendants' objections to the following evidence submitted by the Trustee:[14] (1) Exhibits 4 and 16, which relate to deposition testimony of George and Ron Lefaive ("Lefaive"), who testified about the Company geologist's position on the probability of the Deep Well's failure; (2) Exhibit 8, which relates to the Company's projections about its business future, (3) Exhibits 10, 64, 82, 83, and 119, which relate to a series of letters written by Hal Oppenheimer, a consultant hired by the Company's partners in the Shallow Field, who expressed the partners' disfavor of the Deep Well plan to the Directors; (4) Exhibit 11, which concerns an email from M&T with a draft notice of circumstances letter attached; (5) Exhibit 18, consisting of excerpts of a draft book written by Jonathan Swinchatt ("Swinchatt") about Hefner's life, (6) Exhibit 51, a February 8, 2001, email string regarding the Company's drilling projections and financial forecast; (7) Exhibit 55, a letter from D&M to Ray and Hefner regarding the D&M analysis of geological success for the Deep Well; (8) Exhibit 67, which relates to a series of emails in which some of the Company's employees express concern over the Deep Well plan; and (9) Exhibits 84, 88, and 122, memoranda regarding Ecopetrol's conclusions about the recoverability of oil from the Shallow Field and the need for a pipeline.

---

[13]     The Director and Entity Defendants object to certain exhibits on which the Trustee no longer cites or relies. These exhibits include Exhibit Numbers 43, 50, 53, 85, and 121.  Thus, these objections are **overruled** as moot.

[14]     These exhibits are attached to the Trustee's Response to the Director and Entity Defendants' Motion for Summary Judgment (Doc. 207).

Generally, the Director and Entity Defendants object to these documents on hearsay grounds.  "'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801.  Unless covered within an exception, hearsay evidence is inadmissible.  Fed. R. Evid. 802.  The hearsay rule applies with equal force in the context of summary judgment evidence. *See Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) (noting that hearsay evidence is inadmissible for summary judgment purposes under Federal Rule of Civil Procedure 56).  Here, the majority of the challenged exhibits are being offered to demonstrate whether the Directors adequately informed themselves regarding the risks of the Deep Well and/or whether the Directors were acting in good faith.  As such, those exhibits are not being offered "for the truth of the matter asserted" and are not hearsay.   Those exhibits that are being offered for their truth are either subject to hearsay exceptions or are duplicative of other evidence in the summary judgment record to which the Director and Entity Defendants have not objected.  For these reasons, the court **overrules** the Director and Entity Defendants' objections to the individual documentary evidence.

Therefore, subject to the court's resolution of the admissibility of the challenged expert testimony of Huddleston, Swick, Graves, and Ferchill, the Director and Entity Defendants' motion to strike the Trustee's summary judgment evidence (Doc. 251) is **denied**.

B.      Motions to Exclude Expert Testimony

i.      Legal Standard

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion

> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the

Supreme Court found that the "*Frye* Doctrine," which held that a theory must be generally accepted

in the scientific community before it can be the basis of an expert's opinion, was "not a controlling

principle in federal trials," and Justice Blackmun turned to Rule 702 of the Federal Rules of

Evidence for the proper test to determine the admissibility of scientific evidence. *Moore v. Ashland*

*Chemical Inc.*, 151 F.3d 269, 274 (5th Cir. 1998).  The Court in *Daubert* enumerated five

nonexclusive factors which a court could undertake to determine whether a theory or technique was

scientific knowledge that would assist the trier of fact:

> 1) whether the theory or technique upon which the expert's opinion
> is based can be (and has been) tested; whether the theory or technique
> had been subjected to peer review and publication; 3) whether the
> theory or technique has a known or potential rate of error;  (4) the
> existence and maintenance of standards controlling the technique's
> operation; and 5) whether the theory or technique has achieved
> general acceptance.

509 U.S. at 593-95.  Furthermore, throughout this process, "the focus, of course, must be solely on

the principles and methodology, not on the conclusions that they generate." *Id.* at 595.  However,

> conclusions and methodology are not entirely distinct from one
> another.  Trained experts commonly extrapolate from existing data.
> But nothing in *Daubert* or the Federal Rules of Evidence requires a
> district court to admit opinion evidence which is connected to
> existing data only by the *ipse dixit* of the expert.  A court may
> conclude that there is too great an analytical gap between the data and
> the opinion offered.

*General Electric Company v. Joiner*, 522 U.S. 136,146 (1997).

Procedurally, *Daubert* instructs that the district court determine admissibility under Rule 702 by following Rule 104(a), which requires that a judge conduct preliminary fact-finding as to whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. *Moore*, 151 F.3d at 276. "Thus, the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable," and this requires some "objective, independent validation of the expert's methodology." *Id.* The "expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Id.*

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court extended the reliability and relevancy requirements to all expert witness testimony. The Court made clear that "[t]he trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable." *Id.* at 152 (emphasis in original).

The trial court has discretion under Federal Rule of Evidence 702 to exclude expert evidence, and that decision is reviewed only for abuse of discretion. *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000) (citing *Daubert*, 509 U.S. at 592-93 (1993) and *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 331 (5th Cir.1998)).

        ii.    Defendants' Challenges to Plaintiffs' Experts: Graves, Swick, Huddleston, Ferchill, and Watkins.

All of the Defendants have moved to exclude the expert testimony of Graves, Swick, and Huddleston (Doc. 333), as well as the expert testimony of Ferchill (Doc. 324). Additionally,

the Lawyers have moved to exclude the expert testimony of Watkins (Doc. 325).  For the reasons that follow, the court **denies** Defendants' motion to exclude the testimony of Graves, Swick, and Huddleston; **grants-in-part and denies-in-part** the Defendants' motion to exclude the testimony of Ferchill; and **grants-in-part and denies-in-part** the Lawyers' motion to exclude the testimony of Watkins.

a.   Graves, Swick, and Huddleston

   Raising issues of relevancy and reliability, Defendants challenge numerous elements of the proposed testimony of Graves, Swick, and Huddleston.  Their testimony primarily concerns damage models regarding losses the Company allegedly suffered as a result of the Deep Well Transaction.  Graves and Swick are financial experts and have offered their opinions on the fair market value of the Company's assets, the Company's financial condition, the Company's ability to restructure its existing debt, and damages.  Huddleston is an expert in petroleum engineering and the oil and gas industry.  His opinions concern the foreseeability of the effects the Directors' decisions would have on the Company, the geological characteristic and oil production potential of the Shallow Field, the fair market value of the Company's oil properties, the Company's financial condition, and damages.

   Specifically, the Defendants challenge the following opinions offered by these experts: (1) Graves' and Huddleston's testimony concerning "decline in marketability" damages; (2) Graves' and Huddleston's testimony regarding the $13.8 million in damages representing the costs of the pipeline; (3) Graves' and Huddleston's testimony that the Secured Facility caused $24.3 million in damages, which represents the funds expended in drilling the Deep Well; (4) Graves' and Huddleston's testimony on solvency; (5) Graves' testimony that the Secured Facility caused $12.9

million in damages of "other assets"; (6) Graves' and Swick's testimony that the Secured Facility caused "an amount to be determined for damages for professional fees and administrative expenses that would not have been incurred but for the bankruptcy of Seven Seas . . ."; (7) Swick's testimony about the possibility of restructuring; (8) Huddleston's "fairness opinion"; (9) Huddleston's opinion on "resevoir damage"; (10) Huddleston's opinion on the Directors' alleged awareness of problems with the Shallow Field; and (11) Huddleston's testimony about his conversation with Todd Habliston ("Habliston"), Seven Seas' Field Development Manager at the time of the alleged breaches of fiduciary duty.

The Defendants' *Daubert* objections to the experts can be broken down into three main categories: first, challenges to the relevance of the opinions; second, challenges to the qualifications of certain experts; and, finally, catch-all challenges to the reliability of the opinions. The court addresses each category in turn.

On almost every opinion challenged there is an allegation that the opinion is irrelevant because it has been foreclosed by the Sept. 29 Order. The Defendants, however, have unduly interpreted the reach of the Sept. 29 Order in its arguments that Plaintiffs' duty of loyalty claims regarding the decision to drill the Deep Well have been foreclosed. (*See* Part III.1, *supra*). The issues of solvency and the fair market value of the Company's assets remain relevant to the resolution of the duty of loyalty claims, which have not been foreclosed by the Sept. 29 Order. Additionally, the duty of care claim may still be viable if there is a fact question regarding the Directors' breach of the duty of care. (*See id.*). Finally, the experts' reports are not limited to the damages allegedly suffered by the Company's creditors. They expressly address and analyze the damages suffered by the Company itself. (*See* Graves/Swick June 2, 2005 Report at 2, Graves Decl.

-30-

Ex. 2, Doc. 220; Huddleston October 11, 2004 Report at 11, Huddleston Decl. Ex. B, Doc. 221).

Therefore, these experts' opinions are relevant to the issues pending before the court.

Defendants do not challenge the qualifications of Graves and Swick, but they do challenge the qualifications of Huddleston to opine on either the fair market value of oil and gas properties or the financial condition of an oil and gas company because he does not have an accounting degree. The court finds this objection to be meritless. Huddleston is a registered professional engineer with over forty years of experience in the petroleum industry. (Huddleston Decl. ¶ 4, Doc. 221). He has represented and advised over 500 energy companies, financial institutions, and government agencies regarding oil and gas exploration and production activities, and he has evaluated thousands of oil and gas wells located in the United States and other countries and has advised various client in making financial and drilling decisions. (*Id.* ¶ 5). He is the chairman of a company that owns working interests in several thousand oil and gas wells and manages over 600,000 mineral acres of oil and gas property. (*Id.* ¶ 6). He has been a visiting professor at Texas A&M University, teaching classes such as "Petroleum Property Management" and "Petroleum Investment Analysis." (*Id.* ¶ 7). He has made numerous presentations and published several papers on oil and gas issues, including financial reporting as it relates to oil and gas property. (*See id.*). Huddleston has served on the U.S. Securities and Exchange Commission Advisory Committee, assisting with portions of Regulations SX, which generally relates to form and content of financial statements of oil and gas companies. (*Id.* ¶ 8). In the course of his regular duties managing oil and gas partnerships, Huddleston claims to have made numerous decisions regarding the fair market value of properties in the acquisition and divestiture of oil and gas properties and to have "personally been involved in the assessment of Fair Market Value of oil and gas properties

many hundreds of times."  (*Id.* ¶ 10).  Huddleston's lack of a formal accounting degree does not

disqualify his opinions in this case given the level of his professional experience in this field.  *See*

*S. Cement Co. v. Sproul*, 378 F.2d 48, 49 (5th Cir. 1967) ("'[A] person may become qualified as an

expert by practical experience . . . [.]  Professional education is not a prerequisite.'") (quoting

*Santana Marine Serv., Inc. v. McHale*, 346 F.2d 147, 148 (5th Cir. 1965)).

Turning to reliability, the court finds that the challenged testimony of Graves, Swick,

and Huddleston meets the *Daubert* standards.  The majority of the objections raised regarding this

testimony go to the weight of the testimony rather than to its admissibility.  "Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509

U.S. at 596.  Moreover, the court shall address the substantive attacks on the damage models at

length in the resolution of the Director Defendants' motion for summary judgment.  (*See* Part

III.3.C, *infra*).  At this juncture, the court notes that these are viable damage models under the facts

of this case.  Defendants' arguments regarding the reliability of the experts' opinions on these topics

are without merit.  As such, Defendants' motion to exclude the testimony of Graves, Swick, and

Huddleston (Doc. 333) is **denied**.

b.    Ferchill

The Defendants also move to preclude the expert testimony of Cary Ferchill,

Plaintiffs' corporate governance and legal malpractice expert.  Ferchilll, a lawyer with over twenty

years of experience in corporate and securities matters, has offered opinions concerning, *inter alia*,

(1) whether the Directors adequately informed themselves, acted in good faith and used the requisite

care in authorizing the Deep Well transaction; (2) whether the Defendants made adequate

disclosures to the public regarding the Company's business plan and operations; and (3) whether the Lawyers used the requisite care in providing advice in connection with the Deep Well transaction and the Company's public disclosures.  (*See* Ferchill Decl., dated December 8, 2005, Doc. 225).[15]

Defendants argue that these opinions are irrelevant in light of the Sept. 29 Order.  As noted above, the court has reconsidered certain holdings in the Sept. 29 Order such that Ferchill's duty of care opinions may still be relevant.  To the extent that Ferchill opines about the duty of care owed by the Directors to the Company's creditors, such opinions must be excluded as they no longer relate to any live controversy before the court.

Defendants also challenge Ferchill's opinions as offering nothing more than inadmissible legal conclusions.  An expert witness may not offer testimony regarding legal conclusions.  *Askanase v. Fatjo*, 130 F.3d 657, 672-73 (5th Cir. 1997); *see also Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999) (upholding exclusion of expert opinion as to what a reasonable executor would have done under the same facts).  In *Askanase*, the plaintiff's corporate governance expert proposed to testify on "'whether [the corporation's] officers and directors fulfilled their fiduciary duties to the Company, its creditors, and shareholders.  If not, how and to what extent did [they] breach their fiduciary duties.'"  130 F.3d at 673.  In affirming the district court's exclusion of this testimony, the Fifth Circuit concluded, "[w]hether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide.  It is not for [the expert] to tell the trier of fact what to decide."  *Id.*  The court finds that Ferchill can testify as to the standards of conduct applicable to directors in general, but he cannot testify as to whether the Defendants'

---

[15]    The December 8 Declaration is Ferchill's fourth expert report offered in this matter.  The Defendants have moved, pursuant to Fed. R. Civ. P. 37(c), to strike this Declaration as untimely and prejudicial.  (Doc. 244).  The court finds that the amended report did not allege sufficiently "new" claims to have prejudiced the Defendants and, therefore, **denies** Defendants' motion to strike.

conduct comported with the actions of reasonably prudent individuals in the same or similar circumstances.  The latter is a conclusion that must be determined by the trier of fact.  Ferchill's ultimate conclusions that the Directors violated their fiduciary duties and/or were negligent, grossly negligent, or reckless in approving the Deep Well Transaction are, therefore, excluded.

Defendants further attack Ferchill's opinion that the Directors, due to their conflicts, should have appointed an independent committee to advise the Board on the Secured Facility.  Defendants allege (1) Ferchill is not qualified to make this opinion; and (2) the opinion is unreliable because there was no legal obligation for Seven Seas to appoint an independent committee and because CIBC concluded that the terms of the Secured Financing were fair, from a financial perspective, to the Company.  The court finds that Ferchill's corporate governance experience and the recommendations he has made to similar boards facing conflict issues qualifies him to offer this opinion.  (*See* Ferchill Decl. ¶¶ 4-15, Doc. 225).[16]  The court also finds that Ferchill's opinion about the appointment of an independent committee is reliable.  Ferchill is not testifying with as to a legal conclusion that the Directors were obligated to form a special committee to approve the Secured Facility.  Rather, Ferchill opines that it is prudent practice within the industry to appoint an independent special committee when interested Directors are involved in a transaction.  (*Id.* ¶¶ 34-40).  With respect to the CIBC report, the Deep Well Transaction, as a whole, may not have been fair to the Company such that Ferchill's opinions regarding an independent committee are still helpful to a jury in determining whether the Directors' decisions fell below the applicable standard of care.  Ferchill shall not be permitted, however, to testify as to his conclusion that the Directors

---

[16]    The Defendants' concerns about Ferchill's corporate governance experience, such as their critique that the two private companies for which Ferchill served as a board member subsequently went bankrupt or that Ferchill was fired from his only managerial position, go to the weight of his testimony rather than its admissibility and are best addressed by a "vigorous" cross examination.

failed to conform to the applicable standard of care by failing to appoint an independent committee. That conclusion is within the factfinder's province.

Defendants assert that Ferchill's opinion regarding the violation of any public disclosure obligations is inadmissible, as it is irrelevant to any pending claim and Ferchill is not qualified to give it.[17]  While it is true that this case is not a securities action, the lack of disclosure bears on the good faith of the Directors and on their interest in the Deep Well Transaction.  On this issue of qualification, the court finds that Ferchill's experience as an securities attorney and with disclosure requirements satisfy the *Daubert* standards.  (*See* Ferchill Dep. II, dated July 20, 2005, at 375-84, 429, Doc. 144 Ex. 4).  This testimony is, therefore, admissible.

Finally, Defendants  urge the court to exclude Ferchill's opinion that but for the breach of the Directors' fiduciary duties and the Lawyers' poor advice the Directors would not have entered the Secured Facility or drilled the Deep Well.  The court shall exclude this testimony as speculative and conclusory.

Accordingly, Defendants' motion to exclude the testimony of Cary Ferchill (Doc. 324) is **granted-in-part** and **denied-in-part**.

c.    Watkins

Seven Seas has sued the Lawyers for, *inter alia*, legal malpractice and breach of fiduciary duty.  The Company has offered the expert testimony of Thomas Watkins on the ethical obligations of the Lawyers.  Watkins opines generally that the Lawyers had disabling conflicts of interest that precluded them from participating as counsel with respect to the Secured Facility and that the Lawyers failed to make sufficient disclosures to Seven Seas with regard to the conflicts of

---

[17]     It is Ferchill's opinion that the Directors did not adequately disclose information about the Company's business plan at various times before the Debtor filed bankruptcy.

interest and the fiduciary duties owed by the Directors. (Watkins Report, dated June 2, 2005, at 2, Doc. 142 Ex. 9). The Lawyers have moved to exclude his testimony on three bases: (1) while qualified to opine on Texas legal standards, Watkins is not qualified to render an opinion about the ethical obligations of lawyers in Oklahoma; (2) Watkins' testimony is not helpful because it offers legal conclusions; and (3) his opinions are not reliable because he has not identified a basis for his conclusions other than his own interpretation of the law governing lawyers.

The court finds that Watkins is qualified to offer his opinions regarding the ethical obligations of the Lawyers in this case. Watkins, licensed to practice law in the state of Texas, has over 41 years of experience in litigation practice and is board certified in civil trial law by the Texas Board of Legal Specialization. (Watkins Decl. ¶ 4, Doc. 209). He was chosen by the Texas Supreme Court to serve as Chairman of the Task Force on the Texas Disciplinary Rules of Professional Conduct and has served on the Committee on Professional Ethics for the State Bar of Texas, the Texas Commission for Lawyer Discipline, and the Board of Disciplinary Appeals (as Chairman). (*Id.* ¶ 5). He has served on the faculty at several legal education programs, including the University of Texas Law School, the University of Houston Law Center, and South Texas College of Law. (*Id.* ¶ 6). Watkins has published a myriad of articles concerning legal ethics and has been a frequent speaker on CLE courses on ethical issues. (*Id.*). The Lawyers claim, however, that Watkins is unqualified to testify on the duty of an Oklahoma lawyer to avoid conflicts of interest. This argument is unpersuasive because the Lawyers were offering their services to Seven Seas in Texas, Fuller was licensed in Texas, the alleged negligence and/or breaches of fiduciary duty took place in Texas, and the Lawyers themselves have argued that Texas substantive law applies to the claims against them. Furthermore, the relevant disciplinary rules relating to attorney conduct

are not  substantively different between Oklahoma and Texas.  For example, under Rule 1.7 of the

Oklahoma Rules of Professional Conduct, a lawyer may not represent a client if that representation

could become "directly adverse" to another client, or "if the representation of that client may be

materially limited by the lawyer's own interests."  Okla. Rules of Prof'l Conduct R. 1.7 (2005); *see*

*also* Okla. Rules of Prof'l Conduct R. 1.7 cmt. (2005).  Similarly, the Texas Disciplinary Rules

provide that a lawyer shall not represent a person if that representation "reasonably appears to be

or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a

third person or by the lawyer's or law firm's own interests."  Tex. Disciplinary R. Prof'l Conduct

1.06(b)(2), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon 2004).  Although

violations of these disciplinary rules do not necessarily require a finding of liability, the rules do

have a bearing on the standard of conduct of a reasonably prudent attorney.  Watkins is qualified to

opine about the ethical issues at stake in this case.

**The Lawyers also contend that Watkins is not qualified to testify regarding the**
**substantive matters of corporate governance and finance.  While Watkins has expertise analyzing**
**attorney conduct in multiple-client situations that arise in complex financial transactions with their**
**clients and has experience in matters involving the conduct of lawyers in the context of corporate**
**governance, he is not an expert on the corporate governance issues in this case.  *See Wilson v.***
***Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness**
**to testify if it finds that the witness is not qualified to testify in a particular field or on a given**
**subject.").** Watkins will not be permitted to offer his opinions concerning the adequacy of the

substantive advice offered by the Lawyers.

With respect to the bulk of Watkins' opinions dealing with the ethical obligations of the Lawyers, the court finds that this testimony would be helpful to the jury.  Expert testimony by lawyers is permitted in claims of legal malpractice and breach of fiduciary duty.  Indeed, the general rule is that expert testimony is required to establish the standard of care in a legal malpractice action; an exception to the general rule is recognized where the attorney's lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge, e.g., when an attorney allows the statute of limitations to run on a client's claim.  *James v. Mazuca and Associates v. Schumann*, 82 S.W.3d 90, 97 (Tex. App.--San Antonio 2002, pet. denied); *Zenith Star Ins. Co. v. Wilkerson*, 150 S.W.3d 525, 530 (Tex. App.--Austin 2004, no pet.); *Nat'l Union Fire Ins. of Pittsburgh, Pa. v. Keck, Mahin & Cate*, 154 S.W.3d 714 (Tex. App.--Houston [14th Dist.] 2004, pet denied).  When an attorney's preparation, management and presentation of litigation involves matters of judgment and tactical choices, i.e., conduct beyond the ken of jurors, expert testimony is needed.  *Alexander v. Turtur & Associates, Inc.*, 146 S.W.3d 113, 119 (Tex. 2004).  Generally, expert testimony is also required to prove that any claimed damages were proximately caused by a breach of duty by the defendant attorney.  *Id.* at 119-20; *Hoover*, 196 S.W.3d at 231 (citing *Judwin Props., Inc. v. Griggs & Harrison*, 911 S.W.2d 498, 507 (Tex. App.--Houston [1st Dist.] 1995, no writ)).  Expert testimony is also generally required to establish a fiduciary breach where the issues of confidentiality, loyalty in the context of conflicting interests or adverse representation or causation and damages are beyond common knowledge.  *Geiserman v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990); *Arce v. Burrow*, 958 S.W.2d 239, 252 (Tex. App.--Houston [14th Dist.] 1997), *aff'd in part, rev'd in part on other grounds*, 997 S.W.2d 229 (Tex. 1999).  Thus, Watkins will be permitted to testify about the standard of care of a reasonably prudent attorney, applying his legal understanding to the factual

matters at issue.  *See Waco Int'l, Inc. v. KHK Scaffolding Houston Inc.*, 278 F.3d 523, 533 (5th Cir. 2002).  Finally, the court finds that Watkins' opinions are sufficiently reliable to be submitted to the jury.  *See, e.g.*, *Kuhmo Tire Co.*, 526 U.S. at 150 (the court "may focus upon personal knowledge or experience" in testing the admissibility of expert testimony).

As such, the Lawyers' motion to exclude the testimony of Thomas Watkins (Doc. 325) is **granted-in-part and denied-in-part**.

iii.    Plaintiffs' Challenges to Defendants' Experts: Bratic, George, Vollmar, Steele, and Macey

Plaintiffs move to exclude the expert testimony of Bratic, George, and Vollmar, offered by all the Defendants.  (*See* Docs. 328, 329, 330, respectively).  Seven Seas moves to exclude the expert testimony of Steele and Macey, offered by the Lawyers.  (*See* Docs. 331, 332, respectively).   For the reasons that follow, the court grants Plaintiffs' motion to exclude the testimony of Bratic; denies Plaintiffs' motion to limit the testimony of George; denies Plaintiffs' motion to limit the testimony of Vollmar; denies Seven Seas' motion to exclude the testimony of Steele; and grants Seven Seas' motion to limit the testimony of Macey.

a.    Bratic

Bratic, Vice Chariman and a Managing Director of InteCap, Inc., a subsidiary of Charles River Associates, Inc., and a certified public accountant (Bratic Supp. Report, dated July 22, 2005, at 2, Doc. 172 Ex. 12), has opined as follows: (1) the Board and its Audit Committee fully informed themselves regarding the Secured Facility prior to approving the transaction; (2) the Board acted in the best interest of the Seven Seas, its shareholders, and creditors when they approved the transaction; (3) the Board spent a significant amount of time reviewing and analyzing the Company's needs for additional financing and reviewed and considered numerous alternatives

including the Secured Facility that was finally approved; (4) the financing transaction was fair to the Company and its constituents; (5) at the time the Board reviewed and approved the financing, it was reasonable to believe that the fair market value of the Company's assets exceeded its liabilities; (6) the greatest potential asset the Board perceived the Company to possess was the Deep Well; (7) the distribution of funds from the Secured Facility to both the Shallow Field and the Deep Well was another indication that the Board was acting in the best interests of all parties involved; (8) the Bondholders knew that Seven Seas required additional funds in excess of the $110 million senior notes to develop its properties; (9) the Secured Facility was viewed positively by the Company's creditors; (10) there is no evidence to suggest that the Bondholders would have been willing to agree to a debt for equity swap; (11) the damages conclusions reached by Graves and Swick are unsupported, invalid, and based on facts unknown at the time of the transaction.  Bratic bases his opinions on interviews with the Directors and a review of the documentary evidence.

The court finds that Bratic's opinions concerning what the Board knew and perceived and how the Board acted in connection with the Deep Well Transaction should be excluded.  This testimony does not require special expertise and is merely a commentary on the credibility of the Directors and the documentary evidence in this case.  It is the jury's role to assess the evidence and to determine the contested issues of fact.

With respect to Bratic's opinions concerning the adequacy of the Company's public disclosures and the feasibility of a debt-for-equity swap, Bratic admits that he is not qualified to offer an opinion on the adequacy of the SEC disclosures (Bratic Aff. ¶ 14, Doc. 201) and that he has not analyzed the debt-for-equity issue (*id.* ¶ 16).  Similarly,  Bratic concedes that he does not hold himself out as an expert on corporate governance.  (Bratic Dep., dated Feb. 9, 2005, at 162, Doc. 172

Ex. 1).  Bratic's opinions relating to the SEC disclosures, the debt-for-equity exchange, and duties

and obligations of the Directors must, therefore, be excluded.  *See Wilson*, 163 F.3d at 937. [18]

As such, Plaintiffs' motion to exclude the testimony of Walter Bratic (Doc. 328) is

**granted**.

### b.    George

Defendants have designated petroleum engineer Don Ray George as an expert

witness on various matters based on his technical expertise and experience in the oil and gas

industry.  Plaintiffs have moved to exclude certain portions of George's testimony, including his

opinion on the fair market value of the Company's oil properties on May 17, 2001, and his opinions

relating to an allegedly inapplicable tax appraisal.

George opines that the fair market value of the proved reserves attributable to Seven

Seas as of May 17, 2001, was $172.8 million.  (George Report, dated Nov. 11, 2004, at 6, Doc. 138

Ex. F).  Plaintiffs argue that George's methodology is unsound because (1) he did not allegedly use

the correct standard for fair market value evaluation, i.e., the price at which the property would

change hands in a hypothetical sale between a willing buyer and a willing seller, neither being under

any compulsion to buy or to sell and both having reasonable knowledge of all relevant fact; and (2)

he fails to consider an internal December 2001 interim budget report specifically projecting that new

wells in 2002 would decline at 40%.  With respect to the former, George made clear that he agreed

with this generally accepted definition of fair market value.  (*See* George Aff. ¶ 8, Doc. 210 Ex. 1).

In terms of the latter, the Plaintiff has not clarified how this internal budget, prepared in December

---

[18]    To the extent Bratic offers opinions about the value of the Company's oil properties, including the value of the Deep Well and the Shallow Field, these opinions are likewise excluded because Bratic admits that he is not qualified to assess these values.  (*See* Bratic Dep., dated Feb. 9, 2005, at 116, 388, 399, 400, Doc. 172 Ex. 1).

2001, is of critical importance to a fair market valuation of Seven Seas' properties in May 2001. Moreover, Plaintiffs' own expert, Huddleston, did not apply a full 40% decline rate; rather, he used a 20% decline rate in his evaluation.  Finally, George did review and consider this budget forecast as well as numerous other documents in reaching his fair market value conclusion.  (*See* George Dep., dated Oct. 14, 2005, at 244, Purdie Decl. Ex. B, Doc. 210).  To the extent that George's failure to apply a 40% decline rate was a mistake, vigorous cross examination is the appropriate method to address the deficiency.

Plaintiffs also object to George's alleged adoption of a March 1, 2001, tax appraisal created by John Mason, who calculated a fair market value figure of $175 million "for the purpose of estimating the taxable gain recognized upon Seven Seas migration from the Yukon Territory, Canada, to the Cayman Islands."  (*See* March 2001 Tax Appraisal at SS 00331, Doc. 138 Ex. G). George did not, however, rely on the Mason tax appraisal as a basis for his opinion.  He merely states that it is "interesting to note" that Mason's figure is similar to his.  (*See* George Report, dated Nov. 11, 2004, at 6, Doc. 138 Ex. F).  This objection is not an adequate basis for excluding George's testimony.

Accordingly, Plaintiffs' motion to limit the testimony of Don Ray George (Doc. 329) is **denied**.

### c.      Vollmar

Vollmar, a Managing Director with UHY Mann Frankfor Stein & Lipp Advisors, L.P. and a certified public accountant, has offered opinions on, *inter alia*, whether Seven Seas was insolvent, whether insolvency was foreseeable, whether the Secured Facility was in the best interest of Seven Seas, its shareholders, and its creditors, and whether Seven Seas incurred economic

damages as a result of the Directors' decision to authorize the Secured Facility. (*See* Vollmar Aff. ¶¶ 1, 3, Doc. 203 Ex. 1). Plaintiffs allege that Vollmar is not qualified to render these opinions. Plaintiffs further assert that Vollmar's testimony should be excluded as unreliable because he erroneously bases his opinion on the Mason 2001 Appraisal and because he applies an incorrect solvency standard. The court finds that Vollmar is qualified and that his opinions are sufficiently reliable to withstand Plaintiffs' *Daubert* challenge.

Plaintiffs argue that Vollmar is unqualified to opine on the value of Seven Seas' oil assets because he has never performed a fair market valuation of an oil and gas property (Vollmar Dep., dated Feb. 2, 2005, at 39, Doc. 330 Ex. X); has never performed an appraisal or a fair market valuation of an oil and gas company (*id.* at 39-40); has never rendered an opinion on the solvency of an oil and gas company (*id.* at 40); has never bought an oil and gas company (*id.* at 45); and has never bought an oil and gas property (*id.*). Plaintiffs also claim that Vollmar is unqualified to opine on economic damages or whether the authorization of the Secured Facility created value because he lacks expertise in valuing oil and gas properties and companies. The court disagrees. Vollmar has been qualified as an expert on numerous occasions in accounting, economics, and finance. (*Id.* at 40). His education and training relate to valuation methodologies,[19] and he has performed fair market valuations of other types of companies. (*Id.* at 44). Moreover, Vollmar has had experience analyzing financial statements, including valuation related analyses, of numerous oil and gas companies. (Vollmar Aff. ¶ 6, Doc. 203 Ex. 1). The court finds that Vollmar's training and

---

[19]    Vollmar is not only a certified public accountant but he also has had additional specialized training in valuation methodologies and their application as documented by his Chartered Financial Analyst and Accredited in Business Valuation designations. (*See* Vollmar Aff. ¶ 6, Doc. 203 Ex. 1).

experience are sufficiently related to the issues and evidence before the court to qualify him as an expert in this case.

The court also finds Plaintiffs' arguments concerning the reliability of Vollmar's solvency opinions to be unpersuasive. At issue, once again, is the alleged use of the March 2001 tax appraisal as a basis for determining the fair market value of Seven Seas. The express purpose of this appraisal was to evaluate, for tax purposes, the fair market value of Seven Seas at that time. Mason used the standard definition of fair market value, "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant fact," in making his valuation determination (*see* March 2001 Tax Appraisal at SS 00331, Doc. 138 Ex. G). Nevertheless, Plaintiffs contend that the lack of a "marketability discount" renders the tax appraisal irrelevant to a true valuation of Seven Seas' assets. Plaintiffs have not cited any authority, however, for the proposition that a fair market value analysis of an oil and gas company *must* contain a marketability discount. Mason testified that a fair market evaluation "might" include a discount depending on the relationship of the parties involved and that oil and gas properties are "probably" difficult to market. (Mason Dep., dated Oct. 11, 2005, at 83-84, Doc. 138 Ex. H). In any event, Vollmar did not rely exclusively on Mason's March 2001 tax appraisal in forming his solvency opinions. He testified that the March 2001 tax appraisal was merely one in a series of tools he used to develop his opinions. (Vollmar Aff. ¶ 10, Doc. 203 Ex. 1). Vollmar's use of the March 2001 tax appraisal, as one part of his analysis, does not render his testimony unreliable.

Plaintiffs also argue that Vollmar's use of a "liquidity test," i.e., the ability to pay debts as they come due, to determine whether Seven Seas was insolvent in May 2001 is unreliable because liquidity insolvency should be based on whether financial projections indicate that debts cannot be paid in the future. Plaintiffs cite *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508 (5th Cir. 2004), to support their conclusion that liquidity insolvency can only be based on future projections. The Court in *Carrieri*, however, was construing a unique provision of the Texas Business Corporation Act ("TBCA"), Article 2.38-3A, which allows for the use of one or more of six disjunctive factors to determine whether a corporation is insolvent. *Id.* at 530-31. The six insolvency factors that *may* be used are:

> 1. financial statements of the corporation, including subsidiaries, that present the financial condition of the corporation in accordance with the generally accepted accounting principles (GAAP);
>
> 2. financial statements prepared on the basis of accounting used to file the corporation's federal income tax return or any other reasonable accounting practices;
>
> 3. financial information, including condensed financial statements prepared on a basis consistent with (1) and (2) above;
>
> 4. projection, forecast, or other forward looking information relating to the future economic performance, financial condition, or liquidity of the corporation that is reasonable in the circumstances;
>
> 5. a fair valuation or information from any other method that is reasonable in the circumstances; or
>
> 6. any combination of the statements, valuations, or information authorized by this section.

Tex. Bus. Corp. Act Ann. art. 2.38-3A (Vernon Supp. 2004);[20] *Carrieri*, 393 F.3d at 531 n. 22.  The

*Carrieri* Court specifically stated that, given the permissive "may, but is not required to" language,

the bankruptcy court "was not even required to use any of these factors if it chose not to." *Carrieri*,

393 F.3d at 531.  Moreover, the TBCA defines "insolvency" as the "inability of a corporation to pay

its debts as they become due in the usual course of its business."  Tex. Bus. Corp. Act Ann.

1.02A(16) (Vernon Supp. 2006).[21]   Regardless, Vollmar did consider the financial projections

constructed by Seven Seas.   The court finds that Vollmar's solvency standard is reliable.  (Vollmar

Dep, dated Feb. 2, 2005, at 117, Novosad Decl. Ex. A, Doc. 203).

Plaintiffs' remaining objections go to the weight, rather than the admissibility, of the

testimony.  As such, Plaintiffs' motion to limit the expert testimony of Ronald Vollmar (Doc. 330)

is **denied**.

d.      Steele

---

[20]      TBCA Article 2.33-3 has been recodified at Tex. Bus. Orgs. Code Ann. § 21.314 (Vernon 2007) (effective Jan. 1, 2006).

[21]      This insolvency definition has been recodified at Tex. Bus. Orgs. Code Ann. § 1.002(39) (Vernon 2007) (effective April 1, 2009), and states that "'insolvency' means the inability of a person to pay the person's debts as they become due in the usual course of business."  The Texas Business and Commerce Code also defines insolvency as follows:

(A) having generally ceased to pay debts in the ordinary course of business other than as a result of a bona fide dispute;

(B) being unable to pay debts as they become due; or

(C) being insolvent within the meaning of the federal bankruptcy law.

Tex. Bus. & Com. Code Ann. § 1.201(b)(23) (Vernon Supp. 2007).  The Texas Business and Commerce Code, Texas' version of the Uniform Commercial Code ("UCC"), is inapplicable in the present case because the corporate fiduciary duties at issue are not governed by the UCC.  *See Carrieri*, 393 F.3d at 532-33.

Steele, a professor emeritas at Southern Methodist University School of Law, has taught classes in Professional Responsibility, as well as other courses, since 1968. (Steele Report at 6, Doc. 195 Ex. 1). He has served on the State Bar of Texas Disciplinary Rules Committee since 1984 (*id.* at 7); has presented numerous CLE seminars and published frequently on the topic of legal ethics (*id.* at 7-12); and has provided expert testimony in several other courts, predominately in Texas, on issues such as the attorney-client relationship and conflicts of interest (*see id.* at 13-18). Steele was retained to offer opinions "about whether or not the conduct of [the Lawyers] leading to [the Secured Facility] met the standard for reasonably prudent ethical law practice." (*Id.* at 1). Having looked at the documents and testimony in this case, Steele concludes (1) "[t]he representation of [Seven Seas] for the Chesapeake financing was appropriate, ethical and reasonably prudent"; and (2) M&T's "service as general counsel of [Seven Seas] and [Fuller's] simultaneous service as a member of the [Seven Seas] Board of Directors created a potential conflict of interest that never ripened into an actual conflict of interest." (*Id.* at 1). Seven Seas has moved to exclude Steele's testimony in its entirety.

The Company argues that Steele's opinions should be excluded because (1) they are based upon facts that are "indisputably wrong," *see Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (a court is not required by Rule 703 to admit an opinion based on "facts that are indisputably wrong"); and (2) they are predicated on an incorrect legal standard. With respect to the former, the court is unpersuaded that the factual underpinnings of Steele's opinions are "indisputably wrong." These facts are more appropriately classified as disputed. Thus, Seven Seas' critiques go the weight of Steele's testimony rather than its admissibility. *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) ("'[A]s a general rule, questions relating

to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'") (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)).  In terms of the legal standard used to analyze these disputed facts, Steele, like Watkins, will be permitted to testify about the standard of care of a reasonably prudent attorney, applying his legal understanding to the factual matters at issue.  *See Waco Int'l, Inc.*, F.3d at 533.

As such, Plaintiff's motion to exclude the expert testimony of Walter Steele (Doc. 331) is **denied**.

e.      Macey

Macey was retained to give expert opinions "regarding issues of corporate governance and public policy" relevant to this case.  (Macey Report ¶ 1, Doc. 146 Ex. 1).  Macey is the Sam Harris Professor of Corporate Law, Corporate Finance and Securities at the Yale Law School. (*Id.* at ¶ 2).  He has, *inter alia*, regularly consulted with boards of directors regarding corporate governance issues (Macey Dep., dated Oct. 5, 2005, at 17-18, Doc. 193 Ex.2); written extensively in the areas of corporate finance, corporate law, and securities law (Macey Report ¶ 8, Doc. 146 Ex. 1); and testified numerous times as an expert on a broad range of corporate governance issues (Macey Dep., dated Oct. 5, 2005, at 40-60, Doc. 193 Ex.2).

Plaintiffs have not challenged Macey's qualifications or opinions regarding the corporate governance issues in this case.  They do challenge, however, his qualifications to opine that "there was no violation of any professional duty or cannon or norm of conduct" by the Lawyers and that their conduct was "entirely appropriate." (Macey Dep., dated Oct. 5, 2005, at 141-42, Doc. 146 Ex. 2).  The court agrees that Macey is not qualified to offer opinions about the Lawyer's

professional negligence or ethical obligations.  Nothing in the record substantiates the Lawyers'
contention that Macey is qualifed to give opinions in the area of professional responsibility.  Nor
does Macey hold himself out as an expert in this area.  As such, Macey will not be permitted to give
expert testimony as to whether the Lawyers violated their professional obligations.  *See Wilson*, 163
F.3d at 937.

Plaintiffs' motion to limit the testimony of Jonathan Macey (Doc. 332) is, therefore,
**granted**.

3.    Directors' Motion for Summary Judgment

"The duty of loyalty dictates that a corporate officer or director must act in good faith
and must not allow his personal interest to prevail over the interest of the corporation." *Gearhart*,
741 F.2d at 719 (citing *Holloway*, 368 S.W.2d at 576).  An officer or director is considered
"interested" if he or she (1) makes a personal profit from a transaction by dealing with the
corporation or usurps a corporate opportunity, (2) buys or sells assets of a corporation, (3) transacts
business in his or her officer's or director's capacity with a second corporation of which he or she
is also an officer or director or is significantly financially associated, or (4) transacts corporate
business in his or her officer's or director's capacity with a family member.  *See id*.; *see also Landon
v. S & H Mktg. Group, Inc.*, 82 S.W.3d 666, 673 (Tex. App.--Eastland 2002, no pet.).  Whether an
officer or director is interested with respect to a particular transaction is a question of fact.
*Holloway*, 368 S.W.2d at 577; *Gearhart Indus., Inc.*, 741 F.2d at 719.  Once "interest" is
demonstrated, the burden shifts to the interested officer or director to show that the action under
consideration is fair to the corporation.  *See Gearhart*, 741 F.2d at 720.

The Trustee argues that the Directors breached their duty of loyalty by (1) authorizing the Secured Facility to drill the Deep Well (the Deep Well Transaction); and (2) building an allegedly uneconomical pipeline in order to either facilitate the Deep Well Transaction or to escape liability for making material misrepresentations.  The court addresses each in turn.

A.      The Deep Well Transaction

As an initial matter, the Trustee must demonstrate that the Directors were interested in this transaction.  It is undisputed that Directors Hefner, Fuller, and Schlesinger participated either directly or indirectly in the Secured Facility, taking mortgages on the Company's assets and warrants on the Company's stock.  Although the parties dispute Director Egolf's involvement in the Secured Facility, it is undisputed that Egolf Family Limited Partnership ("EFLP") was a participant in the financing and was controlled by Egolf's father, William Egolf.  Additionally, Egolf himself was either personally a 40% limited partner of EFLP or the sole beneficiary of a trust owning 40% of EFLP.[22]  At a minimum, the participation of EFLP raises a fact question as to whether Egolf personally participated in the transaction. A reasonable jury could infer these participating Directors were interested in the Deep Well Transaction because of their direct participation in the financing and their role as senior secured creditors.  *See id.* at 719.

Unlike Hefner, Fuller, Schlesinger, and arguably Egolf, Directors Ray and Devening did not directly participate in the transaction.  The Trustee claims that Ray and Devening were still "interested" because they acquiesced in the other directors' self-interested corporate actions.  In support, the Trustee offers evidence that Ray and Devening lacked independence and were beholden to the interested Directors, in particular, Hefner.  Although lack of independence does not directly

---

[22]      The record is ambiguous on this point.

align with any of the markers of interestedness identified in the *Gearhart* decision, a reasonable jury could conclude that the non-participating Directors did not act in good faith and facilitated the interested actions of the participating Directors.  As such, the court will permit the Trustee's breach of loyalty claim to proceed against the non-participating Directors.

Because there is a fact question regarding whether the Directors were interested, the court must address whether the Deep Well Transaction was entirely fair to the Company.  *See id.* at 720.  The court finds that there is a fact question regarding whether the Deep Well Transaction was fair.  The fact that CIBC reported to the Directors that the Secured Financing was fair from a financial point of view is not dispositive of whether the Deep Well Transaction, as a whole, was fair to the Company.  The evidence demonstrates that the participating Directors undertook a strategy that had a direct benefit to themselves, through their positions as senior secured creditors, and had only a remote possibility of benefit to the Company.  Hefner marketed the Secured Facility as a no-lose proposition for the participants: the loans, secured by the assets of the Company, would be repaid in the likely event that the Deep Well failed, and if the Well hit, then the participants could cash in their warrants on the Company's stock.  The Company's own projections demonstrated that, if the Deep Well failed, so would Seven Seas.  The Company's working interest partners in the Shallow Field echoed the same concerns to the Directors.[23]  The Directors claim that they did not

---

[23]        *See, e.g.*, July 12, 2000 Memorandum from Oppenheimer (a representative of the Company's working interest partners) to Hefner at MT019888 ("If the deep prospect fails or even stalls, the entire Shallow Field is lost to the senior noteholders in bankruptcy.  This is an all or nothing 'hit the deep or forget it proposal") (Doc. 207 Ex. 82); July 20, 2000 Memorandum from Oppenheimer to Hefner at SS0016224 (Your financial and disclosure problems are not our problems and we do not have any interest in a go-for-broke on the deep plan) (Doc. 207 Ex. 10); July 14, 2000 Oppenheimer Memorandum to Hefner at MT402161 ("Your proposal appears to be just another attempt to simply ignore your current predicament and 'go for broke' on a deep hit") (Doc. 207 Ex. 83).

subjectively believe that the Deep Well was an "all-or-nothing" proposal, but their subjective beliefs only underscore the necessity for trial.

The court concludes that the evidence, taken as a whole and in the light most favorable to the Trustee, merits consideration by a jury regarding whether the Directors breached their fiduciary duty of loyalty in participating in the Secured Facility and in authorizing the Deep Well. To the extent that there are factual questions regarding the interest of the Directors, the court finds that the Trustee's duty of care claim is viable as well. The formulation of the business judgement rule in Texas, as articulated in *Gearhart*, protects the decision of *disinterested* directors unless there is evidence of ultra vires or fraudulent conduct. Absent the business judgement rule, the interested Director's actions in this case are subject to scrutiny under the reasonableness standard of due care. *See Meyers v. Moody*, 693 F.2d 1196, 1209 (5th Cir. 1982) (defining "due care" as "that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances" in the director as fiduciary context). Having considered the briefing in both the current and former round of summary judgment motions, the court finds that there is a fact question as to whether the Directors breached their duty of care in the Deep Well Transaction.[24] Whichever label is ultimately affixed to the fiduciary duties in this case, the Trustee has marshaled more evidence than just rhetoric in support of his position that the Directors breached their fiduciary duties in authorizing a self-dealing transaction to effectuate a business plan with little chance of success.

---

[24] The court acknowledges this conclusion is at odds with its prior holding that "[f]acing the prospect of failure in its chosen business, the Directors' decision to gamble the Company's last resources on a Deep Well that could have enriched everyone holding shares of the Company is not a breach of any duty identified by the *Gearhart Industries* opinion." (Sept. 29 Order at 46, Doc. 267). The Sept. 29 Order did not address the interestedness of the Directors and the impact such interest has on the analysis of the Directors' fiduciary duties.

B.    The Pipeline Decision

In its Sept. 29 Order, the court stated,

> The Directors decision to build the pipeline presents a different problem. Although the decision to use a pipeline, rather than trucks, to transport oil is not subject to scrutiny by this court, if the Directors decided to build an otherwise useless pipeline to avoid an SEC investigation or to facilitate the breach of some other duty, then they might have violated the duty of loyalty that they owed to the Company.

(Sept. 29 Order at 46, Doc. 267).  Thus, the court held that the pipeline decision did not violate the Directors' duty of care to the Company, but may have violated their duty of loyalty to the Company. (*Id.* at 51).[25]

The Directors have moved for summary judgment on the grounds that the pipeline decision was not adequately pleaded in the Trustee's complaint and is now time-barred.  Under the Federal Rules of Civil Procedure, a plaintiff must plead sufficient facts to put the defense on notice of the theories on which the complaint is based.  *Simpson v. James*, 903 F.2d 372, 375 (5th Cir. 1990); *see also* Fed. R. Civ. P. 8.  The Trustee's Third Amended Complaint (Doc. 269) makes  no mention of the pipeline decision as an independent basis for holding the Directors liable for breaching their fiduciary duties.  Nevertheless, the pipeline decision is arguably a component of the Directors' self-interested gamble of the Company's assets on the Deep Well, which has been pled and argued at length.  Additionally, the Trustee provided notice to the Directors that he was seeking damages related to the pipeline decision during the discovery process (*see* Plaintiff's Eighth Supplemental Rule 26(a)(1) Disclosures, dated Oct. 6, 2005, at 15, Doc. 207 Ex. 2), and both the Trustee's and the Directors' experts offered opinions regarding the prudence of building the pipeline

---

[25]    The Trustee has not requested reconsideration of the court's holding on this matter.

(*see* June 3, 2005 Huddleston Report at 2, Carreras Decl. Ex. T, Doc. 314; July 22, 2005 George Report at 7-8, Carreras Decl. Ex. U, Doc. 314).  The court finds that the pipeline claim is sufficiently related  to the Secured Facility to have given the Directors notice of the claim from the Trustee's complaint and his disclosures.

The court finds that there is sufficient evidence to raise a fact question on whether the Directors breached their duty of loyalty with respect to the pipeline.  The Trustee argues that the Directors placed their own interests ahead of the Company's interest because (1) the pipeline helped facilitate their breach of loyalty with respect to the Deep Well Transaction and (2) the pipeline allowed the Directors to avoid personal "liability for putting misleading information out there . . ." (June 18, 2001 Handwritten Notes at MT 435698, Doc. 207 Ex. 79).  The pipeline may have been built, in part, to buy the Directors time to obtain the secured financing.  During 2000, while Hefner and others were actively negotiating the secured financing, the SEC made several inquiries regarding the construction of the pipeline, intimating that the Company's undeveloped reserves should not be classified as "proved" without the means of transporting the oil to market.  (*See. e.g.*, Feb. 2000 Inquiry, Doc. 207 Ex. 30; May 2000 Inquiry, Doc. 207 Ex. 109).  Egolf contemporaneously opined that he doubted the Company would be able to raise the necessary funds to drill the Deep Well "following a public announcement of a downward revision in reserves[.]"  (Egolf Memo, dated Feb. 13, 2000, at 2, Doc. 207 Ex. 31).  A reasonable jury may infer that the decision to build the pipeline was not made on the merits but rather to facilitate the Directors' breach of the duty of loyalty as the claim relates to the Deep Well Transaction.[26]

---

[26]    The court finds less compelling the Trustee's arguments regarding SEC liability.  Even assuming that SEC liability is a valid interest under Texas law, there is no evidence that the Directors actually faced personal liability in the event of a reserve write-down based on a failure to build the pipeline.  The handwritten notes reflect theoretical, not necessarily actual, bases of liability and do not appear to relate specifically to the pipeline decision.  Nevertheless, this

C.       Damages

In the Fifth Circuit, damages related to a directors' breach of fiduciary duty are defined broadly to include "any loss" suffered by the corporation as a result of the director's wrongful conduct. *Meyers*, 693 F.2d at 1214 (applying this rule to a duty of care claim). The Fifth Circuit has held that in breach of fiduciary duty cases, "litigants and courts must be flexible and imaginative in calculating the proper measure of damages." *Taylor Publ'g Co. v. Jostens, Inc.* 216 F.3d 465, 487 (5th Cir. 2000). This flexibility does not, however, excuse the need for the Trustee to prove causation and damages in a breach of fiduciary duty case. *See id.* Moreover, "Texas law requires that damages be established with a reasonable degree of certainty." *Roth v. Mims*, 298 B.R. 272, 295 (N.D. Tex. 2003) (citing *Dyll v. Adams*, 167 F.3d 945, 946-47 (5th Cir. 1999)). While uncertainty as to the amount of damages will not defeat recovery, uncertainty as to the fact of legal damages is fatal. *Id.*

Here, the Trustee seeks the following damages based on the Directors' self-interested, "bet-the-company" Deep Well Transaction: (1) $24.3 million for the money spent on the Deep Well itself; (2) $31 million for the loss in the marketable value of the Company's assets in the "forced fire sale" of the Shallow Field; (3) $13.8 million for the "otherwise useless" pipeline; and (4) $12.9 million for the asset value of the Company that would been available to the Company but for the Directors' actions.[27] Viewing the evidence in the light most favorable to the Trustee, these damage models are not uncertain as a matter of fact and may be submitted to a jury.

---

evidence may go to the good faith element of the breach of the duty of loyalty claim.

[27]       The Trustee has also offered other damage models, including (1) damages calculated by the amount necessary to return the Company to the position it occupied prior to the wrongful acts and omissions of the Defendants; (2) damages arising from Defendants' inadequate public disclosures because proper disclosures would have prevented the Secured Facility; (3) damages related to corporate monies that were improperly used to reimburse personal expenditures by or on behalf of Defendants; and (4) damages related to a loss in pressure in the Shallow Field because of the Directors' alleged intentional overdrilling of the field.

i.      The Cost of the Deep Well

The Trustee argues that the Company is entitled to reimbursement of the money "wasted" on the Deep Well.  It is undisputed that the Deep Well cost $24.3 million ($15 million in escrow from the Secured Facility and an additional $9.3 million due to a cost overrun in the drilling). Nor is it disputed that absent the Secured Financing the Deep Well would not have been drilled.  A reasonable jury could conclude that the costs associated with drilling the Deep Well are recoverable as damages for the self-serving actions of the Directors in authorizing the Deep Well Transaction.

ii.     The "Fire Sale" of the Shallow Field

In the much-disputed loss of marketability theory, the Trustee claims that the Directors' breach of fiduciary duties led to a foreseeable "fire sale" of the Company's oil properties when the properties were sold on an accelerated basis.[28]  The Directors claim that there is no evidence of a distressed sale because the Trustee approved the terms of the sale during the bankruptcy proceedings.  This argument is unpersuasive.  A "fair" price considering the circumstances at the time of the sale does not reflect the price that the Company could have fetched but for the alleged breach of the directors' fiduciary duties, especially given the fact questions regarding their interest in the transaction.  Stated differently, the fair market value in September 2002, *after* the Deep Well Transaction was consummated, may not reflect the fair market value of the Shallow Fields prior to that decision.  The court recognizes that other factors[29] may have contributed to the relatively low sales price of the Shallow Field, but a reasonable jury may conclude

---

[28]     The Trustee also claims that the amendment of the JOA of the Shallow Field in January 2001, which would vest operatorship of the Shallow Field in Sipetrol upon the Company's default, further impaired the marketability of the Shallow Field.  Knowing that operatorship would be lost in bankruptcy, the Company had to sell the properties quickly, which allegedly depressed the price.

[29]     A contributing factor could have been the substantial reserves write-down that occurred in 2002.

that the Directors' actions caused the properties to be sold on an accelerated basis and at a reduced price.

### iii.       The Cost of the Pipeline

The Trustee seeks recovery of the funds expended to build the pipeline, an undisputed $13.8 million.  If the jury concludes that the Directors did not build the pipeline in good faith but rather as a means to facilitate the Deep Well Transaction, then this amount would represent a loss suffered by the Company as a result of a breach of the Directors' duty of loyalty.  The Directors challenge this damage calculation because the Trustee's experts did not account for trucking and other costs that were saved as a result.  The court finds that this argument goes to the amount, rather than the uncertainty, of the damages and does not preclude this damage model.

### iv.       The Value of the Company

As of May 2001, the Company had $12.9 million in value related to other assets, "comprised primarily of cash, cash equivalents, and accounts receivable net of accounts payable." (*See* Graves Decl. ¶ 17, Doc. 220).  The Trustee claims that this money would have been available to the Company but for the Directors' "bet-the-company" scheme.  A reasonable jury could conclude that the Company is entitled to recover the damage to its assets that may have resulted from the potential breach of fiduciary duties in this case.

### v.       Whether an Insolvent Company can be Harmed

The Directors rely heavily on an oft-quoted portion of the Trustee's response to the Directors' original motion for summary judgment, which states that "[r]eorganizing or liquidating the Company would . . .devalue or destroy . . . the equity stake in the Company."  (Pl.'s Resp. at 1, Doc. 207).   Thus, claim the Directors, the Trustee cannot demonstrate harm to the Company because the Trustee's preferred alternative, restructuring, would have devalued the shareholder's

equity.[30]  The Directors' argument fails to consider, however, that their decision ultimately cost Seven Seas' its very existence, which is affirmative harm to all of Seven Seas' constituencies, including the shareholders.   The court notes that to hold otherwise would essentially permit a director to pursue any course of action without scrutiny if the corporation is in dire financial straits. Such a result would be untenable.[31]

For all the reasons discussed above, the Directors' motion for summary judgment on all claims remaining after the court's September 29, 2006, Order (Doc. 299) is **denied**.

4 .    The Entity Defendants' Motions for Summary Judgment

All of the Entity Defendants loaned money under the Secured Facility.[32]  Three of the participating Directors were either directly or indirectly associated with these Entities: Hefner controlled Ramiiilaj; Fuller was the trustee of a trust that served as the general partner of Fuller Family Investments; and Egolf is related to EFLP, which wholly owned Petroleum Properties.[33] The Trustee has asserted claims against the Entity Defendants for conspiracy, tortious interference, and aiding and abetting the Directors' breach of their fiduciary duties to Seven Seas.  Subsequent to the filing of the Trustee's original complaint, the Texas Court of Appeals issued *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398 (Tex. App.--Houston [1st Dist.] 2005, pet. denied), in which the court declined to recognize a cause of action for tortious interference with fiduciary duty.  *Id.* at

---

[30]     The Directors also critique Swick's determination that restructuring was a viable alternative because Swick never talked to any Bondholders about their preferences.  This is an issue for cross examination and not an adequate basis for excluding Swick's testimony.

[31]     Moreover, the Directors originally maintained that the Company was solvent and even produced expert testimony to this effect.

[32]     There is dispute over whether Petroleum Properties intended to invest.  Petroleum Properties ultimately assigned its notes to its parent, EFLP.

[33]     Egolf's father, William Egolf, controlled Petroleum Properties.

407.[34]  In light of this case, the Trustee does not oppose the dismissal of his cause of action against

the Entity Defendants for tortious interference.  (Trustee's Resp. 15-16, Doc. 311).  As such, the

court shall grant the Entity Defendants summary judgment on this claim.  The court shall address

the Trustee's remaining causes of action, aiding and abetting and conspiracy, as well as the Entity

Defendants' defense of *in pari delicto*.

### A.    Aiding and Abetting a Breach of Fiduciary Duty

Texas recognizes a cause of action for aiding and abetting a breach of fiduciary duty.

*See, e.g.*, *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (a

defendant's knowing participation in a breach of fiduciary duty gives rise to a viable cause of

action); *see also Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721 (Tex. App.--Austin

2001, pet. denied) (quoting *Kinzbach Tool Co.*, 160 S.W.2d at 514) ("'It is settled as the law of this

State that where a third party knowingly participates in the breach of duty of a fiduciary, such third

party becomes a joint tort-feasor with the fiduciary and is liable as such.'"); *Kline v. O'Quinn*, 874

S.W.2d 776, 786 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (same).  "To establish a claim

for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of

a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the

third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows*

*v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).[35]

---

[34]     *But cf. ABC Inc. v. Gill*, 6 S.W.3d 19, 28 (Tex. App.--San Antonio 1999, pet. denied) (granting a motion for
summary judgment as to a claim of tortious interference with fiduciary relationship, without addressing whether such
a claim is generally viable under Texas law), *overruled on other grounds by Turner v. KTRK TV., Inc.*, 38 S.W.3d 103,
115 (Tex. 2000)).

[35]     The Entity Defendants claim, citing the Restatement (Second) of Torts § 876, that aiding and abetting a breach
of fiduciary duty requires (1) the primary actor's activity accomplished a tortious result; (2) the defendant provided
substantial assistance to the primary actor in accomplishing the tortious result; (3) the defendant's own conduct, separate
from the primary actor's, was a breach of duty to the plaintiff; (4) the defendant's participation was a substantial factor
in causing the tort.  The Entity Defendants are incorrect on multiple grounds.  First, the full text of the Restatement offers
three, *disjunctive* ways in which a party can be found liable for assisting another in the commission of a tort:

In dispute here is whether the Entity Defendants "knowingly participated" in the breach of the Directors' fiduciary duties. The Trustee seeks to impute the knowledge of Hefner, Fuller, and Egolf to their corresponding Entity Defendant.[36] Texas follows the general rule that, except for knowledge obtained confidentially, the knowledge of the agent is the knowledge of the principal irrespective of its source or time of acquisition. *See Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 S.W.2d 352, 356 (Tex. 1965) (adopting the Restatement (Second) of Agency section 276 as an "exception" to the rule announced in *Tex. Loan Agency v. Taylor*, 29 S.W. 1057 (Tex. 1895), which held that an agent's knowledge is not imputed to his principal unless such knowledge was acquired while he was transacting the business of his principal); *Pan E. Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1128 (5th Cir. 1988) (noting that "exception" swallowed the rule in *Taylor* and that "Texas now follows the Restatement rule which imputes all knowledge of an agent (except that acquired in confidence) to his current principal"). The Entity Defendants claim that any knowledge obtained by their agents, i.e., by Hefner, Fuller, and (disputably) Egolf, was acquired confidentially and cannot be imputed. The record is ambiguous regarding the

---

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

    (a) does a tortious act in concert with the other or pursuant to a common design with him, **or**

    (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, **or**

    (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (emphasis added). Second, the full text of § 876 has not been adopted in Texas. *See Juhl v. Airington*, 936 S.W.2d 640, 643-44 (Tex. 1996) (not formally adopting the "substantial assistance" elements of the Restatement, but addressing them in connection with a "concert of action" claim). Finally, neither Texas nor Fifth Circuit precedent regarding aiding and abetting a breach of fiduciary duty supports the additional elements of proof cited by the Entity Defendants.

[36]    Petroleum Properties objects to the imputation of Egolf's knowledge to Petroleum Properties. The court finds the extent of Egolf's relationship with EFLP and Petroleum Properties to be an issue of fact.

confidentiality of the participating Directors' knowledge.  On the one hand, notice of the relevant terms of the Secured Financing were disclosed to the public in the Company's filings.  Nevertheless, the Trustee has claimed that certain disclosures were incomplete and/or materially misleading regarding, *inter alia*, the riskiness of the Deep Well Transaction.  Because the record is not sufficiently clarified, the court cannot say that all the information relating to the Deep Well Transaction was obtained confidentially such that the Trustee's claims fail as a matter of law. Summary judgment on this claim must be denied.

B.    Conspiracy

"A civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Goldstein v. Morgenson*, 113 S.W.3d 769, 778-79 (Tex. App.--Austin 2003, no pet.) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)); *see also Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968) (quoting *Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex. 1964)).  The elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.  *Juhl*, 936 S.W.2d at 644 (quoting *Massey*, 652 S.W.2d at 934).  "Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 926 (Tex. 1979) (quoting *State v. Standard Oil Co.*, 130 Tex. 313, 329, 107 S.W. 2d 550, 559 (1937)).  "Under Texas law, civil conspiracy is a derivative tort. If a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails." *Meadows*, 492 F.3d at 640.

Typically a conspiracy is proved by circumstantial evidence. *Schlumberger*, 435 S.W.2d at 858 (citing *Jernigan v. Wainer*, 12 Tex. 189 (1854)).  "Circumstantial evidence may be

used to establish any material fact, but it must constitute more than mere suspicion." *Transport Insurance Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995). (citing *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927-28 (Tex. 1993)) ("[S]ome suspicion linked to other suspicion produces only more suspicion, which is not the same as evidence."); *Schlumberger*, 435 S.W.2d at 858 ("vital facts may not be proved by unreasonable inferences from other facts and circumstances"; any vital fact must be proved "by evidence amounting to something more than a mere scintilla"). "When viewing meager circumstantial evidence, if 'circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred.'" *Transport*, 898 S.W.2d at 278 (quoting *$ 56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 662 (Tex. 1987)). Circumstantial evidence can include acts by or statements of the alleged conspirators. *Holloway*, 368 S.W.2d at 581-82 ("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").

Ramiiilaj and Fuller Family Investments argue that there is no evidence to support the "meeting of the minds" element because (i) the acts of an agent and its principal are the acts of a single entity and cannot constitute conspiracy and (ii) corporate agents cannot conspire with each other when they participate in corporate action.  Petroleum Properties argues that the Trustee fails to provide evidence of  the "meeting of the minds" element because Egolf's knowledge can not be imputed to Petroleum Properties.  All Entity Defendants claim that the conspiracy claim fails because loaning money is not an unlawful act.

Ramiiilaj and Fuller Family Investments' arguments fail.  While it is true, as a general proposition, that the acts of an agent and its principal are the acts of a single entity and cannot constitute conspiracy, *see Fotjtik v. First Nat'l Bank*, 752 S.W.2d 669, 673 (Tex.

App.–Corpus Christi 1988, writ denied), the facts of this case raise a jury question concerning whether the agents knowingly agreed with each other, as well as with the Lawyers, to participate in the alleged breach of the Directors' fiduciary duties.

With respect to Petroleum Properties' argument, the court finds there is a fact question regarding the extent of Egolf's involvment with EFLP and/or Petroleum Properties such that summary judgment is not appropriate.

Finally, the fact that loaning money, standing alone, is not an unlawful act does not warrant summary judgment on the Trustee's conspiracy claim. The "meeting of the minds" element is "to accomplish an unlawful purpose **or** to accomplish a lawful purpose by unlawful means." *Transport*, 898 S.W.2d at 278 (emphasis added). The Entity Defendants have essentially collapsed unlawful purpose and unlawful means. The unlawful purpose in this case is the alleged breach of the Directors' fiduciary duties to the Company, which is a question of fact for the jury.

C.       *In Pari Delicto*

The Entity Defendants maintain that the Trustee's claims are barred by the doctrine of *in pari delicto* because their actions were taken with the cooperation of the Company's management.[37]  The doctrine of *in pari delicto*, or "in equal fault," is an equitable defense based on the common-law notion that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing. *Howard v. Fidelity & Deposit Co. (In re Royale Airlines)*, 98 F.3d 852, 855 (5th Cir. 1996) (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)).  The Trustee does not deny that alleged wrongdoing of the Directors would be imputed to the Company and place the Company *in pari delicto* with the Entity Defendants; rather,

---

[37]       The Entity Defendants' reliance on *Shearson Lehman Hutton Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), for the proposition that the Trustee lacks standing to assert these claims is misplaced. The Fifth Circuit has clarified that a potentially valid defense on the merits of the claim, such as *in pari delicto*, does not preclude the Trustee from bringing the claim. *See Schertz-Cibolo-Universal City v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1286 (5th Cir. 1994).

the Trustee argues that the Entity Defendants were "insiders" of the Company such that the *in pari delicto* defense does not apply. *See, e.g., Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005) ("*In pari delicto* will not operate to bar claims against insiders of the debtor corporation."); *Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563, 577 n.23 (Bankr. S.D.N.Y. 2003) ("*In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners.") (citing *Goldin v. Primavera Familienstiftung, TAG Assocs. (In re Granite Partners)*, 194 B.R. 318, 322 (Bankr. S.D.N.Y. 1996)); *Official Comm. Of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999) ("[T]he *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider."); *Official Comm. Of Unsecured Creditors v. Shapiro (In re Walnut Leasing Co.)*, No. 99-526, 1999 WL 729267, at *5 (E.D. Pa. Sept. 8, 1999) ("Vis-à-vis their corporations, insiders cannot avoid the consequences of their own handiwork.") (unpublished); *Official Comm. of Unsecured Creditors v. Shapiro*, No. 99-526, 2001 WL 1468250, at *1 (E.D. Pa. Nov. 16, 2001) ("[I]nsiders exercise control over a corporation and should not benefit from *in pari delicto*, which is an equitable defense.") (unpublished); *In re Healthsouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107 (Del. Ch. 2003) ("[T]he application of the *in pari delicto* doctrine has been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own conduct vis-à-vis their corporations.").

In the bankruptcy context, an "insider" of a corporation "includes," in relevant part, "(i) [a] director of the debtor; (ii) [an] officer of the debtor; (iii) [a] person in control of the debtor . . .[or] (vi) [a] relative of a general partner, director, officer, or person in control of the debtor[.]" 11 U.S.C. § 101(31)(B).  A statutory insider also includes an "affiliate, or insider of an affiliate as

if such affiliate were the debtor." *Id.* § 101(31)(E).[38] The statutory definition of "insider" is not

exhaustive. *See Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (S.D.N.Y.

2002) ("[I]n providing that the term insider 'includes' the statutory insiders, Congress made clear

that 'insider' is not limited to these six categories. Thus, the statutory list is not exhaustive, and it

is for the courts to define the limits of non-statutory insider status."). In determining whether an

entity or person qualifies as a non-statutory insider, courts generally rely on the legislative history

of the insider definition and hold that "an insider under 11 U.S.C. § 101[31] is an entity or person

with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer

scrutiny than those dealing at arms length with the debtor.'" *Wilson v. Huffman (In re Missionary*

*Baptist Foundation, Inc.)*, 712 F.2d 206, 210 (5th Cir. 1983) (citing S. Rep. No. 95-989, 95th Cong.,

---

[38]      An "affiliate," under the Bankruptcy Code, "means," in relevant part, as follows:

> (A) [an] entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--
>
>> (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
>>
>> (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
>
> (B) [a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--
>
>> (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
>>
>> (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote . . .

11 U.S.C. § 101(2)(A)-(B).

2d Sess., *reprinted in* [1978] U.S. Code Cong. & Admin. News, pp. 5787, 5810).  Insider status is ultimately a question of fact.  *Id.*

The court finds that there is a question of fact regarding whether the Entity Defendants qualify as "insiders" in this case.  It is undisputed that Hefner, Fuller, and William Egolf (Director Brian Egolf's father) are all statutory insiders under 11 U.S.C. § 101(31)(B)(i), (ii), and (vi).  A reasonable jury could conclude that the Entity Defendants, through these contacts, had a "sufficiently close relationship" with Seven Seas to be considered an insider of Seven Seas.  *See In re Fortune Natural Res. Corp.*, 350 B.R. 693, 696 (Bankr. E.D. La. 2006) ("Indeed, when [the son of the corporate debtor's director] is without question an insider of the debtor, it would be both folly and a triumph of form over substance to hold that the LLC over which [the son] exerts complete control is not an insider.").  The Entity Defendants' *in pari delicto* defense may yet prevail, but the issue must be submitted to a jury for resolution.

For these reasons, Ramiiilaj's motion for summary judgment (Doc. 300), Fuller Family Investments' motion for summary judgment (Doc. 301), and Petroleum Properties' motion for summary judgment (Doc. 302) are **granted-in-part and denied-in-part**.

### 5.   The Lawyers' Motion for Summary Judgment

The Lawyers have moved for summary judgment on all the claims pending against them, which include conspiracy to breach the Directors' fiduciary duties, aiding and abetting the Directors' breach of fiduciary duties, legal malpractice, and breach of fiduciary duty.  The court addresses first the claims relating to the Lawyers' contribution to the Directors' alleged breach of fiduciary duty (conspiracy and aiding and abetting) and then the claims relating directly to the Lawyer's own duties (negligence, breach of fiduciary duty).

A.      Conspiracy and Aiding and Abetting Breach of Fiduciary Duty

The Lawyers argue that the aiding and abetting a breach of a fiduciary duty and conspiracy claims impermissibly fracture Seven Seas' negligence claim. Texas law prohibits a plaintiff from fracturing his negligence claim into other claims; if the gist of the claim is that the attorney did not exercise the degree of care as an attorney of ordinary skill, then the plaintiff has asserted a negligence claim, not a breach of fiduciary duty claim. *Deutsche v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 189 (Tex. App.--Houston [14th Dist.] 2002, no pet.). If, on the other hand, the "client's complaint is more appropriately classified as another claim, for example . . . breach of fiduciary duty . . . then the client can assert a claim other than negligence." *Id.* Here, the conspiracy and aiding and abetting claims concern the Lawyers' actions vis-à-vis the other Defendants, in particular, the Directors' breach of fiduciary duties. Where supporting evidence exists, Texas law permits a party to bring both a malpractice action based on his lawyer's breach of independent duties and a separate claim for the lawyer's assistance with the breach of another's fiduciary duties. *See, e.g., Turoff v. Jackson Walker, L.L.P. (In re Precept Bus. Servs., Inc.)*, Nos. 01-31351-SAF-7, 04-3216, *9-11 (Bankr. N.D. Tex. Aug. 23, 2004) (denying summary judgment on bankruptcy trustee's dual claims against debtor's former law firm for legal malpractice and for aiding and abetting breach of fiduciary duties owed by debtor's directors). The general rule against fracturing a negligence claim does not, therefore, apply to Seven Seas' conspiracy and aiding and abetting breach of fiduciary duty claims.

The Lawyers also argue that aiding and abetting a breach of fiduciary duty claim is redundant to a conspiracy claim and should be dismissed. The court disagrees. Aiding and abetting a breach of fiduciary duty and conspiracy are two separate claims with different elements of proof.

*See Days Inn Worldwide, Inc. v. Sonia Investments*, No 3:04-CV-2278-D, 2006 WL 3103912, at *19 n.20 (N.D. Tex. Nov. 2, 2006) ("Civil conspiracy is a separate cause of action that requires, *inter alia*, an underlying tort and a 'meeting of the minds' among the coconspirator 'on the object or course of action' to be taken.  By contrast, a cause of action under *Cox* and *Kinzbach* requires only the knowing participation of a party in a breach of a fiduciary duty and does not require a conspiratorial agreement.") (internal citations omitted).  Seven Seas can allege both causes of action under the facts of this case.

With respect to the attack on the merits of these causes of action, the court finds that issues of material fact preclude summary judgment.  A reasonable jury could find that the Lawyers' actions in providing legal services to consummate the Deep Well Transaction and their knowledge regarding the "unlawful purpose" of the Transaction satisfy the elements of a civil conspiracy. Moreover, a reasonable jury could conclude that the Lawyers knowingly participated in the Directors' alleged breach of fiduciary duty.  Finally, because a reasonable jury could confer insider status to the Lawyers, the affirmative *in pari delicto* defense has not been established as a matter of law.  Seven Seas may pursue these claims at trial.

B.      Claim Fracturing: Negligence & Breach of Fiduciary Duty

The rule against fracturing a negligence claim does apply to the claims brought directly against the Lawyers as fiduciaries.  Thus, the court will begin by addressing the basic legal principles of claims for negligence and breach of fiduciary duty and then determine if Seven Seas' breach of fiduciary duty allegations have impermissibly fractured its negligence claim.

i.      Negligence

An attorney is held to the standard of care that would be expected to be exercised by a reasonably prudent attorney. *Cosgrove v. Grimes*, 774 S.W.2d 662, 664-65 (Tex. 1989) (rejecting good faith standard for "attorney's reasonableness in choosing one course of action over another"; "[t]he standard is an objective exercise of professional judgment, not the subjective belief that his acts are in good faith."); *Campbell v. Doherty*, 899 S.W.2d 395, 397 (Tex. App.--Houston [14th Dist.] 1995, writ denied); *Tolpo v. Decordova*, 146 S.W.3d 678, 682 (Tex. App.--Beaumont 2004, no pet.); *Aiken v. Hancock*, 115 S.W.3d 26, 28 (Tex. App.--San Antonio 2003, pet. denied). To succeed on a legal malpractice action grounded in negligence, a plaintiff must prove that "'(1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred.'" *Alexander*, 146 S.W.3d at 117 (quoting *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995)). The attorney's conduct is evaluated based on the information that the attorney had at the time he was allegedly negligent. *Cosgrove*, 774 S.W.2d at 664. On summary judgment, the defendant may prevail by producing uncontroverted expert testimony demonstrating that his challenged acts were within that standard of care. *Palmer v. Espey Huston & Assoc.*, 84 S.W.3d 605. 611 (Tex. App.--Corpus Christi 2002, pet. denied); *Longoria v. United Blood Services,*, 907 S.W.2d 605, 611 (Tex. App.--Corpus Christi 1995). Generally, causation is a fact question, but may be decided as a matter of law if reasonable minds could not reach a different conclusion. *Zenith Star*, 150 S.W.3d at 530. Furthermore, "to recover damages, a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant [attorney]." *Haynes & Boone v. Bouldin*, 896 S.W.2d 179, 181 (Tex. 1995).

ii.    Breach of Fiduciary Duty

An attorney has a fiduciary duty to his client as a matter of law. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988); *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App.--Dallas 2004, no writ). That duty requires an attorney "to render a full and fair disclosure of facts material to the client's representation." *Willis*, 760 S.W.2d at 645. Breach of that duty is tantamount to concealment. *Id.* The word "fiduciary" "refers to integrity and fidelity." *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.--Houston [14th Dist.] 2001, no pet.) (quoting *Kinzbach*, 160 S.W.2d at 512). Therefore an attorney owes his client a fiduciary duty of good faith, which includes absolute candor, openness, and honesty, without concealment or deception. *Combs v. Gent*, 181 S.W.3d 378, 384 (Tex. App.--Dallas 2005, no pet.); *Tanox v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 253 (Tex. App.--Houston [14th Dist.] 2003, pet. denied). A claim for breach of that duty may arise when an attorney obtained improper benefit from representing the client. *Gibson*, 126 S.W.3d at 330 (citing *Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 923 (Tex. App.--Fort Worth 2002, pet. denied)). Examples of breaches of an attorney's fiduciary duty include benefitting improperly from the attorney-client relationship by subordinating the client's interests to the attorney's, retaining the client's funds, engaging in self-dealing, improperly using the client's confidences, failing to disclose conflicts of interest, and making misrepresentations to obtain these results. *Id.* (citing *Goffney*, 56 S.W.3d at 193 ("Breach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentation.")). *See also Vinson & Elkins v. Moran*, 946 S.W.2d 381 (Tex. App.--Houston [14th Dist.] 2001, no pet.)

(finding that the law firm breached its fiduciary duty to a client based on evidence that the law firm failed to disclose conflicts of interest and acted in its own interest).

The elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary relationship (either as a matter of law or a matter of fact) and (2) a breach of the fiduciary duties by the attorney defendant (3) that causes (4) damage to the plaintiff. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.–Houston [1st Dist.] 2003, no pet.) (citing *Avary v. Bank of Am. N.A.*, 72 S.W.3d 779, 792 (Tex. App.–Dallas 2002, pet. denied); *see also* Restatement (Third) of the Law Governing Lawyers § 49 (2000).[39]   Nevertheless, a long recognized equitable remedy for breach of a fiduciary duty is fee forfeiture. *Arce v. Burrow*, 958 S.W.2d at 246.  Where a plaintiff seeks the remedy of fee forfeiture and proves his claim of breach of fiduciary duty, there is no requirement that he must prove causation or damages.   *Id.* at 248-49 (and cases cited therein)("forfeiture is complete and automatic upon proof of a breach"), and 239-40 & nn. 35-37.  *Arce*'s rule does not apply, however, where a plaintiff seeks actual damages resulting from his fiduciary's breach.  *Longaker v. Evans*, 32 S.W.3d 725, 733 n.2 (Tex. App.--San Antonio 2000, pet. withdrawn).  In such a case, a plaintiff must still prove causation and damages.

iii.     Application to the Facts

In its complaint Seven Seas claims that the Lawyers either intentionally or negligently breached their fiduciary duties (1) by failing to fully inform Seven Seas of numerous conflicts of interests; (2) by providing legal representation and advice to Seven Seas while such conflicts existed; (3) by failing to withdraw from representing Seven Seas when certain conflicts of

---

[39]     Texas courts have long cited the draft form and the final version of this Restatement as a guide for various issues. *See, e.g., Hoover Slovacek, LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006); *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159-60 (Tex. 2004); *Levine v. Bayne, Snell & Krause, Ltd.*, 40 S.W.3d 92, 95 (Tex. 20002).

interest likely would have or did impair their judgment; (4) by putting the interests of M&T and

Fuller ahead of those of the Company; and (5) by "other acts."  With respect to the fourth claim,

Seven Seas alleges that the Lawyers placed their interests ahead of those of the Company when they

"chose not to: (i) advise the Directors to empanel an independent committee to analyze the Secured

Financing, (ii) hire an independent counsel to provide the legal opinion for the closing, (iii) disclose

the risks of the Company's business plan in the public documents they drafted and filed, or (iv)

disclose that the Company's publicly reported reserves were overstated."  (Pl.'s Resp. at 45, Doc.

312).   The "other acts" allegation refers to the Lawyers (i) obtaining a distressed company

exemption from the AMEX, (ii) failing to fully disclose the risks associated with the Deep Well in

the Company's public filings, (iii) failing to provide an accurate opinion letter, and (iv) failing to

recommend that a special committee be appointed because a majority of the Directors participated

in the Secured Facility.  (*See* Pl.'s Resp. to Interrogatory No. 5, Doc. 135 Ex. 24).

        The focus of a breach of fiduciary duty claim is whether an attorney obtained an

improper benefit from representing a client. *O'Donnell v. Smith*, 234 S.W.3d 135, 146 (Tex.

App.–San Antonio 2007, pet. filed).  The focus of a legal malpractice claim, in contrast, is whether

the attorney adequately represented the client. *Id.*; *see also Kimleco*, 91 S.W.3d at 923; *Aiken*, 115

S.W.3d at 28.   The court finds that the underlying allegations concerning the Lawyers "putting the

interests of M&T and Fuller ahead of those of the Company"and "other acts" complain about the

adequacy of the representation rather than an improper benefit accruing to the Lawyers.  As such,

these allegations relate solely to Seven Seas' negligence claim.

        Next, the court must determine whether the remaining allegations, failing to disclose

a conflict of interest, providing legal advice while conflicted, and failing to withdraw based on a

conflict of interest, state a separate claim for a breach of fiduciary duty.  Texas courts "have reached

different results in deciding whether a conflict-of-interest allegation against a lawyer gives rise to

a claim for professional negligence or some other cause of action."  *Murphy v. Gruber*, 241 S.W.3d

689, 695 (Tex. App.–Dallas 2007, no pet. h.).  The fact that a "conflict of interest" is alleged does

not necessarily give rise to a separate cause of action for a breach of fiduciary duty:  *Id.* at 697.

Nevertheless, the court finds that the "gist" of the conflict-of-interest allegations in this case is the

Lawyers obtained an improper benefit from their dual roles, which speaks to a breach of fiduciary

duty claim.

   Agreeing that the conflict claims sound in breach of a fiduciary duty, the Lawyers

object to Seven Seas predicating a portion of its negligence claim on the alleged conflicts of interest.

The Lawyers claim that the same facts cannot support both a negligence and breach of a fiduciary

duty claim.  The court in *Deutsch* addressed and dismissed this argument:

> Though [the client] alleged the same facts in his petition for both his
> negligence and breach-of-fiduciary-duty claims, this pleading
> practice is not determinative. The procedural rules allow a claimant
> to plead in the alternative . . .When, as in this case, the evidence
> raises a genuine issue of material fact regarding alleged wrongful
> conduct that sounds in negligence as well as alleged wrongful
> conduct that sounds in breach of fiduciary duty, the trial court should
> charge the jury on both claims, regardless of any alternative pleading.
> . . .Therefore, the trial court erred to the extent it granted a directed
> verdict as to [the client's] allegations concerning conflicts of interest
> on the basis that these allegations impermissibly fractured [the
> client's] negligence claim.

97 S.W.3d at 190-91 (internal citations omitted).  Thus, the court will address the conflict-of-interest

allegations in the context of both the negligence and breach of a fiduciary duty claim to determine

whether summary judgement is appropriate.

   C.  The Merits of the Negligence/Breach of Fiduciary Duty Claims

-73-

(i)     Negligence

As noted above, a plaintiff alleging negligence must prove that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred.  *Alexander*, 146 S.W.3d at 117.  In general, Seven Seas alleges that the Lawyers were negligent by (1) engaging in impermissible conflicts of interest, (2) failing to adequately advise the board regarding the Deep Well Transaction, and (3) enabling the Company to make misrepresentations in its public filings.   The court concludes that no genuine issue of material fact exists and that summary judgment in favor of the Lawyers on this claim  is warranted.

It is undisputed that Fuller wore numerous hats during the relevant time period: he was a director of Seven Seas, a lender in the Secured Facility, and an attorney for Seven Seas. However, there is no evidence that the board did not know about Fuller's multiple roles.  The only evidence offered by Seven Seas that the conflicts were not adequately disclosed is the testimony of Watkins, who cannot testify as to what the board knew.  As such, the allegation that the Lawyers failed to disclose the alleged conflicts is without merit.

In terms of the remaining allegations, even assuming such duties existed, Seven Seas has not offered the testimony of any person associated with the Company who was dissatisfied with the Lawyer's legal performance.  Indeed, the Lawyers accomplished what Seven Seas asked them to do with respect to the Deep Well Transaction.

Finally, Seven Seas has failed to raise a genuine issue of material fact regarding causation.  There is no evidence that but for the Lawyers' advice and actions, the Secured Facility would not have been approved or the Deep Well drilled.  *See Longaker,* 32 S.W.3d at 734-35 (cause

-74-

in fact not established as matter of law in absence of evidence that client would have taken different action in absence of bad advice from lawyer); *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 734-736 (Tex. App.--San Antonio 2007, ) (cause in fact not established in absence of evidence client would have pursued different option if advised by bank and lawyer which had not breached fiduciary duty). The expert opinions offered by Ferchill and Watkins to the contrary are speculative and conclusory and insufficient to prove causation.

For these reasons, the court will grant the Lawyers summary judgment on Seven Seas' negligence claim.

(ii)     Breach of Fiduciary Duty

The relevant allegations on this cause of action are that the Lawyers breached their fiduciary duty by failing to disclose a conflict of interest, providing legal advice while conflicted, and failing to withdraw based on a conflict of interest. The parties have filed competing motions for summary judgment.

As noted above, there is no competent evidence that the Lawyers failed to disclose any conflicts of interest. Nor has Seven Seas provided any evidence that providing legal advice while conflicted or failing to withdraw caused the harm in this case, i.e., the consummation of the Deep Well Transaction. Nevertheless, Seven Seas has sought fee forfeiture pursuant to *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999), which does not require a finding of causation and damages.

The remedy of fee forfeiture is restricted to those cases in which there has been "clear and serious" violations of duty. *Id.* at 241. "A violation is clear if a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful." *Id.* (internal quotation marks and citations omitted). In determining whether fee

forfeiture should be ordered, the court examines "the gravity and timing of the violation, its wilfulness, its effect on the value of the lawyer's work for the client, and the adequacy of other remedies." *Id.* The question of whether a violation has been "clear and serious" is one that must be determined by the court.

The court declines to rule at this time regarding the fee forfeiture issue. Questions of fact remain regarding the extent of the Lawyers' conflicts, which can be more fully developed at trial. Accordingly, the court will deny without prejudice the cross motions for summary judgment on this claim.

V.          Conclusion

Accordingly, and for all of the reasons discussed above, it is hereby

ORDERED that Seven Seas' motion for summary judgment (Doc. 295) is DENIED WITHOUT PREJUDICE;

ORDERED that the Lawyers' motion for summary judgment (Doc. 297) is GRANTED-IN-PART and DENIED-IN-PART;

ORDERED that the Directors' motion for summary judgment (Doc. 299) is DENIED;

ORDERED that Ramiiilaj's motion for summary judgment (Doc. 300) is GRANTED-IN-PART and DENIED-IN-PART;

ORDERED that Fuller Family Investments' motion for summary judgment (Doc. 301) is GRANTED-IN-PART and DENIED-IN-PART;

ORDERED that Petroleum Properties' motion for summary judgment (Doc. 302) is GRANTED-IN-PART and DENIED-IN-PART;

ORDERED that the Defendants' motion to the strike summary judgment evidence (Doc. 251) is DENIED;

ORDERED that the Defendants' motion to preclude the proposed expert witness testimony of Dean Graves, Dean Swick, and Pete Huddleston (Doc. 333) is DENIED;

ORDERED that the combined motion of the Defendants to preclude the expert testimony of Cary Ferchill (Doc. 324) is GRANTED-IN-PART and DENIED-IN-PART;

ORDERED that the Lawyers' renewed motion to exclude the testimony of Thomas Watkins (Doc. 325) is GRANTED-IN-PART and DENIED-IN-PART;

ORDERED that the Trustee's second motion to preclude or limit the expert testimony of Walter Bratic (Doc. 328) is GRANTED;

ORDERED that the Plaintiffs' second motion to limit the expert testimony of Don Ray George (Doc. 329) is DENIED;

ORDERED that the Trustee's motion to limit the expert testimony of Ronald Vollmar (Doc. 330) is DENIED;

ORDERED that Seven Seas' second motion to exclude the expert testimony of Walter Steele (Doc. 331) is DENIED; and

ORDERED that the Plaintiffs' second motion to limit the expert testimony of Jonathan Macey (Doc. 332) is GRANTED.  It is further

ORDERED that the parties' motions in limine (Docs. 327 & 334) and Plaintiffs' motion to equalize the peremptory challenges (Doc. 326) are DENIED WITHOUT PREJUDICE, as the court's resolution of the pending dispositive motions may have altered the relief sought.

Trial remains set for June 16, 2008, at 9:00 a.m.

SIGNED at Houston, Texas, this 31st day of March, 2008.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE